Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Nicholas A. West (SBN 309003) *nw@mckennonlawgroup.com*
**MCKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone: 949-387-9595 | Fax: 949-385-5165

Attorneys for Plaintiff Jason Kim

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| JASON KIM,<br><br>    Plaintiff,<br><br>vs.<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA; and DOES 1 through 10, inclusive,<br><br>    Defendants. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br><br>**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES**<br><br>[Filed Concurrently With:<br>- Civil Cover Sheet;<br>- Summons; and<br>- Certification of Interested Parties] |

Case No.:

# JURISDICTION AND VENUE

1. Plaintiff Jason Kim ("Plaintiff") brings this action to recover benefits and to enforce and clarify his rights under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B). This Court has subject matter jurisdiction over Plaintiff's claim pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f), and 28 U.S.C. Section 1331.

2. Venue lies in the Central District of California, Southern Division, pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because Plaintiff resides in this district, some of the alleged breaches occurred in this district, and the ERISA-governed plan at issue was administered in part in this district.

# THE PARTIES

3. Plaintiff is an individual who, at all times relevant to this action, was a citizen of the State of California, residing in the City of Ladera Ranch in Orange County. Further, at all times relevant to this action, Plaintiff was a participant, as defined by ERISA Section 3(7), 29 U.S.C. Section 1002(7), in the employee welfare benefit plan (the "Plan") that was established by his former employer Dreamhaven, Inc. ("Dreamhaven").

4. Defendant The Guardian Life Insurance Company of America ("Guardian"), at all times relevant, administered long-term disability ("LTD") benefits provided to Plan participants, including Plaintiff, by issuing group policy number 571606 (the "Policy") to Dreamhaven. The Policy and Plan promised to pay LTD benefits to Plaintiff should he become disabled.

5. The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sues DOES 1 through 10 by fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of DOES 1 through 10 when the same are ascertained.



1  DOES 1 through 10 are sued as principals and/or agents, servants, attorneys, or
2  employees of said principals, and all of the acts performed by them were within the
3  course and scope of their authority and employment.  Plaintiff is informed and
4  believes and thereupon alleges that each of DOES 1 through 10 is legally
5  responsible in some manner for the events referred to herein, and directly and
6  proximately caused the damages and injuries to Plaintiff, as hereinafter alleged.

## FACTUAL BACKGROUND

### A. **Plaintiff's Occupation**

6. Plaintiff was employed as an art director at Dreamhaven.  He managed Dreamhaven's software and related projects dealing with the art style, story themes, game engines, and product designs of the software.  He had a managing role related to the "user-experience."  He worked with artists, engineers, and game directors.  This was a sedentary occupation involving a great deal of time sitting at a computer and attending numerous meetings.  He worked long hours.  His job required constant attention to detail and strong interpersonal skills.

### B. **The Policy**

7. Under the Policy, Plaintiff is entitled to disability benefits if he is disabled.  The Policy states:

> Disability or Disabled:
>
> These terms, when used alone, mean (a) Total Disability or Totally Disabled; or (b) Partial or Residual Disability.
>
> **Total Disability or Totally Disabled** means that as a result of Sickness or Injury, during the Elimination Period and the Own Occupation period, You are not able to perform with reasonable continuity the substantial and material acts necessary to pursue Your Usual Occupation and You are not working in Your Usual Occupation. After the end of the Own Occupation period, Total Disability or Totally Disabled means that as a result of Sickness or Injury You are not able to engage with reasonable continuity in any occupation in which You could reasonably be expected to perform satisfactorily in light of Your age, education, training, experience, station in life, and physical and mental capacity.



8. The Policy excludes coverage for pre-existing conditions. It states:

**Pre-Existing Conditions:** You are not covered for a Disability caused or substantially contributed to by a pre-existing condition or medical or surgical treatment of a pre-existing condition.

You have a pre-existing condition if:

You received medical treatment, care or services for a diagnosed condition or took prescribed medication for a diagnosed condition in the three months immediately prior to the effective date of Your insurance under this Certificate; or

You suffered from a physical, or mental condition, whether diagnosed or was misrepresented or not disclosed in Your application (i) for which You received a Doctor s advice or treatment within three months before the effective date of Your insurance under this Certificate, or (ii) which caused symptoms within three months before the effective date of Your insurance under this Certificate for which a prudent person would usually seek medical advice or treatment; and

Disability caused or substantially contributed to by the condition begins in the first 12 months after the effective date of Your insurance under this Certificate.

No benefits are payable for Disability caused by, contributed to, by, or resulting from a Pre-Existing Condition; unless the Disability starts after You complete at least one full day of Active Work after the date You have been covered under this Certificate for 12 Months in a row.

C. **History of Plaintiff's Disability and the Claims Process**

9. Plaintiff started working for Dreamhaven in mid-2020. He was an art director. Through his work, he acquired LTD coverage with Guardian. The coverage became effective on May 1, 2020. The "look-back" period for purposes of the pre-existing condition exclusion is from February 1, 2020 through April 30, 2020.

10. Before working at Dreamhaven, Plaintiff suffered from depression, anxiety, and attention deficit hyperactivity disorder. These problems were relatively minor and did not interfere with his work.



11. On January 5, 2021, Plaintiff started to suffer from fever, chills, and "cognitive clouding." He tested positive for COVID-19. He started to suffer unusual and severe symptoms, including severe restlessness, agitation, panic, and insomnia. He was temporarily treated with olanzapine (Zyprexa). This provided some relief.

12. Plaintiff's agitation and restlessness continued. Doctors prescribed him another cycle of olanzapine/Zyprexa. He continued to take the medication until March 23, 2021.

13. After starting this cycle of medications, he started to suffer from shuffled gait, rocking movements, pacing, "horrible" skin sensations, constant shaking of his head, staring at the ceiling, unusual and grotesque positioning/ movements, and abnormal uncontrollable facial movements such as movements of the jaw and puckering of the lips. He suffered from severe cognitive problems that affected his memory and ability to process basic information.

14. On March 25, 2021, Carolyn Neff, M.D., a neurologist, diagnosed Plaintiff with tardive dyskinesia ("TD") and tardive akathisia ("TA"). She concluded that Plaintiff could not return to work. In early 2021, as a result of his TA, Plaintiff started to suffer from severe mental health problems.

15. TD and TA are movement disorders characterized by involuntary movements such as repetitive tapping, squirming, and marching movements. They are a life-threatening neurological disorder caused by an adverse reaction to certain medications. These conditions also produce a myriad of mental health problems.

16. On May 10, 2021, Plaintiff underwent a neuropsychological evaluation that revealed that he suffered from "Mild Neurocognitive Disorder."

17. Plaintiff began being treated by Kenneth Martinez, M.D., on May 13, 2021. Dr. Martinez completed an "Attending Physician's Statement of Disability" for Guardian. He explained that Plaintiff could not return to work until at least July 20, 2022. He further explained that Plaintiff "has uncontrolled movements due to



tardive dyskinesia and is unable to stay [continuously] in one position due to tardive akathisia."

18.  Plaintiff was treated by Robert Lee, D.O., M.S.  Dr. Lee treated Plaintiff to lessen the psychological trauma of what Plaintiff was experiencing.

19.  On or about June 23, 2021, Plaintiff submitted a claim for LTD benefits to Guardian.

20.  After an inadequate and cursory investigation, Guardian denied the claim.  It had concluded that Plaintiff was not disabled due to TA and TD.  He was allegedly disabled due to mental health problems, which it claimed were covered under the pre-existing condition exclusion under the Policy.  Before Guardian issued a formal denial letter, it informed Plaintiff's wife, Rachel Kim, that the pre-existing condition clause may apply.  Mrs. Kim informed others of Guardian's position.  On July 10, 2021, the insurance broker responsible for selling Dreamhaven the Policy sent an email to Guardian that stated:

> We are needing some help.  Dreamhaven employee Jason Kim who you have been helping us on a few things with is having a terrible time.  He exhausted STD, and is now working through the LTD claim, but Guardian is coming back saying there is a pre-ex situation.  His current ability is a severe health situation, that we believe started due to him contracting COVID-19 (well within his employment).  Guardian is saying because he had some previous medical notes on anxiety, they will exclude and deny LTD.
>
> This feel[s] extremely immoral to us.
>
> It is clear that the situation is not a pre-ex from anxiety … as I'm sure you can understand, anxiety is a very common diagnosis which many have, and this is a severe health case.
>
> We need to partner with Guardian and Burnham to do the right thing.
>
> This family is facing horrors.  They have small children and without the LTD benefit they will lose their livelihood.  The frustration from ownership is immense and at this point they are so disappointed with this benefit that they have invested in … feeling little faith – let['1]s fix this.
>
> HELP!

21. On July 13, 2021, Jennifer Larocco, a regional service manager for Guardian, sent an email to Jennifer Baker, one of Guardian's LTD case managers. Ms. Larocco wrote:

> Do we have reason to believe that this person may have had a serious medical condition or underlying condition prior to contracting covid? It will certainly help Mike in his explanation to the Broker and also help with some credibility if we have some additional information without disclosing too much due to HIPAA. I know A LOT of people are developing long term problems due to covid that were perfectly healthy before[.] I'm sure we get this question all the time, trying to help with the perception from the Broker and Client as to why we are doing further investigation.

22. Ms. Baker responded by explaining:

> **The records do not indicate prior treatment for some of the employee's current complaints**. The policy dictates that we do need to thoroughly investigate all conditions treated in the lookback period to determine if they were pre-existing. Once all the medical is in, it will be reviewed by our Professional Resources Team which includes Registered Nurses and Behavioral Health Case Managers who will assist in determining if the condition should be considered pre-existing. (Emphasis added).

23. In an email dated August 6, 2021, Plaintiff's wife contacted Guardian as part of the ongoing claims process. In her email, she wrote:

> Also, I'm confused why we wouldn't qualify for Long term disability. I understand that we were just shy of the 12-month mark to automatically receive benefits, but it is especially disheartening to be told a pre-existing diagnosis of ADHD/depression/anxiety could disqualify the benefits that are needed. Jason never was previously diagnosed with akathisia, dyskinesia, dystonia, a movement disorder, or a cognitive disorder. He was always high functioning before and while he struggled with anxiety and depression, it never stopped him from being productive and working full time or functioning as a parent either. Now we're just trying to get him to be able to do a few tasks around the house and feel lucky when he can sit still or possibly talk to a neighbor to try to be by himself for a period that's longer than an hour.
>
> I know that the nurses are in charge of going through his medical records, and while there is a previous diagnosis[,] they should also



notice that there were only occasional visits for his ADHD/depression medication since 2019. It wasn't until January of this year that he had any serious doctors['] visits or any psychiatric hospital stays. There have been so many telehealth, urgent care, ER, inpatient, etc[.] visits while previously it was always routine before January 2021. Hopefully, the nurse in charge of his case will try to see the difference.

24. In a letter dated August 18, 2021, Guardian denied Plaintiff's claim for LTD benefits. It concluded that Plaintiff was only disabled for pre-existing conditions or, at a minimum, from conditions related thereto. In particular, it stated:

> [W]e investigated your claim to determine if you received advice or treatment from a doctor or took prescribed medications for Generalized Anxiety Disorder during the "look-back period" of February 1, 2020 through April 30, 2020.
> . . .
> Upon review of your prescription history, you were prescribed Lexapro, an SSRI used to treat depression and anxiety. You were given 100 days of refills, at 1 pill a day, with 1 refill. This would imply you were taking this medication for the period of November 18, 2019 through June 4, 2020, during our lookback period of February 1, 2020 through April 30, 2020. Your psychiatric impairment is considered pre-existing as a result of this.
> . . .
> Because you received treatment for your Major Depressive Disorder, Severe without Psychotic Symptoms, Generalized Anxiety Disorder, and Mild Neurocognitive Disorder during the "look-back period", these conditions and all related conditions and/or complications are pre-existing conditions as defined by the Plan.

25. Guardian also concluded that Plaintiff was not disabled for TA/TD, but rather, he was simply mentally disturbed. Guardian completely misinterpreted that pre-existing condition exclusion by focusing on whether Plaintiff had "received advice or treatment from a doctor or took prescribed medications for Generalized Anxiety Disorder during the 'look-back period . . . .'" instead of properly focusing on whether Plaintiff had received advice or treatment from a doctor or took prescribed medications for TA and TD during the look-back period.



26.   In fact, Guardian's employees were far from sure whether the pre-existing condition limitation applied.  As an August 24, 2021 internal email between Michael Steward, executive sales consultant, and Ms. Baker states:

> Hi Jessica, our broker continues to push on this and I want to make sure that we looked at this one from every angle.  Did we receive all of the medical info/history that we needed to make an informed decision on the condition being pre-existing?  Was the decision made in any way based on a lack of necessary information?  IF the member appeals, what kind of information would be needed to re-consider the decision?
>
> The broker and employer are convinced this condition was triggered by the onset of Covid which I am told was diagnosed after our policy was in place.  I don't really know any details of the condition but just need to make sure our broker is confident we made an honest attempt to provide the protection the group purchased.

27.   In response, Ms. Baker stated:

> The information used to make the claim decision was medical in nature.  We obtained all the information the claimant advised us was available.  The claimant would need to send in additional information on appeal that would indicate he was not [being treated] for his disabling condition during the lookback period.

28.   This response evidenced that Guardian had already concluded that Plaintiff was not disabled due to anything but a pre-existing psychological condition and it was not willing to change its position.

29.   On February 7, 2022, Plaintiff appealed the denial of his claim.  With his appeal, Plaintiff submitted updated medical records and a statement from Dr. Martinez.  In his statement, Dr. Martinez elaborated on Plaintiff's condition as follows:

> Tardive dyskinesia (TD) is a medication-induced hyperkinetic movement disorder and tardive akathisia (TA) is a medication-induced movement disorder manifested by repetitive tapping, squirming, and marching movements. **Both disorders are solely caused by the use of dopamine receptor-blocking agents, including the antipsychotic drug Zyprexa.** TD encompasses a wide range of abnormal, involuntary movements that often persist after discontinuation of the causative



> medication. TD and TA can be irreversible and lifelong. The condition can be disfiguring and disabling, with major negative impacts on psychologic health and quality of life.
>
> . . .
>
> Jason Kim was initially evaluated by Dr. Martinez on 5/13/21 due [to] his continued uncontrolled movements and he agreed with Jason's diagnoses of TD and TA. Jason continues to have uncontrolled movements that are magnified by increased adrenaline and medication stimulants. These movements are still consistent with his original diagnoses of TD and TA. Jason's movements worsen when he is anxious and is consistent with his diagnoses of TD and TA. His movements are not distractible or consistent with a conversion disorder. **Jason's movement may improve as his anxiety is better controlled, but his underlying movement disorder is a neurological disorder, not a mental health condition.** Jason's movement disorder causes him to be unable to stay in a stationary position on the computer or in meetings for extended periods, and a stressful work environment would only exacerbate his movements. Therefore, it is our recommendation that Jason Kim does not work until his symptoms are better controlled. (Emphasis added.)

30. With his appeal, Plaintiff included a letter from Dr. Lee in which he explained:

> This letter is written at the request of Jason Kim, who is a patient under my psychiatric care. Jason has a disorder that causes certain functional limitations. The symptoms that he is currently exhibiting however are not due to depression, anxiety, or ADHD. His current difficulties with movements, cognitive slowing are neurologic in nature. It is unclear at this time as to what has caused these problems but likely a side effect to a trial of medication for mental health is implicated. The patient's current ability to function is impaired to the extent that he is not able to work. Recovery has been slow[,] but patient has been engaged and has been doing what he can to reach a state of being more independent and functional. Please reconsider Mr. Jason Kim's claim.

31. With his appeal, Plaintiff also included statements from his friends, a co-worker, and family. They had watched his condition and provided insight into Plaintiff's circumstances. Plaintiff's wife explained that:

In January 2021, Jason had a typical case of covid until around day 14 when he started to have a lot of pressure in his head. Within 24 hours he lost his cognition and personality. He wasn't able to sleep and it was like seeing a completely different man. I've been married to him for 13 years and had never seen him so outside of himself. Doctors gave him medication which helped him sleep again. After 4 days, the pressure in his head dissipated and I thought he was finally recovering from a very strange case of covid. He had pretty intense brain fog and insomnia . . . He stopped being able to read, he had an inability to stop moving, he couldn't communicate with coworkers anymore, he lost his ability to process information and make decisions, and he lost his short-term memory. From February to July, I was telling him the same things every 5-20 minutes. He had no awareness of his sickness and could only repeat what I tried to explain to him all day, though he seemed to never fully process any new information. It was a horrible thing to watch him lose his control over his mind, speech, body movements, and lose all of his relationships, including with his children. Before his neurological symptoms started, he loved to play and parent our children[;] all of a sudden he was so panicked he went months with almost no interaction with them. He was in a constant state of writhing movements (made worse by Parkinson's medication they gave him to try to stop the Akathisia disorder, the new medication caused dyskinesia which causes really disfiguring facial and fully body twisting movements.) At the same time his cognition made no sense and was illogically agitated. He couldn't sit down and I could barely keep him alive until August when we put him on a new medication for the movement disorder.

He still has akathisia which causes difficulty just being in his skin. He is constantly uncomfortable. For most of the day he's just trying to figure out ways to be in his skin and also trying to do occupational therapy because he hates being unemployed. He still can't manage his thoughts, they're often illogical and his judgement skills are still not there. His movements get increasingly worse when agitated. He would be unable to sit in meetings or even video calls due to his facial and body movements. He isn't able to have a "poker face" anymore and every uneasy thought will have a dystonic or dyskinesia movement to go with it. Once he's even mildly agitated[,] his hips, legs, start to writhe and he can't control his facial movements or his groaning or vocal tics. He doesn't have functionality. His processing is still limited and he still gets physically and emotionally wiped out after interacting with others for even short periods of time. . . .



He needs constant coaching throughout the day and help to manage tasks and to stay calm. He still doesn't have a perception of time and can't manage his very detailed medication schedule. He has an extremely difficult time starting any task or even taking our dog outside on a walk or going outside with our kids. He still has great difficulty engaging in simple daily living skills. It's hard to express how this past year has changed almost every part of my husband's personality, skills, and relationships. He is not able to manage full time employment, work relationships, or maintain a schedule.

32. Mrs. Kim's parents – James and Colleen Harper – also provided a statement in support of Plaintiff's appeal. In their statement, they explained:

We traveled to Jason and Rachel's home with the purpose of offering support to them and their children. Jason was in the behavior hospital the first 3 days of our visit. When he came home, we experienced Jason in a way that we had never seen him in the many years we have known him. We were shocked by the stark contrast of how he was compared to the Jason we have known since the beginning of his marriage to Rachel. He constantly had to move his body in grotesque, involuntary ways. He frequently shook his head violently from side to side. He was unable to sit still and felt driven to pace back and forth and all around the house. He frequently did face grimaces which he was unaware of doing. He had balance problems which was evidenced in his walking, gait, and if he tried to do anything where he needed good balance.

. . .

Jason also had problems with speech. He could not generate sentences with more than about three words, and his generation of even these short phrases took a lot of time. He had trouble comprehending normal conversation. It was obvious, it took him a long time to process information as evidenced by his slowness in responding to questions and his difficulty tracking normal conversations. He had severe short term memory problems. It was typical to have a short conversation with him, and he would not be able to remember any of it 30 minutes later. Several times on this visit, we thought we had conversations that were important only to find that he could not remember any of the conversation within a few hours, and he certainly could not remember anything we talked about in previous days. Jason could not comprehend what he would read. He would read one paragraph and not be able to tell you what it was about. In contrast to the bright, analytic, able to learn anything Jason that we had known prior to January 2021, he was



> confused by conversations, words, and could not learn from reading or watching videos. We had never seen Jason this way. Where we had always experienced Jason as organized, creative, able to understand complex information, good at making decisions and analyzing the outcomes, good awareness of self and how he works inside, we were confronted with his inability to understand and remember even simple things, his inability to make decisions or even understand what decisions need to be made, and certainly his ability to be analytical because he could not remember, he could not process information if he remembered it, and this also meant he couldn't analyze outcomes or organize things enough to make coherent sense of them. His previous creativity-his sketching and drawing when we were around him-- had all disappeared. He could not create art. He could not even copy art. He had trouble remembering to eat. He was unable to drive because of slow processing and his uncontrollable body movements and his general problems with comprehending things as simple as stop lights or traffic signs.

> We also observed changes in Jason's emotions and his perception of himself. He was highly agitated. Since we are both licensed therapists, we have diagnosed and treated many patients with anxiety. What Jason was experiencing seemed far more associated with his uncontrollable body movements and his inability to process verbal and visual information than any anxiety cases we have seen in our many years of practice. He had great difficulty showering because he said the water hurt his skin. He said his skin burned underneath, and the uncontrollable movements helped relieve that some. He made uncontrollable vocalizations such as moaning, grunting, and sometimes short words. When it was pointed out to him that he did this, he seemed unaware. It was like his ability to regulate himself—his body, his emotion, his speech, his creativeness, and organization—was gone. He was having trouble sleeping and could only get 3-4 hours of sleep.

33. Plaintiff's colleague, Wesley Rockholz, also submitted a personal statement in support of Plaintiff's appeal. He stated in part:

> In September 2021, Jason and I met for lunch. I noticed that Jason had some trouble moving, he was slow to walk and didn't appear totally balanced in his motions. While we were talking, he had some physical ticks where he would cover his face or turn his head or take pauses in the conversation as though he was wrestling against some physical compulsion. While our conversation was mostly pleasant, Jason had some trouble keeping his train of thought or remembering earlier



comments in the conversation. He also described to me some of what he had been going through following contracting COVID-19, and it was devastating to hear how much he suffered mentally, physically, and emotionally. Though I was glad to see him recovering, I could tell that he was not himself anymore, and that whatever happened to him had taken a toll on his mind and body. I hope that this provides some clarity on how sharply Jason's health declined after he was exposed to COVID-19.

34. As part of the appeals process, Guardian submitted Plaintiff's medical records to Leon Meytin, M.D. for a paper review and analysis. Dr. Meytin's highly biased report ridiculously concluded that Plaintiff's medical conditions were not serious and did not prevent him from working full-time:

> From a physical neurological perspective, there were no restrictions placed.
> This is a claimant with significant psychiatric history of anxiety, depression, suicidality. When started on Zyprexa in January 2021, it appears that the claimant developed akathisia and possibly tardive dyskinesia. Zyprexa was stopped[,] and symptoms seemed to improve. although it is unclear if they fully resolved. However, by 03/25/2021 (time period of review), there is no indication that the tardive symptoms were severe enough to lead to restrictions. The majority of his issues were psychiatric in nature, including suicidal ideation and attempts, as well as psychiatric inpatient admissions. Repeat notes document that the claimant continues with anxiety, depression, suicidal thoughts, racing thoughts, overwhelming thoughts, repetitive movements.
> . . .
> The claimant was started on Zyprexa on 1/20/2021 for severe anxiety, depression, and suicidal ideation. It was then stopped due to tardive symptoms. Thus, January 2021 would be the start of the tardive symptoms. From a physical neurological perspective, there were no restrictions placed.

35. In a letter dated August 30, 2022, Dr. Martinez very persuasively responded to Dr. Meytin's report, strongly disputing the conclusion that Plaintiff was not disabled from his condition:

> I have been presented with the report produced by Dr. Leon Meytin. I strongly disagree with his position that Mr. Kim was not disabled due



to his Tardive Akathisia ("TA") and Tardive Dyskinesia ("TD"). These neurological conditions were quite severe and left him unable to perform many basic activities required to perform his job. Contrary to Dr. Meytin's assertions, Mr. Kim's TA and TD affected nearly every aspect of Mr. Kim's life and left him unable to work. My position was further outlined in my letter dated October 25, 2021. I stand by the contents of that letter. Mr. Kim could not work at the time in question due to his TA and TD.

36. In an addendum, Dr. Meytin reaffirmed his completely unsupported and preposterous position that Plaintiff's severe TA and TD conditions did not disable him, but he did acknowledge that an Independent Medical Examination ("IME") would be needed to make a definitive determination. He further explained that:

> Additional records were reviewed. Additional records did not provide any new abnormal neurological exams, abnormal imaging, or any other neurological information that would change my original opinion.
>
> . . .
>
> If there continues to be discrepancy with the claimant[']s possible restrictions, a formal IME would be most prudent as I do not physically examine or evaluate the claimant, and am only supplied with medical records to review.

37. Of note, Guardian never ordered the IME that Dr. Meytin recommended. This failure to follow its own doctor's recommendation was a sign of Guardian's improper bias to deny the claim. *See Evans v. Sun Life & Health Ins. Co.*, 601 F.App'x 497, 498 (9th Cir. 2015) (noting that acting contrary to the opinion of its own physician was a clear sign that an insurer had abused its discretion). In its subsequent denial of the appeal letter dated September 30, 2022, Guardian referenced Dr. Meytin's addendum report but completely ignored any reference to his IME recommendation.

38. Furthermore, Dr. Meytin, and Guardian, both failed to consider the statements from Plaintiff's family members further corroborating Plaintiff's



1  disability. This was also highly improper. *See Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 904–07 (9th Cir. 2016).

39. Guardian also submitted the medical records to Elbert Greer Richardson, M.D., who is board-certified in psychiatry. Dr. Richardson concluded that Plaintiff was disabled for psychological reasons. Of note, however, Dr. Richardson stated that Plaintiff's condition was reflective of "severe side effects from Zyprexa including akathisia, it is reasonable that the claimant's symptoms would have interfered with his occupational functioning." Dr. Richardson indicated that his TA and TD conditions were diagnosed after Plaintiff's prescription of Zyprexa in February 2021. Two weeks later he was prescribed with Lithium and Trazadone. This timeline would, by definition, mean that these conditions were not pre-existing conditions. Once again, Guardian did not heed the analysis of its own doctors and further revealed its bad faith towards Plaintiff. *See Evans*, 601 F.App'x at 498.

40. On September 30, 2022, Guardian denied Plaintiff's appeal. Guardian relied exclusively on the opinions of its paper reviewers. It ignored Dr. Meytin's recommendation that an IME be performed and Dr. Richardson's opinion that the condition was induced via medications. Guardian simply concluded that the pre-existing condition clause applied, and it denied the claim stating that "Mr. Kim filed a claim for disability due to the akathisia and dyskinesia; however, these conditions are the results of medication that he was given to him as result of his prior history of depression and anxiety."

41. Of note, Plaintiff's doctors were proven correct in their assertion that his problems were neurological in nature. After approximately one year in his treatment for his physical conditions, in mid-2022, Plaintiff was able to return to work. Both his physical and mental health problems greatly improved after his TA and TD were properly treated. Plaintiff had suffered from a severely adverse reaction to the medications that he had taken to treat his COVID-19. He was not disabled due to a relevant pre-existing condition or a condition remotely related

thereto. Guardian's denial of his claim for benefits was in error. Plaintiff is entitled to his disability benefits under the Policy.

### FIRST CLAIM FOR RELIEF

To Recover Benefits, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest under an ERISA Plan – 29 U.S.C. Sections 1132(a)(1)(B), (g)(1)

(Plaintiff against Guardian and Does 1 through 10)

42. Plaintiff incorporates the previous paragraphs as though fully set forth herein.

43. ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan, and/or to clarify his rights to future benefits under the terms of a plan.

44. At all times relevant, Plaintiff has been entitled to LTD benefits under the Plan. By denying Plaintiff's claim for LTD benefits, and by related acts and omissions, Guardian violated, and continues to violate, the terms of the Plan, and Plaintiff's rights thereunder.

45. Guardian has failed to follow the claims-processing requirements of ERISA and of the Department of Labor Regulations and has failed to conduct a "full and fair review" of the claim denial – an act required by 29 U.S.C. Section 1133(2). Thus, even if the Plan vests discretion in Guardian to make benefits determinations, no deference is warranted with regard to Guardian's handling of this claim. *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

46. A "prudent person" standard is imposed on ERISA fiduciaries. *See* 29 U.S.C. § 1104(a)(1)(b). A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan. *See* 29 U.S.C. Section 1104(a)(1). Under ERISA: (1) a

1 fiduciary must perform its duties solely in the interest of plan participants and
2 beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a
3 fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may
4 not act in any capacity involving a plan, on behalf of a party whose interests are
5 adverse to the interests of that plan, its participants, or its beneficiaries. Guardian's
6 handling of Plaintiff's disability benefit claim falls far short of these standards.

7     47.     For all of the reasons set forth above, the decision to deny disability
8 insurance benefits was arbitrary, capricious, wrongful, unreasonable, irrational,
9 contrary to the evidence, contrary to the terms of the Plan, and contrary to law.
10 Guardian abused its discretion by deciding to deny this claim, as the evidence shows
11 that its denial decision was arbitrary and capricious and an abuse of its discretion.
12 Further, Guardian's denial decision and related actions heighten the level of
13 skepticism with which a court views a conflicted administrator's decision under
14 *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006), and
15 *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008). Guardian's denial
16 of Plaintiff's claim constitutes an abuse of discretion.

17     48.     As a direct and proximate result of Guardian's denial of disability
18 benefits, Plaintiff has been deprived of LTD benefits under the Policy.

19     49.     As a direct and proximate result of the denial of his claim for LTD
20 benefits, Plaintiff has been required to incur attorneys' fees to pursue this action,
21 and he is entitled to reimbursement of these fees, pursuant to 29 U.S.C. Section
22 1132(g)(1).

23     50.     A controversy now exists between the parties as to whether Plaintiff is
24 disabled as defined in the Plan and therefore entitled to LTD benefits. Plaintiff
25 seeks the declaration of this Court that he meets the Plan's definition of "disability"
26 and is entitled to benefits under the Plan. In the alternative, Plaintiff seeks a remand
27 to the claims administrator for a determination of Plaintiff's claim that is consistent
28 with the terms of the Plan.



51. Plaintiff alleges all of the same conduct against Does 1 through 10 as he does against Guardian in this First Claim for Relief and in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1. For all Plan benefits due and owing to Plaintiff, including LTD benefits.
2. For costs and reasonable attorneys' fees pursuant to 29 U.S.C. Section 1132(g).
3. For pre-judgment and post-judgment interest on the principal sum, accruing from the date on which the obligations were incurred. *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992). Specifically, Plaintiff seeks interest at the rate of 10% per annum, pursuant to California Insurance Code Section 10111.2.
4. For such other and further relief as this Court deems just and proper.

Dated: August 23, 2023        **McKENNON LAW GROUP PC**

By: _/s/ Robert McKennon_
ROBERT J. McKENNON
NICHOLAS A. WEST
Attorneys for Plaintiff, Jason Kim