OPHIR JOHNA (SBN 228193)
OJohna@maynardnexsen.com
KAREN T. TSUI (SBN 305869)
KTsui@maynardnexsen.com
MAYNARD NEXSEN LLP
10100 Santa Monica Boulevard
Los Angeles, CA 90067
Telephone:  310.596.4500

Attorneys for Defendant
The Guardian Life Insurance Company of America

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON KIM,<br><br>          Plaintiff,<br><br>     v.<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, and DOES 1 through 10,<br><br>          Defendant. | Case No. 8:23-cv-01579-DOC-ADSx<br><br>(Honorable David O. Carter, Crtrm: 10A, Santa Ana)<br><br>**DEFENDANT'S OPENING TRIAL BRIEF**<br><br>Trial:   April 15, 2024<br>Time:  8:30 a.m.<br>Crtrm: 10A, Santa Ana<br><br>Complaint Filed:  August 23, 2023 |

i

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................ 3

        A.      The Plan and Its Relevant Provisions ..................................... 3

        B.      Kim's History of Depression, Anxiety, ADHD, Insomnia,
                and Other Mental Health Issues and Treatment ...................... 5

        C.      Kim's COVID-19 Infection ...................................................... 7

        D.      Kim's Continued Depression, Anxiety, Insomnia, and
                Related Treatment ..................................................................... 7

        E.      Kim Is Diagnosed With Tardive Dyskinesia and Tardive
                Akathisia As a Result of His Psychotropic Medication Use ....... 8

        F.      Guardian Denies Kim's Claim for LTD Benefits Based on
                the Pre-Existing Condition Exclusion .................................... 10

        G.      Guardian Affirms Its Denial on Appeal Based on Reviews
                from Three Independent, Board-Certified Physicians ............ 12

        H.      Kim Returns to Work .............................................................. 15

III.    GUARDIAN CORRECTLY DETERMINED THAT LTD
        BENEFITS ARE NOT PAYABLE DUE TO THE PLAN'S PRE-
        EXISTING CONDITION EXCLUSION .......................................... 15

        A.      The De Novo Standard of Review ........................................... 15

        B.      The Plan's Pre-Existing Condition Exclusion Is Enforceable ........... 16

        C.      The Plan's Pre-Existing Condition Exclusion Bars Any
                Recovery By Kim Because His Pre-Existing Depression,
                Anxiety, and Related Conditions and Treatment Caused or
                Substantially Contributed to His Claimed Disability ............ 17

                1.      Kim Had an Extensive Pre-Existing History of
                        Diagnosed Depression, Anxiety, and ADHD, for
                        Which He Took Prescribed Medication During the
                        "Lookback Period" ....................................................... 18

                2.      Kim's Depression, Anxiety, and Related Conditions
                        Continued to Worsen Leading Up to His Claimed
                        Disability ...................................................................... 18

                3.      Kim Was Prescribed Zyprexa in January 2021 to
                        Treat Depression and Anxiety Symptoms; He Was
                        Not Prescribed Zyprexa to Treat COVID-19

i

1

Symptoms ............................................................................. 19

2            4.    It Is Sufficient That Kim's Pre-Existing Condition
                   Substantially Contributed to His Claimed Disability,
3                  Irrespective of Any Other Alleged Causes ............................. 23

4    IV.    CONCLUSION ............................................................................. 25

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page(s)**

**Cases**

3

4

*Biggar v. Prudential Ins. Co. of Am.*,
   274 F.Supp.3d 954 (N.D. Cal. 2017).................................................................22, 23

5

*Earle v. Unum Life Ins. Co. of Am.*,

6

   2021 WL 4871785 (9th Cir. 2021) ...........................................................................23

7

*Ekno v. Northwestern Mut. Life Ins. Co.*,

8

   2008 WL 782728 (E.D. Cal., 2008)...........................................................................24

9

*Est. of Maurice v. Life Ins. Co. of N. Am.*,

10

   792 Fed.Appx. 499 (9th Cir. 2020).....................................................................17, 23

11

*Hulbert v. Hartford Life & Acc. Ins. Co.*,

12

   2021 WL 3291888 (N.D. Cal. 2021) .........................................................................22

13

*Ibrahim v. Bayer Corp. Disability Plan*,

14

   584 Fed.Appx. 743 (9th Cir. 2014)............................................................................23

15

*Johnson v. Aetna Life Ins. Co.*,

16

   2017 WL 6043086 (C.D. Cal. 2017) ...................................................................22, 23

17

*Kearney v. Standard Ins. Co.*,

18

   175 F.3d 1084 (9th Cir. 1999) (en banc) ..................................................................16

19

*McClure v. Life Ins. Co. of N. Am.*,

20

   84 F.3d 1129 (9th Cir. 1996) .......................................................................16, 17, 23

21

*McCool v. Life Ins. Co. of N. Am.*,

22

   2018 WL 6137163 (C.D. Cal. 2018) .........................................................................22

23

*Muniz v. Amec Constr. Mgmt., Inc.*,

24

   623 F.3d 1290 (9th Cir. 2010) ..................................................................................15

25

*Quesinberry v. Life Ins. Co. of N. Am.*,

26

   987 F.2d 1017 (4th Cir.1993) (en banc) ...................................................................17

27

28

*Sanchez-Levine v. Metro. Life Ins. Co.*,
  2017 WL 4286139 (C.D. Cal. 2017) ..................................................................23

*Seleine v. Fluor Corp. Long-Term Disability Plan*,
  598 F.Supp.2d 1090 (C.D. Cal. 2009) ..............................................................22

*Shaw v. Life Ins. Co. of N. Am.*,
  144 F.Supp.3d 1114 (C.D. Cal. 2015) ..........................................................22, 23

*Stratton v. Life Ins. Co. of N. Am.*,
  589 F.Supp.3d 1145 (S.D. Cal. 2022) ..............................................................22

*Wilkerson v. Riffage.com Disability Income Prot. Pgm.*,
  303 Fed.Appx. 408 (9th Cir. 2008)..........................................................16, 17, 23

# I.    <u>INTRODUCTION</u>

This is an ERISA-governed dispute concerning the applicability of a pre-existing condition exclusion to bar a claim for long-term disability ("LTD") benefits. It is a unique case in which the claimant's own doctors agree with the plan administrator's conclusions.   The only source of disagreement is the claimant himself, who urges the Court to eschew the opinions of all doctors who have treated him or who have reviewed his claim and instead to accept his own lay opinion as to the cause of his alleged disability.  The applicable standard of review is *de novo*.

The plan under which Plaintiff Jason Kim ("Kim") was covered conspicuously provides that it does not cover a disability that begins in the first 12 months of Kim's coverage if it was "caused or substantially contributed to by a pre-existing condition or medical or surgical treatment of a pre-existing condition."  A "pre-existing condition" is defined as one (i) for which Kim received medical treatment, care, services, or advice, or (ii) for which Kim took prescribed medication, or (iii) which caused symptoms, within the three months immediately prior to the effective date of Kim's coverage.  Under well-settled Ninth Circuit law, such a provision bars coverage where a pre-existing condition **substantially contributes** to a disability, *even if another condition is shown to be a "predominant" or "proximate" cause of the disability*.

It is uncontroverted that Kim had a pre-existing condition as defined by the plan.  Kim admits that he "suffered from depression, anxiety, and attention deficit hyperactivity disorder" prior to becoming covered under the plan [Complaint, ¶10], and he indisputably took prescribed Lexapro and Adderall for these conditions during the three months immediately preceding the May 1, 2020 effective date of his coverage.  After becoming covered, Kim continued to see various doctors for myriad complaints including depression, anxiety, and poor sleep.  His depression progressed to the point that, on November 30, 2020, Kim scheduled a psychiatry consultation to discuss undergoing a multi-session course of transcranial magnetic

stimulation ("TMS"), which applies powerful magnetic fields to the brain to treat severe depression. Kim saw his psychiatrist for his worsening depression again on January 4, 2021.

On January 19, 2021, Kim complained of intense anxiety, "dark thoughts," and insomnia. He was prescribed Zyprexa, anti-psychotic medication used to treat depression and anxiety. In the ensuing months, Kim continued to suffer from significant depression and anxiety symptoms. He was hospitalized involuntarily for suicidal ideation, and later required an emergency room visit for a "suicidal" overdose of Zyprexa. On March 25, 2021, Kim's neurologist diagnosed him with tardive dyskinesia and tardive akathisia, which she opined were *caused by Zyprexa*.[1] Kim subsequently saw at least *three other doctors* who similarly opined that his movement disorders were caused by his Zyprexa use.

Kim claims to be disabled as of March 25, 2021 (within 12 months after becoming covered) due to tardive dyskinesia and tardive akathisia. All of Kim's treating physicians—and Guardian's independent physician consultants—agree that these conditions were caused by Zyprexa, which Kim took to treat his pre-existing condition. Indeed, it is no coincidence that, after Kim discontinued Zyprexa, his conditions eventually improved to the point that he was able to return to work. Still, Kim inexplicably insists that his allegedly disabling conditions were caused by a brief COVID-19 bout in January 2021. *No doctor has endorsed this theory, which finds no medical support whatsoever.* To the contrary, Kim had a "normal," complication-free course of COVID-19 that did not require any medication or treatment. An independent infectious disease specialist explicitly rejected Kim's and his family's assertion that his disabling conditions were caused by COVID-19 as lacking any "verifiable evidence."

---

[1] Tardive dyskinesia is a movement disorder characterized by uncontrollable, abnormal, and repetitive movements of the face and body. Tardive akathisia is a neuropsychiatric syndrome that is associated with psychomotor restlessness. Both are well-known side effects of Zyprexa.

In sum, the Administrative Record establishes that Kim's pre-existing condition and related treatment substantially contributed to his claimed disability. Guardian accordingly is entitled to judgment in its favor.

## II. <u>FACTUAL BACKGROUND</u>

### A. The Plan and Its Relevant Provisions

Moonwell Studios, LLC ("Moonwell") established, maintained, and sponsored the Moonwell Studios, LLC OS, LLC Plan (the "Plan"), an ERISA-governed employee welfare benefit plan. [AR 359] Among other benefits, the Plan provided LTD benefits to eligible employees through group policy no. G-00571606, issued to Moonwell by Guardian (the "Policy"). [AR 477] Guardian also acted as the claims administrator for LTD benefits under the Plan. [AR 300] Kim participated in the Plan as a benefit of his employment with Moonwell's subsidiary, Dreamhaven. [Doc. #1 (Complaint), 2:15-18] Kim became eligible for benefits under the Plan on May 1, 2020. [AR 1419; Doc. #1, 4:21-22]

The Plan defines "total disability," in pertinent part, as follows:

**Total Disability or Totally Disabled** means that as a result of Sickness or Injury, during the Elimination Period and the Own Occupation period, You are not able to perform with reasonable continuity the substantial and material acts necessary to pursue Your Usual Occupation and You are not working in Your Usual Occupation. After the end of the Own Occupation period, Total Disability or Totally Disabled means that as a result of Sickness or Injury You are not able to engage with reasonable continuity in any occupation in which You could reasonably be expected to perform satisfactorily in light of Your age, education, training, experience, station in life, and physical and mental capacity.

[AR 273]

More pertinent to this dispute, the Plan excludes coverage for any disability caused or substantially contributed to by a pre-existing condition:

**Pre-Existing Conditions:** You are not covered for a Disability caused or substantially contributed to by a pre-existing condition or medical or surgical treatment of a pre-existing condition.

You have a pre-existing condition if:

- You received medical treatment, care or services for a diagnosed condition or took prescribed medication for a diagnosed condition in the three months immediately prior to the effective date of Your insurance under this Certificate; or

  You suffered from a physical, or mental condition, whether diagnosed or was misrepresented or not disclosed in Your application (i) for which You received a Doctor's advice or treatment within three months before the effective date of Your insurance under this Certificate, or (ii) which caused symptoms within three months before the effective date of Your insurance under this Certificate for which a prudent person would usually seek medical advice or treatment; and

- Disability caused or substantially contributed to by the condition begins in the first 12 months after the effective date of Your insurance under this Certificate.

No benefits are payable for Disability caused by, contributed to, by, or resulting from a Pre-Existing Condition; unless the Disability starts after You complete at least one full day of Active Work after the date You have been covered under this Certificate for 12 Months in a row.

[AR 260-61]

There is no dispute that Kim's alleged disability began in the first 12 months after the effective date of his coverage. [Doc. #1, 4:21-22, 6:5-6] The so-called

4

"lookback period"—the "three months immediately prior to the effective date of [the] insurance"—is February 1, 2020 to April 30, 2020.  [Doc. #1, 4:22-24]

**B.    Kim's History of Depression, Anxiety, ADHD, Insomnia, and Other Mental Health Issues and Treatment**

Kim's history of mental health issues and treatment is undisputed and extensive:

- July 11, 2018 – During a treatment visit, Kim's family medicine practitioner, Jagdeep Kaur Mehrok, M.D., noted that Kim had been taking Adderall since 2014 and fluoxetine (Prozac) for six to seven months.  Kim also had taken Wellbutrin and Celexa for ongoing depression and anxiety, without relief.  Dr. Mehrok diagnosed Kim with ADHD and generalized anxiety disorder and refilled his prescriptions for Adderall and Prozac.  [AR 4964]

- January 14, 2019 – Kim reported insomnia and anxiety to Dr. Mehrok.  Kim also told Dr. Mehrok that he had treated with a psychiatrist three months earlier[2] and was prescribed Lexapro[3], and that he had another follow-up with the psychiatrist scheduled two weeks later.  [AR 5093]

- July 24, 2019 – Kim emailed Dr. Mehrok to request a testosterone screening because he was experiencing mental fatigue and brain fog.  [AR 5142]

- November 18, 2019 – During a visit for an unrelated skin issue, Dr. Mehrok noted an active prescription of 100 Lexapro tablets (with one refill), with directions to take daily.  [AR 2168-69]

- February 20, 2020 – *During the "lookback period,"* Kim's physical medicine doctor, Andrew Merritt, M.D., noted his diagnoses of depression, anxiety, and ADD [sic].  *Dr. Merritt reviewed Kim's medications and indicated that Kim*

---

[2] These medical records were not provided to Guardian for review and consequently are not part of the Administrative Record.

[3] Lexapro, whose generic name is escitalopram, is a medication that is used to treat depression and anxiety.  [AR 2716]  *See* https://my.clevelandclinic.org/health/drugs/18917-escitalopram-tablets.

DEFENDANT'S OPENING TRIAL BRIEF
CASE NO.  8:23-CV-01579-DOC-ADSX

*was taking one tablet of Lexapro 10 mg daily and Adderall 35 mg tablets.*
[AR 4483-84][4]

In the months leading up to his COVID-19 diagnosis, Kim's depression, anxiety, insomnia, and related symptoms continued to intensify:

- September 13, 2020 – Kim asked Dr. Mehrok for a referral to a sleep study due to his longstanding history of poor sleep.  [AR 5189]

- September 17, 2020 – Robert Lee, D.O. (psychiatrist) referred Kim to Richard Moldawsky, M.D. (psychiatrist) for consultation and refilled Kim's Adderall prescription.  [AR 5190]

- September 23, 2020 – Kim reported to the emergency department at Kaiser due to intermittent, non-exertional chest pain lasting about 45 minutes at a time, with associated shortness of breath.  Kim had a normal chest workup.  [AR 3284]   The attending physician noted Kim's active diagnoses of persistent depressive disorder and generalized anxiety disorder.  [AR 3288]  Kim also reported confusion, disorientation and difficulty forming words earlier that day.  [AR 5217]

- November 30, 2020 – Several weeks before he contracted COVID-19, Kim scheduled a consultation with Dr. Moldawsky, whom he had not seen since 2019, to discuss the possibility of TMS for his "persistent depressive thoughts and feelings."  Kim also reported that he had stopped taking Lexapro on his own because he believed it was making his sleep worse.  Kim acknowledged having taken Wellbutrin, Prozac and Celexa in the past.  [AR 5194]

- January 4, 2021 – Six days before his COVID-19 diagnosis, Kim saw Dr. Moldawsky to discuss to address his recurring passive suicidal ideation and "longstanding history of anhedonia, chronic depression and a feeling of being distanced and distant from family and work."  He acknowledged continually

---

[4] Dr. Merritt's records reflect the same information in connection with subsequent visits.  [AR 2619, 2622, 2626, 4486, 4490, 4498]

DEFENDANT'S OPENING TRIAL BRIEF
CASE NO.  8:23-CV-01579-DOC-ADSX

taking Adderall for his ADHD.  Dr. Moldawsky noted that Kim had taken fluoxetine, citalopram, bupropion, and escitalopram (Lexapro), and had undergone a prior course of eye movement desensitization and reprocessing and some psychotherapy.  Since Kim's anhedonia and related symptoms were "somewhat less responsive to biological [treatment], but as part of longstanding depressive disorder, with history of several appropriate drug and psychotherapy [prescriptions]," Dr. Moldawsky supported a trial of 36 TMS treatment sessions for Kim.  [AR 2238]

### C.    Kim's COVID-19 Infection

On January 7, 2021, Kim began experiencing symptoms from COVID-19 and tested positive three days later, on January 10, 2021.  [AR 4904]  There is no evidence in the record that Kim was hospitalized for COVID-19 symptoms or that he received any medication or other treatment for COVID-19.

### D.    Kim's Continued Depression, Anxiety, Insomnia, and Related Treatment

Following his COVID-19 diagnosis, Kim continued to experience an increase in his pre-existing depression, anxiety, panic, and insomnia, as well as suicidal ideation.  [AR 4898]  On January 19, 2021, he called Kaiser and spoke with Wendy Cohen, M.D.  [*Id.*]  Kim noted his history of anxiety and panic attacks, and told Dr. Cohen he was experiencing severe panic attacks[5] as well as suicidal thoughts.  [*Id.*]  Dr. Cohen advised him to seek help at the ER.    [*Id.*]  Later the same day, Kim emailed Dr. Moldawsky to describe his symptoms:

> I'm currently struggling through a case of COVID-19 and *I'm having some intense mental symptoms.  My anxiety is through the roof* and I spend hours a night just pacing through the house trying to wear myself out.  … *I'm pretty much paralyzed with panic and some dark thoughts*

---

[5] Panic disorder, which causes panic attacks, is a form of anxiety disorder.  *See* https://my.clevelandclinic.org/health/diseases/4451-panic-attack-panic-disorder.

DEFENDANT'S OPENING TRIAL BRIEF
CASE NO.  8:23-CV-01579-DOC-ADSX

and they're about to boil over at any given moment. … (Emphasis added)

[AR 4900]  **Dr. Moldawsky prescribed Zyprexa** and scheduled a follow-up for the following day.  Dr. Moldawksy spoke with Kim by phone the next day and documented Kim's reports of *insomnia, intense anxiety, agitation, pacing, feelings of doom and thoughts of self-harm*.  [AR 4900-01, 4904]  He documented diagnoses of "major depressive disorder, recurrent episode, severe" and "generalized anxiety disorder," and recommended "psychiatry follow up."  [AR 4904]  Kim went on to experience a brief improvement in his psychiatric condition on Zyprexa and thus briefly discontinued taking it on his own.  [AR 2282, 4928]  However, after a resurgence in his anxiety, Kim resumed taking Zyprexa on February 19, 2021.  [AR 4928, 4932]

Kim continued to report panic attacks, restlessness, and insomnia.  [AR 4934]  On February 26, 2021, he told Dr. Moldawsky that he continued taking Zyprexa and also was taking melatonin and over-the-counter sleep aids, and drinking alcohol despite recommendations not to drink alcohol while taking Zyprexa.  [AR 4396]

On March 20, 2021, Kim was admitted to the hospital for involuntary detention pursuant to Welfare and Institutions Code section 5150 due to suicidal ideation, anxiety, insomnia, and panic attacks.  [AR 1565-66]  He was prescribed the psychotropic medications Cogentin[6], Ativan, Desryl (trazodone), Lithium, Adderall, and Zyprexa while hospitalized.  [AR 1566]

**E.    Kim Is Diagnosed With Tardive Dyskinesia and Tardive Akathisia As a Result of His Psychotropic Medication Use**

After his March 20, 2021, hospitalization, Kim began to report physical symptoms, including rocking movements, constant shaking of his head, staring at the ceiling, unusual positioning, and uncontrollable facial movements such as

---

[6] Cogentin, whose generic name is benztropine, is a medication that treats symptoms affecting a person's movement.  Its side effects include confusion and memory loss. *See* https://my.clevelandclinic.org/health/drugs/ 19171-benztropine-tablets.

movements of the jaw and puckering of the lips.  [AR 1264]  On March 25, 2021, Kim saw Carolyn Neff, M.D., a neurologist, for his ongoing abnormal movements. [AR 1257]  Kim reported that he had experienced some relief of his abnormal movements with ADHD medication, but that the symptoms returned after that medication wore off.  *Id*.  Dr. Neff diagnosed Kim's involuntary movements as tardive dyskinesia and tardive akathisia, and ***determined that these conditions had been caused by Kim's use of Zyprexa***.  [AR 1268-69]  Dr. Neff accordingly discontinued Zyprexa.  *Id.*

On April 17, 2021, Kim saw Dr. Linda Soojin Lee in the emergency room and admitted to having taken 8-12 tablets of Zyprexa in a suicidal gesture.  [AR 3475] Dr. Lee noted impressions of "psychotropic overdose" and "***drug induced acute akathisia***."  *Id.* (emphasis added).

On May 4, 2021, Kim saw Dr. Robert Lee, a psychiatrist, for a second opinion. [AR 2427]  *Kim told Dr. Lee that he was prescribed Zyprexa to manage his increased agitation and anxiety following his COVID-19 diagnosis, but then began to experience akathisia as a side effect.  Id*.  Kim reported that after stopping Zyprexa, he started Cogentin, which in turn purportedly caused him confusion, memory problems, and further movement issues.  [*Id.*]  At the time, Kim reported improvement in his akathisia as more time passed since his last use of Zyprexa, but continuing depression and anxiety.  [AR 2427, 2431]  Kim was taking lithium and Depakote due to his recent suicidal ideation and concerns about bipolar disorder. [*Id.*]  Dr. Lee diagnosed Kim with *ADHD, generalized anxiety disorder, and **drug-induced akathisia**.  [AR 2431-32]

In May 2021, Kim underwent a neuropsychological evaluation with Priscilla Armstrong, Ph.D.  [AR 2564-76]  Dr. Armstrong concluded that Kim demonstrated a "variable" neuropsychological profile.  [AR 2575]  He scored in the average or high-average range on multiple tests (including intelligence, verbal skills, executive functioning, and some memory tests), and in the below-average or impaired range

on certain memory tests.  [AR 2573, 2575]  Dr. Armstrong opined that Kim met the criteria for "mild neurocognitive disorder."  [AR 2575]  Dr. Armstrong did not opine as to the cause of Kim's mild neurocognitive difficulties or comment on whether they represented a decline relative to Kim's prior abilities.  [AR 2564-76]

Also in May 2021, Kim began seeing Kenneth Martinez, M.D., a neurologist specializing in movement disorders.  [AR 2598]  *Kim reported an improvement in his symptoms since discontinuing Zyprexa.  Id.  **Dr. Martinez agreed with Dr. Neff's diagnoses of tardive dyskinesia and tardive akathisia and concluded that they were "secondary to Zyprexa use."** [AR 2600]  He advised Kim that his symptoms would resolve between three months and one year after his discontinuation of Zyprexa. [*Id.*]

## F.  Guardian Denies Kim's Claim for LTD Benefits Based on the Pre-Existing Condition Exclusion

In June 2021, Kim submitted a claim to Guardian for LTD benefits, claiming to be disabled as of March 25, 2021 from his occupation as a video game art director. [AR 628, 1489][7]  Because Kim had been covered under the Plan for less than 12 months at the time his claimed disability began, Guardian reviewed his claim for pre-existing conditions during the Plan's three-month "lookback period" of February 1, 2020 to April 30, 2020.  [AR 1419]  Guardian requested and received medical records from Kim's healthcare providers, which revealed the extensive pre-existing conditions and treatment summarized above.  [AR 2106, 2546, 2548, 2550]

Kim submitted an Attending Physician Statement ("APS") from Dr. Martinez stating that he was totally disabled due to tardive dyskinesia and tardive akathisia. [AR 2694]  Kim also submitted an APS from Dr. Robert Lee stating that he was impaired due to "generalized anxiety disorder, movement disorder, major depressive disorder, neuroleptic induced akathisia, [and] cognitive disorder."  [AR 1379]

---

[7] Guardian approved and paid Kim's claim for Short-Term Disability benefits under the Plan, for the maximum period of March 22, 2021 to June 23, 2021.  [AR 518, 520]

DEFENDANT'S OPENING TRIAL BRIEF
CASE NO.  8:23-CV-01579-DOC-ADSX

In July 2021, Guardian conducted an interview with Kim and his wife.  [AR 1968-1971]  Kim reported that his psychiatrist had advised him that his symptoms likely were a manic episode related to his pre-existing depression and anxiety, though Kim believed they were caused by COVID-19.  [AR 1968]  Kim told Guardian that he was prescribed Zyprexa, and a few days later reportedly began to experience panic, insomnia, and continued manic behavior.  *Id*.  He stated that he visited the emergency room, where the physicians again told him he was experiencing anxiety.  [AR 1969]  He reportedly was placed on benztropine (Cogentin), but discontinued it after experiencing memory loss and cognitive delays.  *Id*.  Kim reported that he began to experience involuntary facial and body movements due to medication use.  [AR 1969-70]  Kim stated his psychiatrist again told him that these symptoms were related to his anxiety and depression, with which he had been diagnosed since his twenties.  [AR 1970]  Still, Kim continued to believe that his symptoms were caused by COVID-19.  *Id*.  After further adjustments to his medications, Kim's condition eventually stabilized in April 2021.  [AR 1970-71]

Guardian's Registered Nurse Case Manager, Gloria Polsinelli, reviewed Kim's medical records and concluded that his movement and cognitive issues were directly related to Kim's behavioral health disorders and to side effects of treatment for those disorders, and were not due to COVID-19.  [AR 576]  Polsinelli also opined that Kim's mild cognitive findings would not preclude him from working.  [*Id.*]  Polsinelli recommended referral for review by Guardian's Behavioral Health Case Manager.  [AR 577]

Robbin Holley, Guardian's Behavioral Health Case Manager, in turn reviewed Kim's medical records.  [AR 553-63]  Holley noted several points regarding Kim's medical history and treatment:

- Kim psychiatrist, Dr. Moldawsky, opined that Kim's continued anxiety and panic attacks in March 2021 were primarily caused by his psychiatric

11

conditions, as his depression and anxiety scores had remained consistently high.  [AR 558]

- After his involuntary hold discharge on March 24, 2021, Kim reportedly developed "neuroleptic [P]arkinson's [due to] his Zyprexa."  [AR 557]

- Dr. Robert Lee commented that Kim's tardive dyskinesia and tardive akathisia were worsened by stress and anxiety.  [AR 560]

- Kim's variable neuropsychological testing scores with Dr. Armstrong could be "natural," as Kim had a history of reading comprehension issues as a child in school.  [AR 562]

- Kim's conditions were primarily psychiatric in nature, consistent with the viewpoint of Kim's providers, including Dr. Moldawsky.  [AR 561]

On August 18, 2021, Guardian denied Kim's LTD claim based on the conclusion that his claimed disability was caused or contributed to by his pre-existing psychiatric conditions or by medical treatment for those conditions.  [AR 2714-21]

## G.    Guardian Affirms Its Denial on Appeal Based on Reviews from Three Independent, Board-Certified Physicians

On February 7, 2022, Kim appealed the claim decision through his counsel of record.  [AR 3207-3220]  Kim submitted additional medical records and letters of purported support from Dr. Martinez [AR 3275] and Dr. Lee [AR 3270].   Dr. Martinez vehemently asserted that Kim was disabled due to tardive dyskinesia and tardive akathisia (a point that was not disputed in Guardian's denial letter).  [AR 3274-75, 5447]  But he confirmed the causal link between Kim's allegedly disabling condition and his antipsychotic medication use:

Tardive dyskinesia (TD) is a medication-induced hyperkinetic movement disorder and tardive akathisia (TA) is a medication-induced movement disorder manifested by repetitive tapping, squirming, and marching movements. ***Both disorders are solely caused by the use of***

12

1  ***dopamine receptor-blocking agents, including the antipsychotic drug***

2  ***Zyprexa.*** … TD and TA can be irreversible and lifelong. (Emphasis

3  added.)

4  [AR 3274]

5  Dr. Lee concurred: "It is unclear at this time as to what has caused these

6  [movement and cognitive slowing] problems but ***likely a side effect to a trial of***

7  ***medication for mental health is implicated*** ." (Emphasis added.) [AR 3270]

8  Kim also submitted statements from his family members and friends, which

9  largely attested to the disabling nature of Kim's tardive dyskinesia and tardive

10  akathisia (which, again, Guardian did not dispute in its denial). [AR 3253, 3255,

11  3273, 3276, 3909, 3910] Kim did not submit any medical evidence causally linking

12  Kim's COVID-19 infection to his tardive dyskinesia and/or tardive akathisia.

13  Guardian referred Kim's appeal for peer review by three board-certified

14  physicians. Dr. Arnold Lentnek, board-certified in internal medicine and infection

15  disease, opined that COVID-19 was not a contributing factor to Kim's claimed

16  disability. [AR 5406-10] Dr. Lentnek also specifically rebuffed any connection

17  between Kim's Zyprexa treatment and his COVID-19 infection:

18  *Medical information does not support functional impairment from an*

19  *infectious disease standpoint.* As discussed above, the claimant had a

20  positive COVID-19 test in January 2021. Some symptoms of fever,

21  chills, and similar, were noted, however, *the claimant's course has been*

22  *normal and without any severe issues.* There were no reports of

23  shortness of breath or dyspnea. The claimant's condition did not

24  necessitate hospitalization. ***There was no treatment specifically for***

25  ***COVID-19 started. Although the claimant's attorney indicates in the***

26  ***2/7/22 letter that Olanzapine [Zyprexa] was started due to COVID-19,***

27  ***this is not so, as evidently, per the 1/20/21 report, Olanzapine***

28  ***[Zyprexa] was started for the claimant's severe anxiety and panic***

13

*state after he had a positive COVID-19 test*.  Since March 2021 the claimant reported symptoms described as long-haul COVID-19.  He reported cognitive difficulties, slow thinking, and brain fog.  *Attending physicians noted that a psychiatric etiology to these cognitive issues was a more salient factor, but the claimant and his wife are convinced that these issues are due to COVID-19. Medical information does not provide verifiable evidence of this*.  *The claimant's COVID-19 course has been light and not complicated, and this does not correspond to sudden onset of severe issues two months later*.  Medical information also notes improvement of the symptoms with use of psychiatric medications.  *Medical information does not otherwise support any functional impairment due to COVID-19 or due to any other infectious disease*. … (Emphasis added.)

[AR 5409]

Dr. Leon Meytin, board-certified in neurology, attempted to speak with Kim's neurologists, Drs. Neff and Martinez, but his calls were not returned.  [AR 5416] Nevertheless, he was in agreement regarding the causal connection between Kim's psychiatric treatment and his allegedly disabling condition:

The claimant was started on Zyprexa on 1/20/2021 for severe anxiety, depression, and suicidal ideation.  …  When started on Zyprexa in January 2021, it appears that the claimant developed akathisia and possibly tardive dyskinesia.  Zyprexa was stopped and symptoms seemed to improve, although it is unclear if they fully resolved.

[AR 5415]

Dr. Elbert Greer Richardson, board-certified in psychiatry, called Dr. Moldawsky but was told that Dr. Moldawsky would not comment on any restrictions or limitations without reevaluating Kim.  [AR 5378] Dr. Richardson spoke with Dr. Robert Lee, who advised that he had no contact with Kim during the period in

review.  [*Id.*]  Dr. Richardson's calls to Drs. Neff and Martinez were not returned.  [*Id.*]  Dr. Richardson concluded that Kim was disabled due to his pre-existing psychiatric conditions from March 25, 2021 to July 4, 2021.  [AR 5380]  With respect to Kim's tardive dyskinesia and tardive akathisia diagnoses, Dr. Richardson noted that they followed his Zyprexa treatment.  [AR 5381]

Guardian provided the above peer-review reports to Kim's counsel for review and response.  [AR 5427]  Kim returned a letter from Dr. Martinez disagreeing with Dr. Meytin's prior statement that Kim's neurological conditions were not disabling.  [AR 5447]  In response, Dr. Meytin stood by his statement but suggested that an independent medical examination could help to resolve any discrepancy regarding Kim's "possible restrictions."  [AR 5456][8]

By letter of September 30, 2022, Guardian upheld its denial of the claim based on the Plan's pre-existing condition exclusion.  [AR 5462-67]

**H.    Kim Returns to Work**

In mid-2022, "after his TD [tardive dyskinesia] and TA [tardive akathisia] were properly treated," Kim "was able to return to work."  [Doc. #1, 16:23-27]

**III.    GUARDIAN CORRECTLY DETERMINED THAT LTD BENEFITS ARE NOT PAYABLE DUE TO THE PLAN'S PRE-EXISTING CONDITION EXCLUSION**

**A.    The *De Novo* Standard of Review**

The *de novo* standard applies to this Court's determination of whether Kim is entitled to benefits under the terms of the Plan.  Under that standard, the Court "determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan."  *Muniz v. Amec Constr. Mgmt., Inc.*, 623

---

[8] Dr. Martinez and Dr. Meytin's exchange regarding Kim's restrictions and limitations, and the suggestion of an IME to resolve that conflict, are not germane to the issues in this action because Guardian denied the claim based on the pre-existing condition exclusion, not based on a determination that Kim was not disabled.

DEFENDANT'S OPENING TRIAL BRIEF
CASE NO.  8:23-CV-01579-DOC-ADSX

F.3d 1290, 1295-1296 (9th Cir. 2010).  The Court is to "evaluate the persuasiveness
of conflicting testimony and decide which is more likely true."  *Kearney v. Standard
Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc).  Applying this standard,
Guardian correctly determined that Kim is not entitled to LTD benefits under the
Plan because his claimed disability was caused or substantially contributed to by a
pre-existing condition or medical treatment of a pre-existing condition.

### B.    The Plan's Pre-Existing Condition Exclusion Is Enforceable

Under ERISA, "[a] pre-existing condition exclusion is valid, and bars
recovery, if: (1) the provision is conspicuous; and (2) the pre-existing condition
substantially contributed to the disability."  *Wilkerson v. Riffage.com Disability
Income Prot. Pgm.*, 303 Fed.Appx. 408, 409 (9th Cir. 2008) (citing *McClure v. Life
Ins. Co. of N. Am.*, 84 F.3d 1129, 1135 (9th Cir. 1996)).

Addressing the first prong, the pre-existing condition exclusion here is
undeniably conspicuous.  It appears in the "Long Term Disability Income Coverage"
portion of the Plan, in a section prominently titled, "**Limitations And Exclusions**."
(Emphasis in original.)  [AR 259-61]  The provision is separated by spaces from
other provisions and is preceded by the words, "**Pre-Existing Conditions**," in bold
font. [AR 260][9]  Its text is set out in the same font style and size as virtually all other
text in the Plan, including the provisions that define "Total Disability" and otherwise
establish the circumstances in which the Plan would provide coverage.  [*See, e.g.*,
AR 260-61, 273]

The pre-existing condition provision's text is clearly and simply phrased.  It
begins by plainly stating: "You are not covered for a Disability caused or
substantially contributed to by a pre-existing condition or medical or surgical
treatment of a pre-existing condition."  [AR 260]  The provision then continues with
the words "You have a pre-existing condition if," and delineates the circumstances

---

[9] The "**Limitations And Exclusions**" section of the Plan's "Long Term Disability
Income Coverage" is clearly identified in the Plan's table of contents.  [AR 243]

DEFENDANT'S OPENING TRIAL BRIEF
CASE NO.  8:23-CV-01579-DOC-ADSX

in which a pre-existing condition would be found.  [AR 260-61]  It goes on to state that "[n]o benefits are payable for Disability caused by, contributed to by, or resulting from a Pre-Existing Condition" if that disability starts within the first 12 months after the effective date of Kim's coverage.  [AR 261]

In short, the Plan's pre-existing condition exclusion is enforceable.

### C.  The Plan's Pre-Existing Condition Exclusion Bars Any Recovery By Kim Because His Pre-Existing Depression, Anxiety, and Related Conditions and Treatment Caused or Substantially Contributed to His Claimed Disability

In the Ninth Circuit, "[s]o long as the pre-existing condition substantially contributed to the disability, the insurer may deny benefits even if a later condition is shown to be 'the predominant or proximate cause of the disability.'"  *Wilkerson*, 303 Fed.Appx. at 409 (quoting *McClure*, 84 F.3d at 1136); *see Est. of Maurice v. Life Ins. Co. of N. Am.*, 792 Fed.Appx. 499, 500 (9th Cir. 2020) (reaffirming that "a preexisting condition can bar coverage even though the claimed injury was the predominant or proximate cause of the disability").  In other words, it is enough that Kim's pre-existing depression, anxiety, and related conditions, or the treatment (Zyprexa) of those conditions, *substantially contributed* to his claimed disability, *even if COVID-19 could be shown to be the predominant or proximate cause of the disability (and it cannot be so shown).*

Application of the above test "requires a two-pronged analysis, namely: (1) whether there is a pre-existing disease, pre-disposition, or susceptibility to injury; and (2) whether this pre-existing condition, pre-disposition, or susceptibility substantially contributed to the disability or loss." *McClure*, 84 F.3d at 1135 (citing *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1032 (4th Cir.1993) (en banc)).  The Administrative Record establishes that: (1) Kim took prescribed medication during the "lookback period" for diagnosed, longstanding pre-existing conditions including depression, anxiety, and ADHD; and (2) Kim's alleged

17

disability, which began within the first 12 months after the effective date of his coverage, was substantially contributed to by the same conditions (depression, anxiety, etc.) and/or by his treatment (Zyprexa) for those conditions. As such, the Plan's pre-existing condition exclusion bars coverage.

1. <u>Kim Had an Extensive Pre-Existing History of Diagnosed Depression, Anxiety, and ADHD, for Which He Took Prescribed Medication During the "Lookback Period"</u>

Kim admits that he suffered from depression, anxiety, and ADHD, and that these conditions pre-existed his coverage under the Plan. [Doc. #1, 3:25-27] In his July 7, 2021 interview with Guardian, Kim described a longstanding history of depression, anxiety, and ADHD. [AR 1971] This history is further supported by Kim's medical records, as detailed above. [*See, e.g.*, AR 4480, 4964, 5093]

Kim also had a history of continuous use of Lexapro for his depression and anxiety and Adderall for his ADHD, and he continued taking these prescribed medications during the "lookback period" of February 1, 2020 to April 30, 2020. [AR 568, 2168-69, 4483] Specifically, office visit notes from Kim's November 18, 2019 Kaiser visit indicate an active prescription of 100 Lexapro tablets (with one remaining refill). [AR 2168-69] Kim's medications were reviewed during his February 20, 2020 visit—within the "lookback period"—to his physical medicine doctor. [AR 4483] The notes from that visit reflect diagnoses of depression, anxiety, and ADD [sic], and indicate that Kim was taking one tablet of Lexapro 10 mg daily and Adderall 35 mg tablets at that time. [*Id.*]

2. <u>Kim's Depression, Anxiety, and Related Conditions Continued to Worsen Leading Up to His Claimed Disability</u>

Kim's depression, anxiety, and ADHD not only pre-existed his coverage, but also continued in the months preceding his COVID-19 diagnosis and his claimed disability. In September 2020, Kim asked his primary care physician, Dr. Mehrok, for a sleep study referral due to his ongoing insomnia. [AR 5189] He also emailed

Dr. Moldawsky (whom he had not seen since 2019) in November 2020 and stated that he "still struggle[d] with persistent depressive thoughts and feelings" and that his sleep was worsening.  [AR 5194]  Kim therefore asked Dr. Moldawsky to be referred for TMS treatment for his depression.  [*Id.*]  On September 23, 2020—*three and one-half months before he contracted COVID-19*—Kim reported to the emergency room for treatment of chest pain, a known physical symptom associated with panic attacks.  [AR 3283]  The ER physician noted *active diagnoses* including "persistent depressive disorder and generalized anxiety disorder," and that Kim had reported "confusion, disorientation and difficulty forming words" earlier that day. [AR 3288, 5217]  In his January 4, 2021 treatment session with Dr. Moldawsky— *still before his COVID-19 diagnosis*—Kim reported "recurring passive suicidal ideation" and "chronic depression."  [AR 2238]

### 3. Kim Was Prescribed Zyprexa in January 2021 to Treat Depression and Anxiety Symptoms; He Was Not Prescribed Zyprexa to Treat COVID-19 Symptoms

There is no evidence in the Administrative Record that Kim received any medication or other treatment for COVID-19 symptoms.  On the contrary, the symptoms Kim experienced following his January 7, 2021 COVID-19 infection were the *same or similar symptoms* of depression and anxiety for which he had been treated previously.  When Kim called Kaiser on January 19, 2021 (after his COVID-19 diagnosis), to complain of "severe panic attacks" and "suicidal thoughts," he reported a *prior history of "anxiety and panic attacks."*  (Emphasis added.)  [AR 4898]  That is, Kim was experiencing an increased level of the same symptoms he had experienced in the past.  On the same date, Kim similarly reported to Dr. Moldawsky that he was experiencing the same symptoms he had experienced before his COVID-19 infection: intense anxiety, agitation, suicidal ideation, and poor sleep. [AR 4900]

Every medical professional who treated Kim or reviewed his medical records agrees that: (1) Kim was prescribed and took Zyprexa starting in January 2021 to treat symptoms of depression and anxiety (his pre-existing conditions); and (2) Kim's tardive dyskinesia and tardive akathisia—his allegedly disabling conditions—were likely caused by Zyprexa.  In short, there is no real question that Kim's alleged disability was caused or, at a minimum "substantially contributed to," by medical treatment of his pre-existing conditions.

Kim's treating physicians confirmed that Kim was prescribed and took Zyprexa—an *"antipsychotic drug" used to treat depression and anxiety* [AR 3270, 3274]—to treat his depression and anxiety symptoms.  **Dr. Moldawsky** first prescribed Zyprexa on January 19, 2021, to treat Kim's complaints of "intense anxiety, agitation, pacing, feelings of doom," "thoughts of self-harm," and poor sleep.  [AR 4900-01]  **Dr. Martinez**, who later wrote to Guardian on Kim's behalf, agreed that Kim was treated with Zyprexa for these symptoms.  [AR 3274]  Kim's second course of Zyprexa likewise was prescribed by Dr. Moldawsky in response to Kim's report of a resurgence of "intense anxiety."  [AR 4928-29]  When Kim saw **Dr. Robert Lee** in May 2021 for a second opinion, Kim himself stated that he had taken Zyprexa to treat his increased anxiety and agitation.  [AR 2427]  And Guardian's peer reviewers similarly noted that Kim had been prescribed Zyprexa for his anxiety and related symptoms.  [AR 5409 (**Dr. Lentnek**), 5415 (**Dr. Meytin**)][10]

Kim's treating physicians, who had opined that Kim was disabled due to tardive dyskinesia and tardive akathisia, also unanimously agreed that Zyprexa caused those allegedly disabling conditions.  On March 25, 2021, **Dr. Neff** diagnosed Kim's involuntary movements as tardive dyskinesia and tardive akathisia resulting from Zyprexa usage.  [AR 1269-70]  Dr. Neff reaffirmed in an April 13, 2021

---

[10] Kim's contention in his Complaint that "Plaintiff had suffered from a severely adverse reaction to the medications that he had taken *to treat his COVID-19*" [Doc. #1, 16:26-27 (emphasis added)] stands in sharp contrast to the medical records and finds no support from any medical professional.

DEFENDANT'S OPENING TRIAL BRIEF
CASE NO.  8:23-CV-01579-DOC-ADSX

progress note that Zyprexa had resulted in worsened compulsive thinking and akathisia with new orofacial and head movements.  [AR 704]  **Dr. Linda Soojin Lee,** with whom Kim treated in the emergency room on April 17, 2021, likewise asserted that Kim had developed drug-induced akathisia and cognitive impairment following his Zyprexa intake.  [AR 3475]

In his June 18, 2021 APS, **Dr. Robert Lee** opined that Kim was disabled from working due to "neuroleptic [anti-psychotic medication] induced akathisia."  [AR 1379]  Dr. Lee's October 26, 2021 letter to Guardian similarly stated that Kim's "difficulties with movement, cognitive slowing" were "likely caused by a side effect to a trial of medication for mental health."  [AR 3270][11]  During a May 14, 2021 visit, **Dr. Martinez** noted his agreement with the diagnoses of tardive dyskinesia and akathisia "secondary to Zyprexa use."  [AR 2600]  In his October 25, 2021 letter to Guardian, Dr. Martinez reiterated his opinions that these conditions were "solely caused by the use of dopamine receptor-blocking agents, including the antipsychotic drug Zyprexa."  [AR 3274]

**Dr. Meytin**, the board-certified neurologist who reviewed Kim's records at Guardian's request, echoed Kim's treating doctors' opinion that Zyprexa caused Kim's tardive dyskinesia and tardive akathisia.  [AR 5415]

In sum, the Administrative Record amply demonstrates that Kim treated with Zyprexa for depression and anxiety, and that in turn Zyprexa caused the tardive dyskinesia and tardive akathisia that allegedly disabled Kim.

i. There is No Evidence That COVID-19 or Any Other Non-Pre-Existing Condition Caused Kim's Claimed Disability

Kim's claim is premised on the contention that he "suffered from a severely adverse reaction to the medications that he had taken to treat his COVID-19."  [Doc. #1, 16:26-27]  But this theory is based solely on the say-so of Kim and his family

---

[11] Dr. Lee's May 4, 2021 note identifies Zyprexa as the drug that caused Kim's akathisia.  [AR 2427]

DEFENDANT'S OPENING TRIAL BRIEF
CASE NO.  8:23-CV-01579-DOC-ADSX

members.  None of Kim's medical providers have supported that theory.  "Narratives provided by the claimant and any family and friends are properly accorded less weight than medical evidence in the record given their potential for bias and inability to diagnose medical conditions or assess functional capacity in the way individuals trained in the medical field can."  *Stratton v. Life Ins. Co. of N. Am.*, 589 F.Supp.3d 1145, 1175 (S.D. Cal. 2022) (citing *Shaw v. Life Ins. Co. of N. Am.*, 144 F.Supp.3d 1114, 1136 (C.D. Cal. 2015).  Indeed, courts have consistently held that a claimant's self-reported statements concerning his own disability are not entitled to weight where they are not supported by objective medical evidence.  *See, e.g., Hulbert v. Hartford Life & Acc. Ins. Co.*, 2021 WL 3291888, *11 (N.D. Cal. 2021); *McCool v. Life Ins. Co. of N. Am.*, 2018 WL 6137163, *5 (C.D. Cal. 2018); *Johnson v. Aetna Life Ins. Co.*, 2017 WL 6043086, *6 (C.D. Cal. 2017), *aff'd*, 745 Fed.Appx. 35 (9th Cir. 2018); *Biggar v. Prudential Ins. Co. of Am.*, 274 F.Supp.3d 954, 968 (N.D. Cal. 2017); *Seleine v. Fluor Corp. Long-Term Disability Plan*, 598 F.Supp.2d 1090, 1101-02 (C.D. Cal. 2009), *aff'd* 409 Fed.Appx. 99 (9th Cir. 2010).

In contrast, Dr. Lentnek, the peer reviewer specializing in infectious disease, affirmatively rejected any such connection as lacking medical support.  [AR 5409] As set forth more fully earlier, Dr. Lentnek commented that Kim's COVID-19 course was light, normal, not complicated, and without any severe issues, and that Kim did not experience any shortness of breath or dyspnea and did not require hospitalization or any treatment specifically for COVID-19.  [AR 5409] Dr. Lentnek went on to expressly reject Kim's attribution of his disability to COVID-19:

> Attending physicians noted that a psychiatric etiology to these cognitive issues was a more salient factor, but the claimant and his wife are convinced that these issues are due to COVID-19.  Medical information does not provide verifiable evidence of this.  The claimant's COVID-19 course has been light and not complicated, and this does not correspond to sudden onset of severe issues two months

later.  Medical information also notes improvement of the symptoms with use of psychiatric medications.  Medical information does not otherwise support any functional impairment due to COVID-19 or due to any other infectious disease.

[AR 5409-10]  The well-supported opinion of a peer reviewer is entitled to credit over the unsupported opinion of a treating physician, let alone the conclusory statements of a lay claimant or his family members.  *Ibrahim v. Bayer Corp. Disability Plan*, 584 Fed.Appx. 743, 745 (9th Cir. 2014); *Biggar*, 274 F.Supp.3d at 968; *Sanchez-Levine v. Metro. Life Ins. Co.*, 2017 WL 4286139, *10 (C.D. Cal. 2017); *Johnson*, 2017 WL 6043086 at *6; *Shaw*, 144 F.Supp.3d at 1130.

               4.      <u>It Is Sufficient That Kim's Pre-Existing Condition Substantially Contributed to His Claimed Disability, Irrespective of Any Other Alleged Causes</u>

The evidence discussed above unequivocally establishes that Kim's depression and anxiety, and the medication he took to treat them, at a minimum "substantially contributed to the disability" he claims to have suffered.  *See Wilkerson*, 303 Fed.Appx. at 409; *McClure*, 84 F.3d at 1136.  For argument's sake, however, even if any medical evidence existed of a connection between Kim's alleged disability and any non-pre-existing condition, *this would not be enough to elude the Plan's pre-existing condition exclusion*.  That is because, under well-settled Ninth Circuit law, if a pre-existing condition substantially contributed to the claimed disability, "the insurer may deny benefits *even if a later condition is shown to be 'the predominant or proximate cause of the disability*.'"  *Id.*; *Est. of Maurice*, 792 Fed.Appx. at 500.

In *Earle v. Unum Life Ins. Co. of Am.*, 2021 WL 4871785 (9th Cir. 2021), the Ninth Circuit affirmed the district court's determination that the insurer had correctly denied benefits based on the conclusion that the claimant's pre-existing vitreomacular traction ("VMT") substantially contributed to her vision loss.  *Id.* at

*1.  The court found that the claimant "could have developed a macular hole even without her … fall, and conversely, that she would not have developed a macular hole without the preexisting VMT.  *Id.*  Here, the Administrative Record demonstrates that Kim could have developed tardive dyskinesia and tardive akathisia without his COVID-19 infection, and conversely, that Kim would not have developed tardive dyskinesia and tardive akathisia without his depression and anxiety.  Indeed, without depression, anxiety, and their related symptoms, Kim would not have been prescribed Zyprexa, the medication that indisputably caused him to develop tardive dyskinesia and tardive akathisia.

In *Ekno v. Northwestern Mut. Life Ins. Co.*, 2008 WL 782728 (E.D. Cal., 2008), the claimant alleged disability due to depression, "for which she was treated and took medication for during the pre-existing condition exclusionary time period." *Id*. at *7.  The court found that the pre-existing condition exclusion applied to preclude benefits:

> The record contains substantial evidence demonstrating that Ekno currently suffers from severe depression and was treated and took prescription medicine for depression during the pre-existing condition exclusionary time period.  The record also contains evidence, based on a medical evaluation by a psychiatrist, demonstrating that Ekno has a long history of recurrent depression that began when she was twenty-nine (approximately ten years before she stopped working for the Water Education Foundation), and has been prescribed various anti-depressants over that span to treat bouts of depression that occur approximately twice-a-year.  Finally, while there is evidence in the record indicating that Ekno also suffers from the non-pre-existing condition of prolactinoma, the record contains substantial evidence supporting NWML's conclusion that Ekno's disability was caused or contributed to by depression.

1    *Id.*

2       As such, because Kim's pre-existing condition, and the use of Zyprexa to treat

3 it, substantially contributed to his claimed disability, Guardian correctly concluded

4 that the Plan's pre-existing condition exclusion precluded any LTD benefits.

5

6 **IV.**    **CONCLUSION**

7       Based on the foregoing, the Court should find, as did Guardian, that Kim's

8 alleged disability was caused or substantially contributed to by a pre-existing

9 condition, and accordingly that Kim is not entitled to LTD benefits under the Plan.

10 The Court should enter judgment against in favor of Guardian and against Kim.

11

12 Dated: March 4, 2024          MAYNARD NEXSEN LLP

13                     By: /s/ Ophir Johna

14                        OPHIR JOHNA
                        KAREN T. TSUI

15                        Attorneys for Defendant The Guardian Life
                       Insurance Company of America

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.1**

The undersigned, counsel of record for Defendant The Guardian Life Insurance Company of America, certifies that this brief contains 6,998 words (excluding the caption, any table of contents, any table of authorities, the signature block, this certification, and any indices and exhibits), which complies with the word limit of Local Rule 11-6.1.

Dated: March 4, 2024

MAYNARD NEXSEN LLP

By: /s/ Ophir Johna
OPHIR JOHNA
KAREN T. TSUI
Attorneys for Defendant The Guardian Life
Insurance Company of America

# CERTIFICATE OF SERVICE

### *Kim v. Guardian Life Insurance Company of America*
### Case No. 8:23-cv-01579-DOC-ADS

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am a citizen of the United States and employed in Los Angeles, California, at the office of a member of the bar of this Court at whose direction this service was made. I am over the age of 18 and not a party to the within actions; my business address is 10100 Santa Monica Blvd., Ste. 550, Los Angeles, CA 90067.

On **March 4, 2024**, I served the document(s) entitled, DEFENDANT'S OPENING TRIAL BRIEF, on the interested parties in this action by placing true copies thereof enclosed in a sealed envelope(s) addressed as stated below:

## SEE ATTACHED SERVICE LIST

☒ **(BY CM/ECF SERVICE)**: I caused such document(s) to be delivered electronically via CM/ECF as noted herein.

I declare under penalty of perjury under the laws of the United States that the above is true and correct and was executed on **March 4, 2024**. at Los Angeles, California.

_____
Lea Borys

1020793\304578071.v1

## SERVICE LIST

### *Kim v. Guardian Life Insurance Company of America*

### Case No. 8:23-cv-01579-DOC-ADS

Robert J. McKennon, Esq.
m@mckennonlawgroup.com
Nicholas A. West, Esq.
nw@mckennonlawgroup.com
Erik C. Fritz, Esq.
ef@mckennonlawgroup.com
MCKENNON LAW GROUP PC
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |
Fax:  949-385-5165

*Attorneys for Plaintiff Jason Kim*

1020793\304578071.v1