Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Nicholas A. West (SBN 309003) *nw@mckennonlawgroup.com*
Erik C. Fritz (SBN 337341) *ef@mckennonlawgroup.com*
**MCKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff Jason Kim

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| JASON KIM,<br><br>                    Plaintiff,<br><br>vs.<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No.: 8:23-cv-01579-DOC-ADS<br><br>Action Filed: August 23, 2023<br><br>Trial Date: April 15, 2024<br><br>---<br><br>**PLAINTIFF JASON KIM'S OPENING TRIAL BRIEF**<br><br>DATE:   April 15, 2024<br>TIME:   8:30AM<br>JUDGE:  Honorable David O. Carter<br>CTRM:   10A, Santa Ana |



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



## **TABLE OF CONTENTS**

1.   INTRODUCTION ……………………………………………………1

2.   STATEMENT OF FACTS ………………………………………...3

    A.   The Policy's Terms …………………………………………..3

    B.   Plaintiff's Occupation, Medical History and the Claims Process….4

3.   GUARDIAN'S CLAIM DENIAL WAS INCORRECT………………16

    A.   Standard of Review…………………………………………16

    B.   Guardian Improperly Relied on the Pre-Existing Condition Exclusion…………………………………………………16

    C.   Plaintiff Was Disabled Under the Policy …………………………20

4.   CONCLUSION ……………………………………………...21

## TABLE OF AUTHORITIES

### Cases

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003) ..............................19

*Brainard v. Liberty Life Assurance Co. of Boston*, 173 F.Supp.3d 482 (E.D. Ky. 2016) ............................................................................................................21

*Demer v. IBM Corp. LTD Plan*, 835 F.3d 893 (9th Cir. 2016) ..............................21

*Dowdy v. Metropolitan Life Ins. Co.*, 890 F.3d 802 (9th Cir. 2018).......................16

*Evans v. Sun Life & Health Ins. Co.*, 601 F.App'x 497 (9th Cir. 2015) .................21

*Hodjati v. Aetna Life Ins.*, 2014 WL 7466977 (C.D. Cal. Dec. 29, 2014) ..............19

*Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999) ................................16

*Kibel v. Aetna Life Ins. Co.*, 725 F.App'x 475 (9th Cir. Feb. 13, 2018) ...........19, 21

*McClure v. Life Ins. Co. of N. Am.*, 84 F.3d 1129 (9th Cir. 1996) ...................16, 17

*Silver v. Executive Car*, 466 F.3d 727 (9th Cir. 2006) ...........................................16

*Williams v. United of Omaha*, 2013 WL 5519525 (N.D. Ala. Sept. 30, 2013) ......19



1. **INTRODUCTION**

Guardian Life Insurance Company of America  ("Guardian") denied Plaintiff Jason Kim's ("Plaintiff's) claim for long-term disability ("LTD") benefits under a group insurance policy (the "Policy").  It relied on a pre-existing condition exclusion, *even though its own doctor, Elbert Greer Richardson, M.D., stated that the pre-existing conditions did not cause or substantially contribute to Plaintiff's disability*.  Dr. Richardson stated that "The conditions the claimant received advice, treatment, or medication caused by, contributed to by, or resulting from those conditions ... **did not** cause or contribute to the conditions that are impairing...." (AR:5379)(Emphasis added)  Guardian ignored this statement and the medical records in its possession and relied on the pre-existing condition exclusion to deny Plaintiff's claim.

Plaintiff suffered from a myriad of very serious and disabling medical symptoms.  His health problems began in January 2021 when he developed COVID-19.  He started suffering from a variety of severe symptoms, including: brain fog, cognitive impairments, extreme pacing (to the extent that he wore out a pair of shoes in a couple of days), fever, chills, insomnia, panic attacks, restlessness, agitation, "pressure in his head," loss of the ability to communicate, short-term memory damage, and damage to his ability to process information.  He became psychotic.  Plaintiff's treating physicians explained that this was likely caused by COVID-19.  Studies have shown that 1.4% of people develop psychosis when infected with COVID-19.

Plaintiff was prescribed Zyprexa to treat his psychosis symptoms.  He had never been previously treated with Zyprexa, an antipsychotic medication.   Zyprexa substantially worsened his condition.  He developed tardive akathisia ("TA") and tardive dyskinesia ("TD").[1]  Before Plaintiff recovered, he lost significant control of

---

[1] Akathisia and tardive dyskinesia, both caused by side effects of neuroleptic drugs

Footnote continues on next page…

1   his body, became suicidal, and nearly lost the basic ability to communicate.

2       Guardian, however, concluded that common anxiety, depression, and

3   attention deficient hyperactivity disorder ("ADHD") were the cause of his disability

4   and were pre-existing conditions because Plaintiff had received treatment for these

5   prior non-disabling condition during the 3-month lookback period.  Plaintiff's

6   treating physicians and one of Guardian's own doctors explain that this was

7   incorrect.  Even Guardian's own insurance broker attempted to dissuade Guardian

8   from denying the claim on that basis.  Guardian insisted that the exclusion applied.

9   It insisted that nearly dormant and non-disabling history of anxiety and depression

10  caused or substantially contributed to Plaintiff's disability.  Regardless of whether

11  COVID-19 or something else caused Plaintiff's condition in early 2021, his anxiety,

12  depression, and ADHD did not.  His disability was caused by his psychosis, TA, and

13  TD.   These were not preexisting conditions.

14      In denying the claim, Guardian received reports from three peer-review

15  doctors.  It ignored Dr. Richardson's conclusion.  Arnold Lentnek, M.D. opined that

16  COVID-19 did not contribute to Plaintiff's disabling symptoms.  Of note, however,

17  Guardian did not provide Dr. Lentnek with Plaintiff's medical records.  It only

18  provided him with an inaccurate "abstract."  Leon Meytin, M.D., a neurologist,

19  provided an outrageous and conclusory opinion that Plaintiff was not disabled.

20  Significantly, because he was not sure, he also concluded that an Independent

21  Medical Exam ("IME") should be performed.  Guardian never ordered the IME.

22  It denied the claim based on the preexisting condition exclusion.

23      Plaintiff's disability is well established and should not be disputed.  Multiple

24  treating physicians, including Guardian's own peer-review doctor, have certified

25  _____

26  such as Zyprexa, are serious neurological disorders. Akathisia is fundamentally a
    subjective disorder characterized by a desire to be in constant motion resulting in an

27  inability to sit still and a compulsion to move. Tardive dyskinesia is an involuntary
    movement disorder characterized by repetitive purposeless uncontrollable

28  movements.  *See https://pubmed.ncbi.nlm.nih.gov/6139392/*

Case No.: 8:23-cv-01579-DOC-ADS



that Plaintiff could not work during the time in question.  Plaintiff's medical records and the statements from witnesses who observed his condition, overwhelmingly established Plaintiff's disability.  Because Plaintiff's clear disability was not caused in any manner by medical conditions that were preexisting under the Policy, Guardian's decision was wrong and the Court should enter judgment in Plaintiff's favor.

## 2.    STATEMENT OF FACTS

### A.    The Policy's Terms

Plaintiff is entitled to disability benefits if he is "Totally Disabled."  The Policy states:

> **Total Disability or Totally Disabled** means that as a result of Sickness or Injury, during the Elimination Period and the Own Occupation period, You are not able to perform with reasonable continuity the sub-stantial and material acts necessary to pursue Your Usual Occupation and You are not working in Your Usual Occupation.(AR:273)

The Policy excludes coverage for pre-existing conditions.  It states:

> **Pre-Existing Conditions:** You are not covered for a Disability caused or substantially contributed to by a pre-existing condition or medical or surgical treatment of a pre-existing condition.
>
> You have a pre-existing condition if:
>
> - You received medical treatment, care or services for a diagnosed condition or took prescribed medication for a diagnosed condition in the three months immediately prior to the effective date of Your insurance under this Certificate; or
>
> You suffered from a physical or mental condition, whether diagnosed or was misrepresented or not disclosed in Your application (i) for which You received a Doctor s advice or treatment within three months before the effective date of Your insurance under this Certificate, or (ii) which caused symptoms within three months before the effective date of Your insurance under this Certificate for which a prudent person would usually seek medical advice or treatment; and



- Disability caused or substantially contributed to by the condition begins in the first 12 months after the effective date of Your insurance under this Certificate.(AR:260-61)

The effective date of the Policy was May 1, 2020, making the 3-month "lookback" period run from February 1, 2020 through April 30, 2020.(AR:2715)

**B.    Plaintiff's Occupation, Medical History and the Claims Process**

Plaintiff started working for Dreamhaven, Inc. in mid-2020.  He worked as an art director.  (AR:1490)  Through his work, he acquired LTD coverage with Guardian.

Before working at Dreamhaven, Plaintiff had a minor history of suffering from depression, anxiety, and ADHD.  Before January 2021, these conditions were minor, non-disabling, and did not interfere with his work.  (AR: 931, 1019-23, 1490-91, 2239, 3256)  He was not seen by his therapist from 2019 to January 2021. (AR:2239)  *His medical records and Guardian's internal notes document that he had never been prescribed anti-psychotic medications or suffered from psychosis before January 2021.*  (AR:556, 707, 987, 3411)  The last relevant testing before January 4, 2021 listed Plaintiff as "Negative" for Depression and Anxiety. (AR:1019-23)  Whereas in December 2020 he contacted his then-psychiatrist, Richard Moldawsky, M.D., about attempting TMS therapy, his conditions were sufficiently mild that he did not see Dr. Moldawsky until he developed severe health problems in January 2021.  (AR:2239, 5581)  When contacting Dr. Moldawsky in December 2020, he explained that his condition was not severe, but he was inquiring because some relatives had used the treatment and he wanted to try it. (AR:5581)

On or about January 4-5, 2021, this changed.  Plaintiff started testing positive for severe depression and anxiety.  Those symptoms appeared with a constellation of other symptoms that first arose in early January.  He started to suffer from fever, chills, aches, hyperkinetic movement disorder, insomnia, cognitive deficits, "head



pressure," restlessness, agitation, panic attacks, and "cognitive clouding." He lost the ability to organize his thoughts. His affect, cognition, and behavior were significantly different. He became suicidal and paced all night. The pacing was sufficiently severe that over a couple of days he wore out a pair of shoes. For the first time, he developed psychosis. (AR:691, 695, 881, 931, 987, 2040, 2254, 3255-56, 3258, 3274, 3411, 5380)

On January 7, 2021, Plaintiff tested positive for COVID-19. (AR:691, 931, 3258, 3411) He was symptomatic as of January 5. (AR:2040, 3258, 3411) He certainly had COVID-19 when his January 4, 2021 symptoms started.[2] Plaintiff's medical records explain that COVID-19 can trigger a psychotic disorder in 1.4% of people. (AR:708) They explain that COVID-19 likely caused Plaintiff's sudden onset of psychosis. They state: "Note: onset of psychosis and anxiety after covid in January, medical literature support this is a possible sequelae." (AR:707-08) Plaintiff's medical records from March 25, 2021 also noted that these changes were a "possible post viral event[.]" (AR: 695) Robbin Holley, BHCM, a Guardian employee, made a note that explained as follows:

> The case could be strongly made [that] the problems with COVID-19 as well as his subsequent (& rather marked) problems with adverse psychiatric medication reactions strongly exacerbated his MH issues. One MD noted his problems as a possible sequela and noted recent research showing that 34% of COVID-19 survivors subsequently receive a neurological or psychiatric DC & 17% are specifically DX's with Anxiety.(AR:562-63)

Plaintiff's condition was now very different. (AR:691, 931-32, 3255-56) He no longer suffered from common low-grade anxiety or depression. (AR:3411) He was prescribed and started taking olanzapine (Zyprexa) for psychosis. (AR:987,

---

[2] On average, a person has COVID-19 for five days before the respiratory symptoms show. *See* Dan Brennan, M.D., Coronavirus Incubation Period, WebMD, (January 10, 2024, 9:31 AM) *https://www.webmd.com/covid/coronavirus-incubation-period.*



1    3411, 4900-01)  Plaintiff had never been treated with an antipsychotic medication.

2    (AR:691)  He continued to take the medication until March 2021.  (AR:1263)

3        Around this time, Plaintiff developed a shuffled gait, made rocking

4    movements, and suffered from "horrible" skin sensations.  He constantly shook his

5    head, stared at the ceiling, and made unusual and grotesque positioning/movements.

6    He grunted, jerked his hands, twitched, and made abnormal uncontrollable facial

7    actions such as movements of the jaw and abnormal facial/eye movements.  His

8    cognitive problems worsened.  They continued to affect his memory, and he was

9    constantly confused.  (AR:690-91, 931-32, 2040, 3255-56, 3258, 3411)

10        Plaintiff's condition is recorded in various statements from his friends and

11   family.  (AR:3253-54, 3255-56, 3273, 3276, 3909-12)  Plaintiff's wife is a therapist.

12   (AR:2268) She explained that:

13   > In January 2021, Jason had a typical case of covid until around day 14
14   > when he started to have a lot of pressure in his head. Within 24 hours
     > he lost his cognition and personality. He wasn't able to sleep and it was
15   > like seeing a completely different man. I've been married to him for 13
     > years and had never seen him so outside of himself. Doctors gave him
16   > medication which helped him sleep again. After 4 days, the pressure in
17   > his head dissipated and I thought he was finally recovering from a very
     > strange case of covid. He had pretty intense brain fog and insomnia ...
18   > He stopped being able to read, he had an inability to stop moving,
19   > he couldn't communicate with coworkers anymore, he lost his ability to
     > process information and make decisions, and he lost his short-term
20   > memory. From February to July, I was telling him the same things
21   > every 5-20 minutes. He had no awareness of his sickness and could
     > only repeat what I tried to explain to him all day, though he seemed to
22   > never fully process any new information. It was a horrible thing to
     > watch him lose his control over his mind, speech, body movements,
23   > and lose all of his relationships, including with his children. Before his
24   > neurological symptoms started, he loved to play and parent our
     > children[;] all of a sudden[,] he was so panicked [that] he went months
25   > with almost no interaction with them. He was in a constant state of
26   > writhing movements (made worse by Parkinson's medication they gave
     > him to try to stop the Akathisia disorder, the new medication caused
27   > dyskinesia which causes really disfiguring facial and fully body
28

-6-



twisting movements.) At the same time[,] his cognition made no sense and was illogically agitated. He couldn't sit down[,] and I could barely keep him alive until August when we put him on a new medication for the movement disorder.

He still has akathisia which causes difficulty just being in his skin. He is constantly uncomfortable. For most of the day he's just trying to figure out ways to be in his skin and also trying to do occupational therapy because he hates being unemployed. He still can't manage his thoughts, they're often illogical and his judgement skills are still not there. His movements get increasingly worse when agitated. He would be unable to sit in meetings or even video calls due to his facial and body movements. He isn't able to have a "poker face" anymore and every uneasy thought will have a dystonic or dyskinesia movement to go with it. Once he's even mildly agitated[,] his hips, legs, start to writhe and he can't control his facial movements or his groaning or vocal tics. He doesn't have functionality. His processing is still limited[,] and he still gets physically and emotionally wiped out after interacting with others for even short periods of time....

He needs constant coaching throughout the day and help to manage tasks and to stay calm. He still doesn't have a perception of time and can't manage his very detailed medication schedule. He has an extremely difficult time starting any task or even taking our dog outside on a walk or going outside with our kids. He still has great difficulty engaging in simple daily living skills....(AR:3255-56)

Mrs. Kim's parents are also licensed therapists.  (AR:3910)  In a statement, they explained:

… we experienced Jason in a way that we had never seen him in the many years we have known him. We were shocked by the stark contrast of how he was compared to the Jason we have known since the beginning of his marriage to Rachel. He constantly had to move his body in grotesque, involuntary ways. He frequently shook his head violently from side to side. He was unable to sit still and felt driven to pace back and forth and all around the house. He frequently did face grimaces which he was unaware of doing. He had balance problems[,] which was evidenced in his walking, gait, and if he tried to do anything where he needed good balance....

Jason also had problems with speech. He could not generate sentences with more than about three words, and his generation of even these short phrases took a lot of time. He had trouble comprehending normal



conversation. It was obvious, it took him a long time to process information as evidenced by his slowness in responding to questions and his difficulty tracking normal conversations. He had severe short term memory problems. It was typical to have a short conversation with him, and he would not be able to remember any of it 30 minutes later. Several times on this visit, we thought we had conversations that were important only to find that he could not remember any of the conversation within a few hours, and he certainly could not remember anything we talked about in previous days. Jason could not comprehend what he would read. He would read one paragraph and not be able to tell you what it was about. In contrast to the bright, analytic, able to learn anything Jason that we had known prior to January 2021, he was confused by conversations, words, and could not learn from reading or watching videos. We had never seen Jason this way. Where we had always experienced Jason as organized, creative, able to understand complex information, good at making decisions and analyzing the outcomes, good awareness of self and how he works inside, we were confronted with his inability to understand and remember even simple things, his inability to make decisions or even understand what decisions need to be made, and certainly his ability to be analytical because he could not remember, he could not process information if he remembered it, and this also meant he couldn't analyze outcomes or organize things enough to make coherent sense of them.  His previous creativity [–] his sketching and drawing when we were around him [–] had all disappeared. He could not create art. He could not even copy art. He had trouble remembering to eat. He was unable to drive because of slow processing and his uncontrollable body movements and his general problems with comprehending things as simple as stop lights or traffic signs.

We also observed changes in Jason's emotions and his perception of himself. He was highly agitated. Since we are both licensed therapists, we have diagnosed and treated many patients with anxiety. What Jason was experiencing seemed far more associated with his uncontrollable body movements and his inability to process verbal and visual information than any anxiety cases we have seen in our many years of practice. He had great difficulty showering because he said the water hurt his skin. He said his skin burned underneath, and the uncontrollable movements helped relieve that some. He made uncontrollable vocalizations such as moaning, grunting, and sometimes short words. When it was pointed out to him that he did this, he seemed unaware. It was like his ability to regulate himself—his body, his emotion, his

speech, his creativeness, and organization—was gone. He was having
trouble sleeping and could only get 3-4 hours of sleep.(AR3910-11)

Initially, Plaintiff treated with Dr. Moldawsky.  (AR:2239)  Plaintiff's wife
argued with Dr. Moldawsky that Plaintiff's cognitive problems were related to
COVID-19.  (AR:786)  Dr. Moldawsky acknowledged that it "could be true in part"
but considered the psychiatry issues "more salient."  (AR:786)  Plaintiff transferred
to the care of Robert Lee, D.O., M.S. in May 2021.  (AR:928)  Dr. Lee certified that
Plaintiff was unable to work and noted that "patient with significant symptoms and
far from baseline functioning, significant anxiety and depressive symptoms from
movement problems...." (AR:1223, 1381-82)

Plaintiff attempted to see a neurologist, but the referral was cancelled.
(AR:2334)  Plaintiff went to the hospital on March 25, 2021.  (AR:1257)  Plaintiff
finally managed to treat with a neurologist, Carolyn Neff, M.D.  She diagnosed
Plaintiff with TA and TD.  (AR:695)  TD and TA are movement disorders
characterized by involuntary movements.  These conditions also produce a myriad
of mental health problems.  The Zyprexa had caused Plaintiff's TA and TD.
(AR:3274-75)  *Plaintiff's condition became so severe that he had to be hospitalized
in March and April 2021 for attempted suicide.*  (AR:1326, 2715)

These medical conditions significantly impaired Plaintiff's ability to work.
Initially, at times, they would be dormant.  During others, they would be significant.
His symptoms continued to worsen until he could not work.  (AR:988)  Dr. Neff
certified Plaintiff's disability.  (AR:659, 681)  Plaintiff submitted a claim for LTD
benefits asserting a date of disability of March 25, 2021.  (AR:2714)

To treat his condition, Plaintiff was prescribed a variety of medications and
underwent psychotherapy.  Some of the medications caused severe side effects.
Ultimately, he was prescribed medications that provided limited benefit.  (AR:3262)

On May 10, 2021, Plaintiff underwent a neuropsychological evaluation that
revealed that he suffered from "Mild Neurocognitive Disorder."  (AR:987-90)  He



1    tested below average in a range of different aspects of "processing speed, timed
2    verbal fluency, immediate and delayed verbal memory for a list learning task, and
3    immediate visual memory." (AR:990) "He was impaired with immediate and
4    delayed verbal memory for stories read to him." (AR:990)

5         Kenneth Martinez, M.D., a neurologist, started treating Plaintiff on May 11,
6    2021. (AR:3266) Dr. Martinez completed an "Attending Physician's Statement of
7    Disability" ("APS") for Guardian stating that Plaintiff could not return to work until
8    at least July 20, 2022. He explained that Plaintiff "has uncontrolled movements due
9    to tardive dyskinesia and is unable to stay in one position due to tardive akathisia."
10   (AR:2694) Plaintiff's TA and TD were "not consistent with a conversion disorder
11   or anxiety." (AR:3260) Whereas his TA and TD had improved some, the
12   symptoms were "still magnified with anxiety and stimulants." (AR:3260)

13        Guardian informed Mrs. Kim that the pre-existing condition clause may
14   apply. (AR:2062) Mrs. Kim informed others of Guardian's position. The insurance
15   broker responsible for selling Dreamhaven the Policy sent an email to Guardian. It
16   stated:

17       We are needing some help. Dreamhaven employee Jason Kim who
         you have been helping us on a few things with is having a terrible time.
18       He exhausted STD, and is now working through the LTD claim, but
         Guardian is coming back saying there is a pre-ex[isting condition]
19       situation. His current ability is a severe health situation, that we
         believe started due to him contracting COVID-19 (well within his
20       employment). Guardian is saying because he had some previous
         medical notes on anxiety, they will exclude and deny LTD.
21
22       **This feel[s] extremely immoral to us**.

23       **It is clear that the situation is not a pre-ex from anxiety... as I'm
         sure you can understand, anxiety is a very common diagnosis
24       which many have, and this is a severe health case.**

25       We need to partner with Guardian and Burnham to do the right thing.
26
         This family is facing horrors. They have small children and without
27       the LTD benefit they will lose their livelihood. The frustration from
         ownership is immense and at this point they are so disappointed with
28



this benefit that they have invested in … feeling little faith – let's fix this.

HELP!(AR:2025-26)(Emphasis added).

On July 13, 2021, Jennifer Larocco, a regional service manager for Guardian, sent an email to Jennifer Baker, one of Guardian's LTD case managers.  She wrote:

> Do we have reason to believe that this person may have had a serious medical condition or underlying condition prior to contracting covid?  It will certainly help Mike in his explanation to the Broker and also help with some credibility if we have some additional information without disclosing too much due to HIPAA.  I know A LOT of people are developing long term problems due to covid that were perfectly healthy before[.]  I'm sure we get this question all the time, trying to help with the perception from the Broker and Client as to why we are doing further investigation.(AR:2061)

Ms. Baker responded by explaining that "The records do not indicate prior treatment for some of the employee's current complaints."  (AR:2060)  Mrs. Kim contacted Guardian as part of the ongoing claims process.  She reiterated that Plaintiff had always been a high functioning individual and only occasionally required treatment for medications.  (AR:2701)

Guardian denied the claim by letter dated August 18, 2021, concluding that while Plaintiff was disabled, his disability was caused by pre-existing conditions that were excluded under the Policy.  (AR:2714, 2716-17)  It stated:

> Upon review of your prescription history, you were prescribed Lexapro, an SSRI used to treat depression and anxiety.  You were given 100 days of refills, at 1 pill a day, with 1 refill.  This would imply you were taking this medication for the period of November 18, 2019 through June 4, 2020, during our lookback period of February 1, 2020 through April 30, 2020.  Your psychiatric impairment is considered pre-existing as a result of this.
> ...
> Because you received treatment for your Major Depressive Disorder, Severe without Psychotic Symptoms, Generalized Anxiety Disorder, and Mild Neurocognitive Disorder during the "look-back period", these conditions and all related conditions and/or complications are pre-existing conditions as defined by the Plan.(AR:2715-16)



It is unclear if Guardian concluded that Plaintiff was not disabled from his debilitating TA/TD.  It stated only that they were not caused by COVID-19, that these conditions were the result of taking Zyprexa and "that the symptoms should resolve in several months once the medications fully leave your system." (AR:2715-16)  Of note, Plaintiff was not diagnosed with "Mild Neurocognitive Disorder" until May 10, 2021.  (AR:987-90)  As for his depression and anxiety, as noted above, these conditions were mild, nondisabling, and he did not see his psychiatrist during the lookback period or the entire year before. (AR:1019-23, 2239)

Guardian's broker continued to argue against the exclusion applying.  An August 24, 2021 email to Ms. Baker stating that "*The broker and employer are convinced [that] this condition was triggered by the onset of Covid which I am told was diagnosed after our policy was in place.*"  (AR:3125)

On February 7, 2022, Plaintiff appealed the denial of his claim.  (AR:3238) Plaintiff submitted updated medical records and statements from his friends, his family, Dr. Lee, and Dr. Martinez.  (AR:3240)  Dr. Martinez explained:

> Jason continues to have uncontrolled movements that are magnified by increased adrenaline and medication stimulants. These movements are still consistent with his original diagnoses of TD and TA. Jason's movements worsen when he is anxious and is [sic] consistent with his diagnoses of TD and TA. His movements are not distractible or consistent with a conversion disorder. Jason's movement may improve as his anxiety is better controlled, but his underlying movement disorder is a neurological disorder, not a mental health condition. Jason's movement disorder causes him to be unable to stay in a stationary position on the computer or in meetings for extended periods, and a stressful work environment would only exacerbate his movements. Therefore, it is our recommendation that Jason Kim does not work until his symptoms are better controlled.(AR:3274-275)

Plaintiff also included a letter from Dr. Lee, who explained:

> Jason has a disorder that causes certain functional limitations.  The symptoms that he is currently exhibiting[,] however[,] are not due to depression, anxiety, or ADHD.  His current difficulties with



movements, cognitive slowing are neurologic in nature. It is unclear at
this time as to what has caused these problems[,] but likely[,] a side
effect to a trial of medication for mental health is implicated. The
patient's current ability to function is impaired to the extent that he is
not able to work. Recovery has been slow[,] but patient has been
engaged and has been doing what he can to reach a state of being more
independent and functional. Please reconsider Mr. Jason Kim's
claim.(AR:3270-271)

Guardian submitted Plaintiff's medical records to Dr. Meytin. Dr. Meytin

concluded that:

> From a physical neurological perspective, there were no restrictions
> placed.
> This is a claimant with significant psychiatric history of anxiety,
> depression, suicidality. When started on Zyprexa in January 2021,
> it appears that the claimant developed akathisia and possibly tardive
> dyskinesia. Zyprexa was stopped[,] and symptoms seemed to
> improve[,] although it is unclear if they fully resolved. However, by
> 03/25/2021 (time period of review), there is no indication that the
> tardive symptoms were severe enough to lead to restrictions. The
> majority of his issues were psychiatric in nature, including suicidal
> ideation and attempts, as well as psychiatric inpatient admissions.
> Repeat notes document that the claimant continues with anxiety,
> depression, suicidal thoughts, racing thoughts, overwhelming thoughts,
> repetitive movements....
> The claimant was started on Zyprexa on 1/20/2021 for severe anxiety,
> depression, and suicidal ideation. It was then stopped due to tardive
> symptoms. Thus, January 2021 would be the start of the tardive
> symptoms. From a physical neurological perspective, there were no
> restrictions placed.(AR:5415-16)

In a letter dated August 30, 2022, Dr. Martinez responded to Dr. Meytin's

report:

> I have been presented with the report produced by Dr. Leon Meytin.
> I strongly disagree with his position that Mr. Kim was not disabled due
> to his Tardive Akathisia ("TA") and Tardive Dyskinesia ("TD"). These
> neurological conditions were quite severe and left him unable to
> perform many basic activities required to perform his job. Contrary to
> Dr. Meytin's assertions, Mr. Kim's TA and TD affected nearly every
> aspect of Mr. Kim's life and left him unable to work.(AR:5447)



In an addendum, Dr. Meytin, noting there was a "discrepancy" about Plaintiff's condition, recommended that Guardian conduct an IME:

> Additional records did not provide any new abnormal neurological exams, abnormal imaging, or any other neurological information that would change my original opinion....
> If there continues to be discrepancy with the claimant[']s possible restrictions, **a formal IME would be most prudent**[,] **as I do not physically examine or evaluate the claimant, and am only supplied with medical records to review**.(AR:5455-56)(Emphasis added).

Guardian submitted Plaintiff's medical records to Dr. Lentnek.  Dr. Lentnek concluded that Plaintiff was not disabled due to complications related to COVID-19. He stated:

> Although the claimant's attorney indicates in the 2/7/22 letter that Olanzapine was started due to COVID-19, this is not so, as evidently, per the 1/20/21 report, Olanzapine was started for the claimant's severe anxiety and panic state after he had a positive COVID-19 test. Since March 2021 the claimant reported symptoms described as long-haul COVID-19. He reported cognitive difficulties, slow thinking, and brain fog. Attending physicians noted that a psychiatric etiology to these cognitive issues was a more salient factor, but the claimant and his wife are convinced that these issues are due to COVID-19. Medical information does not provide verifiable evidence of this.(AR: 5409-10)

However, of note, Dr. Lentnek was not provided with Plaintiff's medical records. As Dr. Meytin explained in his report:

> **Dr. Lentnek states he had access to only "abstracted" records**, but **based on what he was provided**, the claimant had a mild course of COVID-19 and that would not cause any restrictions.(AR:5417)(Emphasis added.)

Dr. Lentnek based his opinion solely on what Guardian wanted him to see.  If he had read Plaintiff's records, he would have noted that some of Plaintiff's medical records did state a causal relationship between his COVID-19 and his January conditions and that his treating physicians **did** consider COVID-19 as a possible cause of the condition.  (AR:695, 707-08)  Guardian submitted the medical records



to Dr. Richardson, a psychiatrist.  (AR:5375)  He explained that the treatment Plaintiff received in the lookback period ***did not cause or contribute to his disabling conditions*** as follows:

> The claimant has restrictions and limitations as of 3/25/21…
> **The conditions the claimant received advice, treatment, or medication caused by, contributed to by, or resulting from those conditions between 2/1/20-4/30/20; did not cause or contribute to the conditions that are impairing as of 3/25/21.**(AR:5379)(Emphasis added).

Dr. Richardson found that Plaintiff was disabled from January 2021 through July 4, 2021 due to his TA/TD and psychological conditions.  (AR: 5379-81)

On September 30, 2022, Guardian denied Plaintiff's appeal.  (AR:5462)  It ignored Dr. Meytin's recommendation that an IME be performed.  (AR:5465-66)  It also only briefly discussed Dr. Richardson and **completely ignored his conclusion that Plaintiff was disabled for reasons that were not "caused by, contributed to by, or resulting from" pre-existing conditions.**  (AR:5466)  It also relied on Dr. Lentnek's uninformed opinion.  (AR:5466)  Guardian erroneously stated that "While Plaintiff did have Covid-19 in early January 2021, there was no mention in the records that these symptoms were related to Covid-19 but that he had a history of anxiety and depression, for which he had admitted had started to become worse prior to January 1, 2021."  (AR:5466)  These statements are false.  Guardian concluded by stating that Plaintiff was only disabled due to conditions falling under the pre-existing condition exclusion, and, therefore, the claim was denied.  (AR:5466)[3]

---

[3] Plaintiff notes that his condition gradually improved.  He was able to return to work on a part time basis in March 2022.



### 3.  **GUARDIAN'S CLAIM DENIAL WAS INCORRECT**

### A.   **Standard of Review**

The standard of review is de novo.[4]  Under a de novo review, the Court undertakes an independent and thorough inspection of the administrative record without giving any deference to the insurer's findings, *Silver v. Executive Car*, 466 F.3d 727, 728, 733 (9th Cir. 2006), to freshly evaluate whether Guardian erred in denying Plaintiff's claim, *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999).

### B.   **Guardian Improperly Relied on the Pre-Existing Condition Exclusion**

Guardian erred in relying on the pre-existing condition exclusion and denying Plaintiff's claim.  It ignored the report from one of its medical professionals.  It failed to provide complete records to another.  Its conduct was egregious.

Because Guardian relied on a Policy exclusion, it has the burden to establish that the exclusion applies.  *See Dowdy v. Metropolitan Life Ins. Co.*, 890 F.3d 802, 810 (9th Cir. 2018).  The court in *McClure v. Life Ins. Co. of N. Am.*, 84 F.3d 1129 (9th Cir. 1996), determined that the proper standard is whether a preexisting condition "substantially contributed" to the loss, "even though the claimed injury was the predominant or proximate cause of the disability." *Id.* at 1136.

The Ninth Circuit addressed what constitutes substantial contribution.  In *Dowdy*, the insured Tommy Dowdy had diabetes.  He was in a car accident that nearly amputated his lower leg.  His group accidental death and dismemberment policy with MetLife covered a complete amputation.  His leg was amputated below the knee due to his comorbidities and his original injury from the car accident.  Dowdy's diabetes contributed to the complications with his wounds and to the amputation.  He submitted a claim for the dismemberment.  MetLife denied his claim based on the policy's insuring clause – which required that an accident be

---

[4] The parties have agreed that this is the standard of review.



the "direct and sole cause" of the amputation "independent of other causes" – and the exclusion for losses "contributed to by ... illness." MetLife asserted that Dowdy's diabetes contributed to the amputation. *Id*. at 805-07, 811.

The court held that the loss was covered because diabetes was not enough of a causative factor to meet the "substantial contribution" test. *Id*. at 808. The court explained that "[i]n order to be considered a substantial contributing factor for the purpose of a provision restricting coverage to direct and sole causes of injury, a pre-existing condition must be more than merely a contributing factor." *Id*. at 809. The court reasoned that "a 'predisposition' or 'susceptibility' to injury does not necessarily amount to a substantial contributing cause. A mere 'relationship' of undetermined degree is not enough.'" *Id*. at 808.

The court examined a variety of sources to determine what should be deemed a substantial cause. One respected source explained that the word "substantial" denotes that the conduct had an effect strong enough that it would lead "reasonable [people] to regard it as a cause" in the more concrete sense and not just in some "philosophic sense." *Id*. at 809. The court held that there must be evidence showing that the preexisting ailment contributed a "significant magnitude of causation" and was a "substantial catalyst." *Id*. The preexisting condition cannot "merely [be] related to the injury" (*Id.*) and it cannot merely be a "predominant or proximate cause of the disability." *McClure, supra,* at 1136.

An examination of Plaintiff's symptoms shows just how unreasonable Guardian's position is. He had not seen a therapist in years and his test results show that the symptoms for his depression and anxiety were minimal. (AR:1019-23, 2239) Whereas he had arranged for a visit to see his psychiatrist before his condition worsened, he waited a month before he saw that doctor and said that it was not an emergency. (AR:2239, 5581) In early 2021, however, he started suffering from a variety of severe symptoms, including: psychosis, brain fog, cognitive impairments, extreme pacing, fever, chills, insomnia, panic attacks,



restlessness, agitation, "pressure in his head," loss of the ability to communicate, short-term memory damage, and damage to his ability to process information. (AR:691, 695, 881, 931, 987, 2040, 2254, 3255-56, 3258, 3274, 3411, 5380)  **He clearly was no longer suffering from common anxiety or depression**.  To link his minimal prior treatment and barely recognizable anxiety/depression to this array of severe symptoms defies reason.

Dr. Richardson informed Guardian that there was no connection.  Dr. Richardson stated that "The conditions the claimant received advice, treatment, or medication caused by, contributed to by, or resulting from those conditions between 2/1/20-4/30/20; did not cause or contribute to the conditions that are impairing as of 3/25/21."  (AR:5379)  An examination of Dr. Richardson's report shows that he was aware of Plaintiff's mental health history.  He spoke with Dr. Lee and received medical records from the period in question.  (AR:5375, 5378)  He concluded that the conditions and treatment therefore did not cause or contribute to the disability.

This is a direct refutation of Guardian's position.  This refutation is particularly problematic for Guardian.  The alleged pre-existing conditions were mental health issues.  Guardian's psychiatrist stated that those conditions and their treatment **did not** cause or contribute to Plaintiff's impairing conditions *at all*, let alone *substantially*.

Plaintiff's medical records make it explicitly clear that COVID-19 has been shown to cause psychosis and was potentially the cause here.  (AR:695, 707-08)  Even Guardian's own employee acknowledged this.  (AR:562-63)  Whereas Plaintiff and his treating physicians believe that COVID-19 triggered his health problems in early 2021, that causality is not legally necessary for Plaintiff's claim.  All that is required is that whatever rendered Plaintiff disabled not be caused or substantially contributed to by a pre-existing condition.  Whether it was COVID-19 or just a spontaneous breakdown of Plaintiff's mental health is irrelevant.  The question is whether the prior identified mental health conditions/treatments *in the*

-18-

1  *lookback period* "caused or substantially contributed to" the disability.  *They did*

2  *not.*

3      Guardian cannot reasonably rely on Dr. Lentnek's opinion.  Dr. Lentnek

4  opined that COVID-19 did not cause Plaintiff's conditions.  He stated that none of

5  Plaintiff's treating physicians thought there was a connection.  That is incorrect.

6  (AR:695, 707-08)  Dr. Lentnek could not have known that he was mistaken because

7  *Guardian did not provide him with the relevant records*.  It only provided him with

8  an abstract thereof missing key information such as research showing a causal

9  connection between COVID-19 and psychosis.

10     The summary that Guardian provided was not even accurate.  Dr. Lentnek

11  states that Plaintiff's brain fog, head pressure, and slow thinking started in March

12  2021.  (AR:5409)  In fact, they started in January 2021.  (AR:690, 2040, 3255,

13  3411)  He could not know whether Plaintiff's condition was caused by COVID-19.

14     He states that "Medical information does not provide verifiable evidence" that

15  COVID-19 caused Plaintiff's condition.  However, because he was never provided

16  with Plaintiff's medical records, he could not know this.  The weight of the opinion

17  of a single paper-review doctor who did not even review the relevant medical

18  records should not persuade the Court.  The opinions of Plaintiff's treating

19  physicians carry far more weight.  *See Williams v. United of Omaha*, 2013 WL

20  5519525, at *12 (N.D. Ala. Sept. 30, 2013), citing *Black & Decker Disability Plan*

21  *v. Nord*, 538 U.S. 822, 832 (2003); *see also Kibel v. Aetna Life Ins. Co.*, 2015 WL

22  858751, *7 (C.D. Cal. Feb. 26, 2015); *Hodjati v. Aetna Life Ins.*, 2014 WL 7466977,

23  *14 (C.D. Cal. Dec. 29, 2014).

24     Furthermore, Plaintiff's family includes numerous therapists.  They

25  understand common anxiety and depression.  They quickly realized that whatever

26  was happening to Plaintiff was not his prior low-grade anxiety and depression.

27     The Policy does not support the extensive chain of causation that Guardian

28  relies on.  It inquires whether a pre-existing condition, or treatment related thereto,

"caused or substantially contributed" to the disability.  Plaintiff's prior treatment for his depression, anxiety, and ADHD during the lookback period had no connection whatsoever with his disability.  He also was not disabled for common anxiety or depression.  As Guardian's insurance broker noted, "It is clear that the situation is not a pre-ex from anxiety ...  as I'm sure you can understand, anxiety is a very common diagnosis which many have, and this is a severe health case."  (AR:2025-26)  Guardian's application of the Policy language made a "very common diagnosis" a pre-existing condition for countless maladies.  There is no medical basis for this conclusion.  Guardian cannot carry its burden.

### C.   Plaintiff Was Disabled Under the Policy

Given that the pre-existing condition exclusion does not apply, the Court must examine whether Plaintiff was disabled.  The evidence shows that he clearly was.

Dr. Richardson determined that Plaintiff was totally disabled from January 2021 through July 4, 2021, the date Dr. Lee gave as Plaintiff's expected return to work date.  (AR:5379-80)  Dr. Richardson based this conclusion on Plaintiff's TA/TD.  (AR:5380)  However, the evidence establishes that Plaintiff was still disabled well after that time period.  (AR:2694, 3270-71, 3274-75)  An examination of Dr. Richardson's report shows that he was not provided with this evidence and could not know that Plaintiff was disabled beyond that date.  (AR:5375-77)

Plaintiff's own physicians also determined that Plaintiff was disabled.  Dr. Lee, certified that Plaintiff could not work as of October 26, 2021.  As he explained in a statement, "The patient's current ability to function is impaired to the extent that he is not able to work." (AR:3270-71)

Dr. Martinez and Dr. Neff both concluded that Plaintiff could not work.  (AR:659, 681, 3274-75)  In a July 22, 2021 APS, Dr. Martinez explained that Plaintiff had an expected return to work date of July 20, 2022.  (AR:2694)  In a statement as late as October 25, 2021, Dr. Martinez continued to certify that Plaintiff was disabled due to his TA and TD.  (AR:3274-75)



To the extent that Guardian took the position that Plaintiff was *not* disabled due to TA and TD, that position is meritless.  Whereas Dr. Meytin opined that Plaintiff was not disabled, he also recommended that an IME be performed and that Plaintiff's condition be examined by "neuropsychology."  (AR:5415, 5456)  *Even Dr. Meytin conceded that his paper review may be insufficient.*  The failure to follow its doctor's recommendation showed Guardian's improper bias in denying the claim.  *See Evans v. Sun Life & Health Ins. Co.*, 601 F.App'x 497, 498 (9th Cir. 2015).

Dr. Meytin's report fails to explain the basis of his position.  It makes a few references to a lack of evidence, but, Plaintiff had provided explanations and medical records from his neurologist that explained his condition and documented his treatment.  Dr. Meytin's statements to the contrary are copy-and-paste excuses used to deny a claim.  Courts regularly criticize this very type of report: brief with no analysis.  *See, e.g.*, *Brainard v. Liberty Life Assurance Co. of Boston*, 173 F.Supp.3d 482, 492 (E.D. Ky. 2016).

Guardian's failure to consider the statements from Plaintiff's friends and family is yet another reason to reject its analysis and conclusion.  *See Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 904-07 (9th Cir. 2016); *Kibel v. Aetna Life Ins. Co.*, 725 F.App'x 475, 477 (9th Cir. Feb. 13, 2018).  This conduct is particularly egregious in Plaintiff's case.  Mrs. Kim and her parents are certified to treat people who suffer from mental health problems.  Their statements described the horrors that Plaintiff was experiencing and his family was witnessing.  Plaintiff was clearly disabled by his TA and TD and these conditions were in no manner caused or substantially contributed to by preexisting conditions.

## 4.   <u>CONCLUSION</u>

For the above-stated reasons, this Court should find that Guardian improperly denied the claim, and grant judgment in Plaintiff's favor.



1    Dated:  March 4, 2024                **McKENNON LAW GROUP PC**

2

3                                 By:  

                                      ROBERT J. McKENNON
4                                      NICHOLAS A. WEST
                                      ERIK C. FRITZ
5                                      Attorneys for Plaintiff, Jason Kim

6

7

8

9

10

11

12

13

14

15

16              **CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.1**

17          The undersigned, counsel of record for Plaintiff Jason Kim, certifies that this

18   brief contains 6,969 words (excluding the caption, any table of contents, any table of

19   authorities, the signature block, this certification, and any indices and exhibits),

20   which complies with the word limit of Local Rule 11-6.1.

21

22

     Dated:  March 4, 2024                **McKENNON LAW GROUP PC**
23

24                                 By:

25                                      ROBERT J. McKENNON
                                      NICHOLAS A. WEST
26                                      ERIK C. FRITZ
                                      Attorneys for Plaintiff, Jason Kim
27

28



## CERTIFICATE OF SERVICE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 20321 SW Birch St., #200, Newport Beach, California 92660; Fax 949-385-5165; E-mail address: dc@mckennonlawgroup.com.

I hereby certify that on March 4, 2024, I served the foregoing documents described as: PLAINTIFF JASON KIM'S OPENING TRIAL BRIEF on the interested parties as follows:

OPHIR JOHNA
OJohna@maynardnexsen.com
KAREN T. TSUI
KTsui@maynardnexsen.com
MAYNARD NEXSEN LLP
10100 Santa Monica Boulevard
Los Angeles, CA 90067
Telephone: 310.596.4500

Attorneys for Defendant, The Guardian Life Insurance Company of America
☒ ECF Participant

☒ **ECF/CM:** I caused a true and correct copy thereof to be electronically filed using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF System. I served those parties who are not registered participants of the ECF System as indicated below.

☐ I placed the ☐ original ☐ a true copy thereof enclosed in sealed envelope(s) to the notification address(es) of record and caused such envelope(s) to be delivered by ☐ **FIRST-CLASS MAIL** ☐ **OVERNIGHT DELIVERY**.

☐ **BY E-MAIL:** I electronically transmitted a true and correct copy thereof to the notification electronic mail address(es) of record before close of business for the purpose of effecting service and the transmission was reported as complete and without error.

☐ **FACSIMILE:** Based on ☐ courtesy ☐ court order ☐ agreement of the parties, I caused a true copy thereof to be served by transmitting via facsimile machine to the notification facsimile number(s) of record before close of business. The transmission was reported as complete, without error.

☐ **PERSONAL DELIVERY:** I caused ☐ the original ☐ a true copy thereof to be delivered by hand to the notification address(es) of record by an employee or independent contractor of a registered process service.

I am employed in the office of a member of the Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America and the State of California that the above is true and correct. Executed at Newport Beach, California on March 4, 2024.

NAME: _Debi Cartee_
(Signature)

