OPHIR JOHNA (SBN 228193)
OJohna@maynardnexsen.com
KAREN T. TSUI (SBN 305869)
KTsui@maynardnexsen.com
MAYNARD NEXSEN LLP
10100 Santa Monica Boulevard, Suite 550
Los Angeles, CA 90067
Telephone:  310.596.4500

Attorneys for Defendant
The Guardian Life Insurance Company of America

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON KIM,<br><br>            Plaintiff,<br><br>      v.<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, and DOES 1 through 10,<br><br>            Defendant. | Case No. 8:23-cv-01579-DOC-ADSx<br><br>(Honorable David O. Carter, Crtrm: 10A, Santa Ana)<br><br>**DEFENDANT'S RESPONSIVE TRIAL BRIEF**<br><br>Trial:   April 15, 2024<br>Time:  8:30 a.m.<br>Crtrm: 10A, Santa Ana<br><br>Complaint Filed:  August 23, 2023 |

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ............................................................................... 1

II.   IT IS UNDISPUTED THAT ZYPREXA CAUSED KIM'S ALLEGEDLY DISABLING MOVEMENT DISORDERS ......................... 2

III.  KIM WAS PRESCRIBED ZYPREXA TO TREAT DEPRESSION AND ANXIETY, NOT TO TREAT ANY "PSYCHOSIS" ........................... 2

IV.  THE DEGREE OF KIM'S PRE-EXISTING CONDITION IS IRRELEVANT TO APPLICATION OF THE EXCLUSION ...................... 6

V.   DR. RICHARDSON DID NOT CONCLUDE THAT KIM'S PRE-EXISTING DEPRESSION AND ANXIETY DID NOT SUBSTANTIALLY CONTRIBUTE TO HIS DISABILITY ..................... 10

VI.  DR. LENTNEK REVIEWED KIM'S MEDICAL RECORDS ................... 12

VII. THE STATEMENTS OF KIM'S FAMILY MEMBERS AND INSURANCE SALESPERSONS ARE ENTITLED TO NO WEIGHT ........................................................................................... 13

VIII. GUARDIAN DID NOT NEED TO REQUEST AN INDEPENDENT MEDICAL EXAMINATION BECAUSE IT DID NOT REACH THE ISSUE OF WHETHER KIM WAS TOTALLY DISABLED ..................................................................... 15

IX.  CONCLUSION ............................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dowdy v. Metro. Life Ins. Co.*,
  890 F.3d 802 (9th Cir. 2018) ...................................................................8

*Est. of Maurice v. Life Ins. Co. of N. Am.*,
  792 Fed.Appx. 499 (9th Cir. 2020)............................................................8

*Kushner v. Lehigh Cement Co.*,
  572 F.Supp.2d 1182 (C.D. Cal. 2008) ....................................................16

*Lukianczyk v. Unum Life Ins. Co. of Am.*,
  505 F.Supp.3d 1033 (E.D. Cal. 2020) ......................................................3

*Ramos v. Bank of Am.*,
  779 F.Supp.2d 1058 (N.D. Cal. 2011)......................................................15

*Shaw v. Life Ins. Co. of N. Am.*,
  144 F.Supp.3d 1114 (C.D. Cal. 2015) ..............................................3, 14

*Stratton v. Life Ins. Co. of N. Am.*,
  589 F.Supp.3d 1145 (S.D. Cal. 2022) .....................................................14

## I.    <u>INTRODUCTION</u>

Guardian is not required to prove that Kim's pre-existing depression and anxiety were the *sole* cause of his claimed disability, to the exclusion of all other causes. Guardian is merely required to show that those pre-existing conditions "substantially contributed" to his claimed disability. Guardian has met that burden here.

Kim unequivocally admits in his opening brief that "Zyprexa had caused [Kim's] TA [tardive akathisia] and TD [tardive dyskinesia]." [Doc. #28, 12:16.] This admission is fatal to Kim's position, because *all* medical providers—both treating and consulting—unanimously agree that Kim was prescribed Zyprexa for depression and anxiety. The record is clear that Kim's treating psychiatrist, Dr. Moldawsky, prescribed Zyprexa for "major depressive disorder, recurrent episode, severe," and "generalized anxiety disorder." Even Kim, himself, in subsequently describing his own medical history to another psychiatrist, reported that he had been prescribed and had taken Zyprexa to treat his anxiety. [AR 2427] Inasmuch as Zyprexa caused Kim's allegedly disabling conditions, and Kim had taken Zyprexa to treat depression and anxiety, there can be no real dispute that Kim's depression and anxiety "substantially contributed" to his disability.

Seeking to avoid the inevitable, Kim floats a brand new theory: that he was prescribed Zyprexa for "psychosis," a new condition. Doc. #28, 4:23. Psychosis— a condition in which one is detached from reality and cannot discern what is real from what is not—is never even mentioned in Kim's painstaking, 18-page Complaint. And the Administrative Record is devoid of any support for the assertion that Kim suffered from psychosis or that he took Zyprexa to treat that condition. To the contrary, *Dr. Moldawsky explicitly ruled out psychosis*.

Kim advances other futile arguments in an effort to dodge the pre-existing condition exclusion, which Guardian addresses more fully below. At the end of the day, the Administrative Record amply demonstrates that Kim's depression and

anxiety, for which he was prescribed Zyprexa, at a minimum substantially contributed to his alleged disability. Accordingly, the pre-existing condition exclusion bars coverage, even if COVID-19, psychosis, or any other alleged condition also could be regarded as a contributing cause.

The Court should enter judgment in Guardian's favor.

## II.    IT IS UNDISPUTED THAT ZYPREXA CAUSED KIM'S ALLEGEDLY DISABLING MOVEMENT DISORDERS

Kim admits, as he must, that "Zyprexa had caused [his] TA [tardive akathisia] and TD [tardive dyskinesia]," the movement disorders that he claims disabled him. [Doc. #28, 12:16.] This is consistent with the opinions of Dr. Neff [AR 704, 1269-70], Dr. Martinez [AR 2600, 3274], Dr. Linda Lee [AR 3475], Dr. Robert Lee [AR 1379, 3270], and Dr. Meytin [AR 5415]. Again, no medical professional ever opined that Kim's tardive dyskinesia and tardive akathisia were caused by anything other than Zyprexa.

## III.   KIM WAS PRESCRIBED ZYPREXA TO TREAT DEPRESSION AND ANXIETY, NOT TO TREAT ANY "PSYCHOSIS"

Kim's effort to attribute his Zyprexa use—which he admits caused his allegedly disabling tardive dyskinesia and tardive akathisia—to "psychosis," rather than to his depression and anxiety, is revisionist at best. Preliminarily, *Kim was never even diagnosed with psychosis*. Psychosis is "disconnection from reality," i.e., "when a person has trouble telling the difference between what's real and what's not."[1] That is not what Kim was experiencing. Indeed, neither of Kim's treating psychiatrists, Drs. Moldawsky and Lee, ever diagnosed him with psychosis. On the contrary, Kim's longtime treating psychiatrist, Dr. Moldawsky, ***explicitly ruled out***

---

[1]  https://my.clevelandclinic.org/health/symptoms/23012-psychosis; *see also* https://www.nimh.nih.gov/health/publications/understanding-psychosis.

DEFENDANT'S RESPONSIVE TRIAL BRIEF
CASE NO.  8:23-CV-01579-DOC-ADSX

***psychosis*** *during an April 7, 2021 visit* (during the "thick" of Kim's post-COVID-19 issues), stating: **"*No psychotic symptoms.*"** (Emphasis added.) [AR 786] Dr. Moldawsky also dismissed any relationship between Kim's condition and his COVID-19 diagnosis, noting that "*the primary psych disorder is the more salient factor.*" (Emphasis added.) [*Id.*]

Of Kim's dozen citations to the Administrative Record for the assertion that he "developed psychosis," Doc. #28, 8:5-6, only one actually mentions "psychosis." That reference is in a note by Dr. Neff—a neurologist—in which she states: "onset of psychosis and anxiety after covid in January, medical literature support this as a possible sequelae." [AR 707] Dr. Neff, who is not a psychiatrist, did not appear to be documenting her own diagnosis; rather, she merely appeared to be imprecisely recording Kim's self-report of his history. [*Id.*] Even if Dr. Neff was purporting to diagnose psychosis, such a diagnosis—which stands in isolation from the numerous other medical professionals, including psychiatrists, who never diagnosed psychosis—is entitled to little-to-no weight. In assessing the weight to give a treating provider's opinions, the Court looks not only to "whether they report subjective complaints or objective medical evidence," but also to "(1) the extent of the patient's treatment history, (2) the doctor's specialization or lack thereof, and (3) how much detail the doctor provides supporting his or her conclusions." *Lukianczyk v. Unum Life Ins. Co. of Am.*, 505 F.Supp.3d 1033, 1046 (E.D. Cal. 2020) (internal quotations omitted) (citing and quoting *Shaw v. Life Ins. Co. of N. Am.*, 144 F.Supp.3d 1114, 1129 (C.D. Cal. 2015)). Dr. Neff is not a psychiatrist, never treated Kim for any mental health issues (she only treated his movement disorders), and provided no support—objective or subjective—for a diagnosis of psychosis (disconnection from reality). What's more, her comment stands in contradiction to the explicit findings of Kim's treating psychiatrist, Dr. Moldawsky. [AR 786][2]

---

[2] In the same visit, Dr. Neff's treatment plan consisted solely of a referral for psychiatry, reaffirming that Kim's psychiatric condition was outside the scope of her expertise.

Kim also assigns significance to Dr. Neff's recitation of a then-recent study of psychiatric conditions in COVID-19 patients. [Doc. #28, 8:9-12] That study apparently found that 1.4% of patients with confirmed COVID-19 were diagnosed with psychotic disorder within six months. [AR 708] From this isolated statistic, Kim speculates that "COVID-19 likely caused [Kim's] sudden onset of psychosis." [Doc. #28, 8:11-12] Kim's inference is wholly unsupported. 1.4% does not signify a "likelihood." In fact, it signifies the opposite: 98.6% of COVID-19 patients—the vast majority—were **not** diagnosed with psychotic disorder. So, relying on Kim's proffered study, it is far more likely that he did not develop psychosis.

That Kim's "psychosis" theory is an after-the-fact pivot is obvious from his Complaint, which makes no mention of the condition in any of its 18 pages of detailed allegations. [Doc. #1] It is telling that, out of 6005 pages of Administrative Record, Kim was able to muster just one reference to "psychosis." This falls woefully short of demonstrating that his disability was caused by psychosis, let alone that it was caused *solely* by psychosis without substantial contribution from Kim's significant depression and anxiety.

Critically, regardless of whether Kim suffered from psychosis, the determinative, undisputed fact is that ***Zyprexa was prescribed to treat Kim's depression and anxiety, not any psychosis***:

- Dr. Moldawsky prescribed Zyprexa on January 19, 2021, in direct response to an email in which Kim stated: "I'm having some intense mental symptoms. My anxiety is through the roof . . . . I'm pretty much paralyzed with panic and some dark thoughts . . . ." Kim did not report any delusions, hallucinations, or detachment from reality. [AR 4900]

- In a phone consult with Dr. Moldawsky the following day, Kim reiterated his complaints of intense anxiety, agitation, pacing, insomnia, feelings of doom, and thoughts of self-harm, and again reported no psychosis symptoms. [AR 4900-01, 4904]

- In connection with his Zyprexa prescription, Dr. Moldawsky noted diagnoses of "major depressive disorder, *recurrent episode*, severe," and "generalized anxiety disorder." [AR 4904] Dr. Moldawsky did not record a diagnosis of psychosis; *to contrary, he noted "no paranoid ideation" and that Kim's "thought processes [were] grossly intact."* (Emphasis added) [AR 4900]

- On May 4, 2021, Kim told psychiatrist Dr. Robert Lee that he had been prescribed Zyprexa to treat his increased anxiety and agitation. Kim did not say he had been prescribed Zyprexa to treat psychosis or its symptoms (e.g., delusion, hallucinations, etc.). [AR 2427]

- Dr. Robert Lee diagnosed Kim with generalized anxiety disorder, ADHD, and drug-induced akathisia. Dr. Lee did not diagnose Kim with psychosis or note any such diagnosis. [AR 2431-32]

- Following his review of Kim's medical records, Dr. Lentnek noted that Zyprexa "was started for [Kim's] severe anxiety and panic state," not for psychosis. [AR 5409]

- Following his review of Kim's medical records, Dr. Meytin noted that Kim "was started on Zyprexa on 1/20/21 for severe anxiety, depression, and suicidal ideation," not for psychosis. [AR 5415]

In sharp contrast to the above, ***Kim has cited no evidence that he was prescribed Zyprexa to treat psychosis***.

In sum, because Zyprexa—the drug that Kim admits caused his allegedly disabling movement disorders—was prescribed and taken to treat Kim's depression and anxiety, Guardian has demonstrated that Kim's pre-existing condition and its related treatment caused or substantially contributed to his alleged disability.

///

///

///

## IV.    THE DEGREE OF KIM'S PRE-EXISTING CONDITION IS IRRELEVANT TO APPLICATION OF THE EXCLUSION

Kim's attempts to elude the pre-existing condition exclusion by characterizing his pre-existing depression and anxiety as "minor," "common," "mild," and "non-disabling" are unavailing, both factually and legally.  [*See* Doc. #28, 5:2-3, 7:10-12, 15:6-8, 21:3-4]  As discussed in Guardian's opening brief, Kim's depression and anxiety were hardly "minor."   Kim's pre-existing psychiatric symptoms were steadily worsening to the point that in September 2020, months before contracting COVID-19, Kim sought referral for a sleep study to treat his insomnia [AR 5189] and emergency treatment for symptoms for symptoms of a panic attack including non-exertional chest pain, confusion, disorientation and difficulty forming words [AR 3284, 5217].[3]  And in November 2020, Kim's depressive thoughts and feelings were so persistent and uncontrolled that he asked Dr. Moldawsky for TMS treatment. [AR 5194]

Kim's assertion that he did not see Dr. Moldawsky until after his COVID-19 diagnosis, Doc. #28 at 7:18-21, is false.  Kim saw Dr. Moldawsky on January 4, 2021—before testing positive for COVID-19 on January 10—to complain about his chronic depression, anhedonia, and suicidal ideation.   [AR 2238-39]    Dr. Moldawsky's notes characterize these complaints as "longstanding," contrary to Kim's assertion that his symptoms were new and onset by his recent COVID-19 infection.   [*Id.*]    It was during that visit that Dr. Moldawsky approved TMS treatment, in light of Kim's prior inability to effectively treat his symptoms through other means.  [AR 2238][4]

---

[3]  *See* Curt Cackovic, Saad Nazir, Raman Marwaha, *Panic Disorder*, https://www.ncbi.nlm.nih.gov/books/NBK430973.

[4]  Kim's statement that he inquired about TMS treatment simply "because some relatives had used the treatment and he wanted to try it," Doc. #28 at 7:22-24, is misleading.  Kim emailed Dr. Moldawsky in November 2020 to ask about TMS because he was "struggling with persistent depressive thoughts and feelings," which he had been unable to control with medication.  [AR 5580-81]  The record shows that the only reason Kim did not start his TMS treatment was because he subsequently contracted COVID-19.  [AR 4903 ("I haven't started the TMS

Of course, the fact that Kim's pre-existing condition was "non-disabling" during the lookback period and became disabling later, after the coverage's inception, is immaterial. By definition, *all* disabilities within the scope of the pre-existing condition exclusion necessarily are non-disabling initially, when the plan participant is working and eligible for disability coverage through his employment, and disabling later, when a disability commences during the first 12 months of the coverage. Consider, for instance, a plan participant who suffers from a history of non-disabling migraines, which he is able to manage with medication and work through. If that participant were to claim that he became totally disabled from migraines within the first 12 months of his coverage, could he circumvent application of a pre-existing condition exclusion based on the assertion that, during the lookback period, his migraines were "minor," "common," "mild," and "non-disabling"? The answer, obviously, is "no." Any contrary conclusion would nullify the pre-existing conclusion entirely.

The Plan does not require that a condition be "severe" to constitute a pre-existing condition. Under the Plan's clear terms, a participant who "received medical treatment, care or services for a diagnosed condition or took prescribed medication for a diagnosed condition" during the lookback period has a "pre-existing condition." [AR 260] The condition's subjective "severity" is immaterial; the Plan deems any condition that requires medical care or prescription medication to be sufficiently serious for purposes of the exclusion. Kim does not dispute that he took Lexapro, a prescribed medication, and otherwise received medical care, for his diagnosed depression and anxiety during the lookback period. [AR 4483-84] As such, Kim's depression and anxiety are "pre-existing conditions" under the Plan.

---

treatment we discussed because I've been sick.")] After he contracted COVID-19, Kim described that his "anxiety is through the roof" and asked about commencing the TMS treatment. [AR 4903] In other words, Kim, himself, considered his post-COVID-19 symptoms an intensification of the same psychiatric symptoms he had experienced previously, and wanted to treat them with the same treatment he had requested months before he contracted COVID-19.

And pursuant to the Plan, Kim is not covered for any disability "caused or substantially contributed to by [depression or anxiety] or medical or surgical treatment of [depression or anxiety]."  [AR 260-61]

Kim's reliance on *Dowdy v. Metro. Life Ins. Co.*, 890 F.3d 802 (9th Cir. 2018), is misplaced.  The issue before the *Dowdy* court was not whether the severity of Dowdy's pre-existing diabetes increased following his car accident, but whether diabetes substantially contributed to Dowdy's post-accident amputation.  *Id.* at 806. The Ninth Circuit determined that the car accident resulted in a severe injury that *by itself* came close to amputating Dowdy's lower leg, and thus that diabetes was not a substantial contributing factor.  *Id.* at 811.  This is not the case here.  There was no basis independent of depression and anxiety that resulted in Zyprexa being prescribed to Kim (which, in turn, caused the allegedly disabling movement disorders).

*Est. of Maurice v. Life Ins. Co. of N. Am.*, 792 Fed.Appx. 499 (9th Cir. 2020), is applicable here.  *Id.* at 500.  There, after Maurice cut his feet on glass in a swimming pool, his own expert opined that his pre-existing diabetes prevented the cuts from healing properly and thus exacerbated the resultant infection, eventually leading to amputation.  *Id.*  The Ninth Circuit found it "inescapable that Maurice's diabetes substantially contributed to the amputation."  *Id.*  In so concluding, the Ninth Circuit reinforced that "a preexisting condition can bar coverage even though [a subsequent] injury was the predominant or proximate cause of the disability."  *Id.* at 500.  Here, where Zyprexa was the undisputed cause of Kim's allegedly disabling movement disorders, and Zyprexa had been prescribed to treat depression and anxiety, it is "inescapable" that Kim's depression and anxiety substantially contributed to his claimed disability, even if another condition somehow could be shown to be a "predominant or proximate cause of the disability."  *See id.*

Significantly, the symptoms that ultimately led Kim to seek additional treatment in late January 2021 were the same—albeit more intense—depression and

anxiety symptoms Kim had experienced previously.  [*See* AR 3288, 4898, 5189, 5190, 5217]  As detailed in Guardian's opening brief, Kim's symptoms gradually intensified, prompting him to seek TMS treatment.  When prescribing Zyprexa in late January 2021, Dr. Moldawsky (Kim's longtime psychiatrist) noted the supporting diagnoses as "generalized anxiety disorder" and "major depressive disorder, recurrent episode, severe"—*the same diagnoses Kim had since at least 2018*. [AR 4904, 4964] Dr. Moldawsky's reference to a "recurrent episode" further solidifies that Kim was experiencing a recurrence of an existing condition.

Kim also perceived his own symptoms as a progression of his pre-existing symptoms, as evident from his January 4, 2021 (*pre*-COVID-19) self-report of "severe" depression and "severe" anxiety, the *same* as his report during the five subsequent visits ranging from January 25, 2021 to May 13, 2021. [AR 1020, 1022]. While some of the symptoms endorsed by Kim increased in frequency, e.g., from "more than half of the days" to "nearly every day," it is clear that Kim was experiencing a progression of pre-existing symptoms.  [AR 1019-1023][5]  This is further reinforced in Kim's January 19, 2021 email to Dr. Moldawsky:

> I'm currently struggling through a case of covid and I'm having some
> intense mental symptoms.  My anxiety is through the roof and I spend
> hours a night just pacing through my house trying to wear myself out.
> …  I haven't started the TMS treatment we discussed because I've been
> sick.  If I'm no longer contagious should I get the TMS treatment sooner
> than later or should I be trying to get my head back to baseline first?"

[AR 4903].

///

///

///

---

[5] Kim's characterization of these self-reports as depicting that his symptoms were "minimal," Doc. #28 at 20:22-23, are a blatant mischaracterization of the records themselves.

DEFENDANT'S RESPONSIVE TRIAL BRIEF
CASE NO.  8:23-CV-01579-DOC-ADSX

## V.    DR. RICHARDSON DID NOT CONCLUDE THAT KIM'S PRE-EXISTING DEPRESSION AND ANXIETY DID NOT SUBSTANTIALLY CONTRIBUTE TO HIS DISABILITY

Kim's contention that Dr. Richardson concluded that his pre-existing depression and anxiety did not substantially contribute to his disability, Doc. #28 at 4:4-12, is based on an utter distortion of Dr. Richardson's report.  The context in which Dr. Richardson made the quoted statement is critical.  Dr. Richardson was asked the following question:

> Did Mr. Kim have a physical or mental condition whether diagnosed or was misrepresented for which he received advice, treatment, or took medication during the period 2/1/20-4/30/20?  If yes, please outline all conditions.

[AR 5378]  He answered that question in the affirmative and identified Kim's pre-existing *orthopedic* condition (which is not at issue in this action):

> Yes, the claimant had a physical or mental condition whether diagnosed or was misrepresented for which he received advice, treatment, or took medication during the period 2/l/20-4/30/20.  *Conditions are cervical radiculitis, radiculopathy, and neck pain.*  (Emphasis added.)

[AR 5379]  Dr. Richardson was then asked if Kim had received treatment for those conditions, and Dr. Richardson went on to list Kim's cervical radiculitis, radiculopathy, and neck pain.  [*Id.*]  *Dr. Richardson did not address Kim's psychiatric treatment history.*  [*Id.*]

Next, Dr. Richardson was asked to list the conditions causing Kim's impairment, and he identified Kim's psychiatric conditions and related movement disorders.  [*Id.*]  He then provided the opinion, which Kim pulled out of context, in which he stated that Kim's pre-existing conditions—i.e., the orthopedic conditions he had identified above—did not cause or contribute to the impairing psychiatric conditions and related movement disorders:

DEFENDANT'S RESPONSIVE TRIAL BRIEF
CASE NO.  8:23-CV-01579-DOC-ADSX

1    The conditions the claimant received advice, treatment, or medication

2    caused by, contributed to by, or resulting from those conditions

3    between 2/1/20-4/30/20; did not cause or contribute to the conditions

4    that are impairing as of 3/25/21.

5  [*Id.*]

6    In summary, Dr. Richardson opined on the existence of a causal connection

7  between Kim's pre-existing orthopedic conditions and his allegedly disabling

8  psychiatric conditions and movement disorders.  Dr. Richardson did ***not*** opine, as

9  Kim suggests, that Kim's psychiatric treatment during the lookback period did not

10 contribute to his allegedly disabling conditions.  On the contrary, Dr. Richardson's

11 statements elsewhere in his report corroborate the conclusion that Zyprexa caused

12 Kim's movement disorders.  [AR 5380-81]

13 ///

14 ///

15 ///

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

## VI.   **DR. LENTNEK REVIEWED KIM'S MEDICAL RECORDS**

Kim's argument that Dr. Lentnek did not review Kim's medical records, Doc. #28 at 22:15-16, is belied by the Administrative Record.  Dr. Lentnek opens his report by stating "I reviewed records from 7/11/2018 through 6/20/2022," and then proceeds to list the records he reviewed:

> This is a peer review regarding Kim, Jason. Co-reviewers have been asked to review the medical records on behalf of ECN. I reviewed records from 7/11/2018 through 6/20/2022 including: Ruby G. Burrell, LVN / Licensed Vocational Nurse, on 7/11/2018; Jagdeep K. Mehrok, MD / Family Medicine, extending from 7/12/2018 to 9/13/2020; Michael Kabiri, MD / Diagnostic Radiology, on 10/25/2018; Jason H. Lee, MD / Neuroradiology, on 11/19/2018; Adrian C. Nickolescu, MD / Physical Medicine & Rehabilitation, extending from 11/7/2018 to 11/20/2018; Kaiser Permanente / Physical Therapy, extending from 11/20/2018 to 1/10/2019; Tan N. Ma, LVN / Licensed Vocational Nurse, on 12/24/2018; Mubeen Siddiqua, MD / Family Medicine, on 1/14/2019; Marie Christine Y. Niebala, LVN / Licensed Vocational Nurse, on 6/3/2019; Andrew W. Merritt, MD / Physical Medicine & Rehabilitation, extending from 7/15/2019 to 9/16/2021; Prescription Records from Walgreens, extending from 7/24/2019 to 3/10/2020; Andrea Esqueda-Chavez, LVN / Licensed Vocational Nurse, on 8/2/2019; Jeevan S. Daniels, DO / Family Medicine, on 10/11/2019; Steven S. Abad, RN / Registered Nurse, on 1/8/2020; Premiere Physical Therapy, extending from 1/23/2020 to 2/6/2020; Robert J. Lee, DO / Psychiatry, extending from 9/17/2020 to 6/18/2021; Richard W. Swartzentruber Jr., MD / Emergency Medicine, on 9/23/2020; Richard J. Moldawsky, MD / Psychiatry, extending from 11/30/2020 to 4/22/2021; Claimant Interview Records from The Guardian, on 1/1/2021; Josie D. Lang, RN / Registered Nurse, on 1/5/2021; Wendy L. Cohen, MD / Family Medicine, on 1/18/2021; Tiffanie I. Luk, MD / Family Medicine, on 1/20/2021; Masayuki Fukuzawa, NP / Nurse Practitioner, extending from 1/22/2021 to 2/19/2021; Cori A. McMahon, PA-C / Physician Assistant, on 3/18/2021; Jun J. Kim, RN / Registered Nurse, on 3/20/2021; Jason N. Hartis, MD / Emergency Medicine, on 3/25/2021; Carolyn S. Neff, MD / Neurology, extending from 3/25/2021 to 5/12/2021; Gabriel A. Figueroa, LMFT / Licensed Marriage & Family Therapist, extending from 3/26/2021 to 3/31/2021; Alexandra G. Duckworth, MD / Emergency Medicine, on 4/16/2021; Linda Soojin Lee, MD / Emergency Medicine, on 4/17/2021; Erika Lemus, LCSW / Licensed Clinical Social Worker, extending from 4/21/2021 to 6/9/2021; Anne M. Rose, LMFT / Licensed Marriage & Family Therapist, on 4/26/2021; Priscilla P. Armstrong, PhD / Psychology, on 5/10/2021; Medications Lists, on 7/20/2021; Raafat W. Girgis, MD / Psychiatry, on 5/13/2021; Patient Health Questionnaire (PHQ-9), on 5/13/2022; Medical Review Referral, on 6/20/2022.

[AR 5406] Dr. Lentnek's review of Kim's medical records also is evident from his summary of those records.  [*See* AR 5407-08]  In short, Dr. Lentnek's report

demonstrates that he was provided with and reviewed Kim's medical records.[6]

Significantly, among the records Dr. Lentnek listed as having reviewed were records from "Carolyn S. Neff, MD / Neurology, extending from 3/25/2021 to 5/12/2021." [AR 5406]  Still, Kim hypothesizes that Dr. Lentnek must not have reviewed Dr. Neff's records because he concluded that "[m]edical information does not provide verifiable evidence" that Kim's impairment was due to COVID-19. [Doc. #28, 22:14-16]  As discussed above, Dr. Neff's records do not contain "verifiable evidence" that Kim's allegedly disabling conditions were caused by COVID-19.  At best, those records demonstrate that a tiny minority of COVID-19 patients also are diagnosed with psychosis.  But no doctor diagnosed *Kim* with psychosis, and the medical records show his allegedly disabling movement disorders were caused by Zyprexa, which Dr. Moldawsky had prescribed for depression and anxiety. [AR 4900-01, 4904]  Dr. Moldawsky never diagnosed Kim with psychosis, whether in connection with COVID-19 or otherwise.

Finally, Dr. Lentnek's conclusions that Kim's COVID-19 infection was normal, light, and did not require hospitalization or other treatment, also are supported by the medical evidence.  [AR 5409]

## VII.  THE STATEMENTS OF KIM'S FAMILY MEMBERS AND INSURANCE SALESPERSONS ARE ENTITLED TO NO WEIGHT

Kim devotes a substantial portion of his brief to statements from his wife and parents-in-law.  While their statements document their observations of Kim's post-disability condition, they are of no value in determining the *cause* of that condition or, more specifically, whether Kim's pre-existing depression and anxiety substantially contributed to it.  There is no indication that Kim's wife or her parents

---

[6] Kim makes much of Dr. Meytin's comment that, as of his July 5, 2021 conversation with Dr. Lentnek, Dr. Lentnek purportedly had access only to "abstracted" records. [Doc. #28, 17:19-23]  While it is not clear that Dr. Meytin meant, it *is* clear that, by the time he authored his July 21, 2021 report, Dr. Lentnek obviously had reviewed Kim's medical records.

reviewed Kim's extensive medical records or that they were even aware of his pre-existing conditions and related treatment. None of them even acknowledged that Kim had taken Zyprexa, much less recognized the medical providers' consensus that Zyprexa caused the movement disorders they had observed.

That Kim's wife or her parents had been "therapists" at one point is of no import. Independent of the lack of any information about their qualifications, experience, or specialization, there also is no evidence that any of them ever had a therapist-patient relationship with him. (The existence of such a relationship is unlikely, given the potential for conflict of interest.)

As discussed in Guardian's opening brief, "[n]arratives provided by the claimant and any family and friends are properly accorded less weight than medical evidence in the record given their potential for bias and inability to diagnose medical conditions or assess functional capacity in the way individuals trained in the medical field can." *See Stratton v. Life Ins. Co. of N. Am.*, 589 F.Supp.3d 1145, 1175 (S.D. Cal. 2022) (citing *Shaw v. Life Ins. Co. of N. Am.*, 144 F.Supp.3d 1114, 1136 (C.D. Cal. 2015).

Kim also spotlights the statements of two sales individuals—the broker who sold the Policy and a "service manager"—in purported support of his position. Neither individual is a doctor or was involved in the adjudication of Kim's claim. And there is no evidence that either of them reviewed Kim's medical records or was familiar with Kim's medical history, including his pre-existing psychiatric conditions and his post-disability Zyprexa use and related issues. Instead, their statements reveal that they were merely making a plea to Guardian based on information selectively supplied to them by Kim's family. For example, the broker stated that "we [i.e., the broker and Kim's family] believe [Kim's severe health situations] started due to him contracting COVID-19." [AR 2025] The service manager, who said she was seeking an "explanation [for] the broker," simply posed

the question of whether Kim had a serious medical condition or underlying condition prior to contracting covid." [AR 2061]

As such, the statements from Kim's family and the insurance broker and service manager are inconsequential to the outcome of this action.

## VIII. <u>GUARDIAN DID NOT NEED TO REQUEST AN INDEPENDENT MEDICAL EXAMINATION BECAUSE IT DID NOT REACH THE ISSUE OF WHETHER KIM WAS TOTALLY DISABLED</u>

Kim's criticism of Guardian for not requesting an independent medical examination ("IME") of Kim, Doc. #28 at 18:10-11, is disingenuous. Dr. Meytin suggested that an IME be conducted *on the issue of whether Kim is disabled*, not on the issue of whether Kim's pre-existing condition substantially contributed to his claimed disability. [AR 5456] This followed his exchange with Dr. Martinez, in which they disagreed as to whether Kim was disabled. Specifically, Dr. Meytin commented in his July 21, 2022 report that, "[f]rom a physical neurological perspective, there were no restrictions placed." [AR 5416] On August 30, 2022, Dr. Martinez responded after reviewing Dr. Meytin's report: "I strongly disagree with [Dr. Meytin's] position that Mr. Kim was not disabled due to his Tardive Akathisia ("TA") and Tardive Dyskinesia ("TD")." [AR 5447] It was in reply to Dr. Martinez's response that Dr. Meytin suggested that an IME might help to resolve their differences: "If there continues to be discrepancy with [Kim's] possible restrictions, a formal IME would be most prudent . . . ." [AR 5456]

Because Guardian determined that Kim's claimed disability was barred by the pre-existing condition exclusion, it did not need to adjudicate the issue of whether Kim was totally disabled, and thus it did not need to resolve the discrepancy between the opinions of Dr. Meytin and Dr. Martinez on that issue. Accordingly, there was no need for an IME of Kim. *See Ramos v. Bank of Am.*, 779 F.Supp.2d 1058, 1075-76 (N.D. Cal. 2011) ("There is no requirement in ERISA that the claims

administrator order an in-person IME of a claimant."); *Kushner v. Lehigh Cement Co.*, 572 F.Supp.2d 1182, 1192 (C.D. Cal. 2008) ("ERISA also does not require that an insurer seek independent medical examinations."). Importantly, no doctor ever suggested that an IME would assist in the determination of whether the pre-existing condition exclusion applied.

## IX.  **CONCLUSION**

For the foregoing reasons and those set forth in Guardian's opening brief, this Court should enter judgment in favor of Guardian, and against Kim.

Dated:  March 25, 2024                    MAYNARD NEXSEN LLP

By:   /s/ Ophir Johna
OPHIR JOHNA
KAREN T. TSUI
Attorneys for Defendant The Guardian Life
Insurance Company of America

1

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.1</u>

The undersigned, counsel of record for Defendant The Guardian Life Insurance Company of America, certifies that this brief contains 3,996 words (excluding the caption, any table of contents, any table of authorities, the signature block, this certification, and any indices and exhibits), which complies with the word limit of Local Rule 11-6.1.

Dated:  March 25, 2024                    MAYNARD NEXSEN LLP

By:  /s/ Ophir Johna
OPHIR JOHNA
KAREN T. TSUI
Attorneys for Defendant The Guardian Life
Insurance Company of America

17

# CERTIFICATE OF SERVICE

### *Kim v. Guardian Life Insurance Company of America*
### Case No. 8:23-cv-01579-DOC-ADS

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am a citizen of the United States and employed in Los Angeles, California, at the office of a member of the bar of this Court at whose direction this service was made. I am over the age of 18 and not a party to the within actions; my business address is 10100 Santa Monica Blvd., Ste. 550, Los Angeles, CA 90067.

On **March 25, 2024**, I served the document(s) entitled, DEFENDANT'S RESPONSIVE TRIAL BRIEF, on the interested parties in this action by placing true copies thereof enclosed in a sealed envelope(s) addressed as stated below:

### SEE ATTACHED SERVICE LIST

☒ **(BY CM/ECF SERVICE)**: I caused such document(s) to be delivered electronically via CM/ECF as noted herein.

I declare under penalty of perjury under the laws of the United States that the above is true and correct and was executed on **March 25, 2024**, at Los Angeles, California.

_____
Lea Borys

1020793\304578071.v1

# SERVICE LIST

### *Kim v. Guardian Life Insurance Company of America*

### Case No. 8:23-cv-01579-DOC-ADS

Robert J. McKennon, Esq.
m@mckennonlawgroup.com
Nicholas A. West, Esq.
nw@mckennonlawgroup.com
Erik C. Fritz, Esq.
ef@mckennonlawgroup.com
MCKENNON LAW GROUP PC
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |
Fax:  949-385-5165

*Attorneys for Plaintiff Jason Kim*

1020793\304578071.v1