Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Nicholas A. West (SBN 309003) *nw@mckennonlawgroup.com*
Erik C. Fritz (SBN 337341) *ef@mckennonlawgroup.com*
**MCKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone: 949-387-9595 | Fax: 949-385-5165

Attorneys for Plaintiff Jason Kim

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| JASON KIM,<br><br>               Plaintiff,<br><br>vs.<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA; and DOES 1 through 10, inclusive,<br><br>             Defendants. | Case No.: 8:23-cv-01579-DOC-ADS<br><br>Action Filed: August 23, 2023<br><br>Trial Date: April 15, 2024<br><br>---<br><br>**PLAINTIFF JASON KIM'S RESPONDING TRIAL BRIEF**<br><br>DATE:  April 15, 2024<br>TIME:  8:30AM<br>JUDGE:  Honorable David O. Carter<br>CTRM:  10A, Santa Ana |



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

1.  INTRODUCTION……………………………………………………………1

2.  THE PLAN'S PRE-EXISTING CONDITION EXCLUSION DOES
    NOT BAR PLAINTIFF'S RECOVERY……………………………………4

    A.  Plaintiff's Pre-Existing Conditions of Mild Anxiety and Depression
        Did Not Cause His Disability ……………………………………………4

    B.  A Pre-Existing Condition Did Not Substantially Contribute to
        Plaintiff's Disability ……………………………………………………14

3.  CONCLUSION ……………………………………………………………..17



1
2

# **TABLE OF AUTHORITIES**

## **Cases**

*Biggar*, 274 F.Supp.3d at 968 ................................................................. 12

Dowdy v. Metropolitan Life Ins. Co., 890 F.3d 802 (9th Cir. 2018) .............. passim

*Earle v. Unum Life Insurance Company of America*, 2021 WL 4871785 (9th Cir. 2021) ................................................................................................. 17

*Ekno v. Northwestern Mutual Life Insurance Co.*, 2008 WL 782728 (E.D. Cal. 2008) ........................................................................................... 17

*Estate of Maurice v. Life Insurance Co. of North America*, 792 F.App'x 499 (9th Cir. 2020) ................................................................................... 15, 16

*Ibrahim v. Bayer Corp. Disability Plan*, 584 F.App'x 743 (9th Cir. 2014) ...... 12, 13

*Miller v. PNC Financial Servs. Group, Inc.*, 278 F.Supp.3d 1333 (S.D. Fla. 2017) ............................................................................................... 12

*Sanchez-Levine v. Metro. Life Ins. Co.*, 2017 WL 4286139 (C.D. Cal. 2017) ....... 13

*Sanchez-Levine v. Metropolitan Life Insurance Co.*, 2017 WL 4286139 (C.D. Cal. 2017) ....................................................................................... 13

*Shaw*, 144 F.Supp.3d at 1130 ................................................................. 13

*Stratton v. Life Insurance Co. of North America*, 589 F.Supp.3d 1145, 1175 (S.D. Cal. 2022) ............................................................................... 10

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1. **INTRODUCTION**

The Guardian Life Insurance Company of America ("Guardian") does not question that Plaintiff Jason Kim ("Plaintiff") was disabled during the time in dispute between the parties. Instead, it focuses solely on the pre-existing condition exclusion in the long-term disability ("LTD") policy (the "Policy") at dispute in this matter. Guardian presented the Court with a trial brief that mischaracterizes facts, omits key information, and fails to understand the difference between minor long-term non-disabling depression and anxiety versus a complete psychotic breakdown triggered by COVID-19 which then led to a prescription of medication (Zyprexa, an anti-psychotic medication) that caused his tardive akathisia ("TA") and tardive dyskinesia ("TD") conditions. The Policy's pre-existing condition exclusion requires Guardian to prove that the pre-existing conditions or treatment related thereto caused or substantially contributed to the disability. Here, the pre-existing conditions on which it relies **did not** cause or contribute to Plaintiff's disability.

Guardian inaccurately asserts that no treating physician agrees with Plaintiff's position that his disability due to TA and TD were caused by complications related to the treatment of COVID-19 symptoms. It falsely insists that all physicians agree that Plaintiff's pre-existing conditions – his minor anxiety and depression – caused or substantially contributed to his disability. **Not only do Plaintiff's treating physicians agree with him, but Guardian's own peer-review psychiatrist, Elbert Greer Richardson, M.D., specifically explained that Plaintiff's pre-existing mental health conditions *did not cause or contribute* to Plaintiff's disability**. Dr. Richardson explicitly rejected Guardian's position in this matter. Guardian's untenable position is analogous to someone having a cold during a lookback period, and arguing that later contracted pneumonia and COVID-19 are pre-existing conditions just because all three involve coughing. Here, in its egregious cherry-picking of evidence expedition, Guardian failed to accept the opinions of its own doctor. It denied Plaintiff's claim for the same inaccurate



reasons that it now presents in its trial brief.  This reasoning is highly flawed and should be rejected by the Court.

While Guardian concedes that Zyprexa caused the TA and TD conditions, it argues that Plaintiff was prescribed this medication to treat his pre-existing condition.  This is incorrect.  Not only did Guardian's own doctor reject this argument, but so have Plaintiff's treating physicians.  Plaintiff's medical records have multiple notes from his neurologist specifically explaining that COVID-19 likely caused his symptoms that ultimately led to his disability.  The evidence points to one conclusion:  Plaintiff was prescribed this medication to treat his psychotic breakdown, *a condition for which he was never previously treated*.  His neurologist even provided scientific studies supporting this position.  And, Richard Moldawsky, M.D., Plaintiff's initial psychiatrist, acknowledged that this was likely true.  Guardian focused on Dr. Moldawsky's diagnoses of anxiety and depression as evidence of its position.  However, Dr. Moldawsky specifically acknowledged that COVID-19 likely caused the health problems that Plaintiff was suffering from and he acknowledged that there was a break in the chain of causation.  Whereas Dr. Moldawsky referenced anxiety and depression in the medical records that he authored, subsequent analyses explain that Plaintiff suffered from far more than simple anxiety and depression.

Carolyn Neff, M.D., one of Plaintiff's neurologists, specifically explained both the COVID-19 connection and how Plaintiff suffered from advanced psychosis, not low grade, non-disabling anxiety and depression.  Guardian's consulting doctor, Dr. Richardson, reached a similar conclusion.  He explained that the medications that induced Plaintiff's TA and TD were prescribed after the lookback period to treat psychosis.  He also explained that Plaintiff suffered from hyperkinetic movement disorder during this time, which Dr. Moldawsky did not even address.  Ultimately, Dr. Moldawsky's medical records were very vague and basic.  In addition to the mischaracterization of Plaintiff's medical records,



1    **Guardian's only other support is that of a single peer-review doctor who never**

2    **even reviewed Plaintiff's medical records**.  Guardian only presented the doctor

3    with an inaccurate summary, not Plaintiff's actual medical records.  In short, he did

4    not have the necessary information to reach the conclusions that he reached.

5    Guardian's argument is ultimately based on an incomplete and misleading review of

6    the Administrative Record ("AR").  Plaintiff's pre-existing conditions, and the

7    treatment thereof, did not cause or contribute to his disability.

8        Guardian also argues that even if Plaintiff's disability was not caused by

9    a pre-existing condition (it was not), then, at a minimum, his pre-existing conditions

10   substantially contributed to the disability.  Again, Guardian fails to differentiate

11   between barely symptomatic low grade non-disabling depressive disorder and

12   anxiety as opposed to a full psychotic breakdown caused by a virus which then led

13   to a prescription of medication that caused his TA and TD conditions.  It mistakenly

14   treats one as a continuation of the other.  This is incorrect.  Dr. Richardson explicitly

15   rejected Guardian's position.  He stated that there was no connection at all.

16   Guardian has no evidence to refute this conclusion.  Guardian's insistence that Dr.

17   Richardson's report supports its position is blatantly false.

18       Ultimately, Guardian insists that persistent mild/asymptomatic depression and

19   anxiety, or their treatment, caused a complete psychotic breakdown.  This, in turn,

20   led Plaintiff to take the medications that triggered his TA and TD.  Guardian has the

21   burden of establishing that position.  Even its own expert rejected that argument.

22   The Court should reject it as well and enter judgment in Plaintiff's favor.

23

24

25

26

27

28

## 2. THE PLAN'S PRE-EXISTING CONDITION EXCLUSION DOES NOT BAR PLAINTIFF'S RECOVERY[1]

### A. Plaintiff's Pre-Existing Conditions of Mild Anxiety and Depression Did Not Cause His Disability[2]

Guardian argues that Plaintiff suffered from depression and anxiety during the lookback period, that the depression and anxiety became severe, that he took Zyprexa for that specific depression and anxiety, and that the treatment of the pre-existing conditions caused Plaintiff's TA and TD. ECF 27 at 17-18.[3] Guardian attempts to establish the above through various arguments. Each argument lacks merit.

In an attempt to meet its burden of establishing its argument and that the exclusion applies,[4] Guardian creates a false image that Plaintiff's mental health was quickly deteriorating before he developed COVID-19. ECF 27 at 18-19. It discusses a variety of conditions with absolutely no connection to Plaintiff's mental health or disability, such as sleep and chest pain problems. *Id*. **Without any medical support**, Guardian insinuates that these were related to Plaintiff's mental health issues. *Id*. These insinuations are incorrect and without medical support. No medical professional supported any such conclusion.

---

[1] Plaintiff provided a detailed statement of facts in his opening trial brief. He incorporates it by reference into this brief. ECF 28 at 3.

[2] Guardian appears to concede that Plaintiff was disabled during the time period in question. As such, Plaintiff will not address his disability status in this brief. He addressed that issue at length in his opening trial brief and incorporates that argument by reference. ECF 28 at 20.

[3] Plaintiff does not dispute that he took Lexapro during the look back period or that Zyprexa caused his TA and TD. Indeed, Plaintiff embraces the finding that Zyprexa, **taken for his psychosis that was not a pre-existing condition**, caused his TA and TD.

[4] Guardian has the burden of establishing that the pre-existing condition exclusion applies in this matter. *See Dowdy v. Metropolitan Life Ins. Co.*, 890 F.3d 802, 810 (9th Cir. 2018).

Guardian then emphasizes that Plaintiff contacted Dr. Moldawsky in November 2019, arguing that Plaintiff's condition was quickly deteriorating during the end of 2020. It concludes that Plaintiff's mental health deteriorated, that he took the Zyprexa because of his low grade, non-disabling depression and anxiety, and that the medication caused his TA and TD. As such, it claims that pre-existing conditions caused Plaintiff's disability.

The problem with this argument is that its own peer-review physician rejected it. When addressing Plaintiff's claim for LTD benefits, Guardian submitted Plaintiff's medical records to Dr. Richardson. (AR:5375) Dr. Richardson examined Plaintiff's medical records and spoke with one of Plaintiff's psychiatrists, Robert Lee, D.O., M.S. (AR:5378) He was informed of Plaintiff's medical history and explained:

> I was able to speak with Dr. Lee. I discussed my name, the claimant's name, the time frame in question and the purpose of my call. During the time frame in question, there was no contact with Dr. Lee. The claimant was on Lexapro 5mg per the chart, but he was not seen until November 2020. From April 2019-November 2020, he was not seen for mental health symptoms by Dr. Lee or at his practice. (AR:5378)

Having conversed with one of Plaintiff's treating physicians, and having reviewed Plaintiff's medical records, Dr. Richardson addressed Guardian's specific questions. He concluded that Plaintiff had pre-existing conditions that he received advice or treatment for. (AR:5379) However, when addressing Plaintiff's disability, he explained:

> The claimant has restrictions and limitations as of 3/25/21....
>
> **The conditions the claimant received advice, treatment, or medication caused by, contributed to by, or resulting from those conditions between 2/1/20-4/30/20; did not cause or contribute to the conditions that are impairing as of 3/25/21.** (AR:5379)
> (Emphasis added.)

Dr. Richardson then proceeded to find that Plaintiff was disabled from January 2021 through July 4, 2021. (AR5379-81) Dr. Richardson conclusively



opined that Plaintiff's conditions and medical treatment during the lookback period **did not cause or contribute to Plaintiff's disability**. He obviously concluded that just because Plaintiff suffered from mild depression and anxiety during the lookback period does not mean that those conditions caused or contributed to a psychotic breakdown in 2021. In fact, there are no test or other results saying that Plaintiff's conditions were anything but asymptomatic during the lookback period. (AR:881) Dr. Richardson's report explained that, in January 2021, Plaintiff suffered from the disabling conditions of psychosis and hyperkinetic movement disorder. (AR:5376, 5380) Hyperkinetic movement disorder was the disabling condition that caused Plaintiff's constant pacing that resulted in him wearing through a pair of shoes in a few days. (AR:691) Guardian's own psychiatrist rejected Guardian's argument.

As for Plaintiff contacting Dr. Moldawsky in November 2020, Guardian failed to inform the Court that Dr. Moldawsky's call log specifically refutes Guardian's image that Plaintiff's mental health was quickly deteriorating. It omits the contents of a December 3, 2020 conversation with Dr. Moldawsky's staff. In it, Plaintiff explained why he contacted Dr. Moldawsky about a new depression treatment methodology, TMS. Plaintiff stated, "I don't think it's like emergency severe symptoms and just underlying over the years. I've tried medications, I exercise, eat right, meditate and family members have had success with it." (AR:5581) He was looking to try a new treatment for the same minor symptoms that he had felt over the years. Contrary to Guardian's arguments, it was not an escalation of his symptoms. Even several months after the end of the lookback period, Plaintiff was barely symptomatic. Guardian's characterization of Plaintiff's contact of Dr. Moldawsky does not reflect the facts or evidence in the AR.

Guardian focuses on the fact that the records from Dr. Moldawsky reference anxiety and depression. However, it fails to acknowledge that Dr. Moldawsky's medical records also state that "Wife is quite convinced that his cog[nitive] abilities are worse than before, and, that this is associated with COVID effects on the brain[.]

I discussed with them that **this could be in part true**, but I do think the primary psych disorder is the more salient factor." (AR:786) (Emphasis added.) Dr. Moldawsky was aware of all of the symptoms when he prescribed Zyprexa. Guardian's insistence that Plaintiff's psychosis was simply a more severe form of his prior anxiety and depression does not match the facts or evidence. Its insistence that Zyprexa was prescribed for depression and anxiety as opposed to this larger psychosis is inaccurate. He was prescribed Zyprexa for psychosis, not for his prior mild anxiety and depression. Dr. Richardson cites to Dr. Carolyn Neff's comments that clearly make that distinction. (AR:5376) When addressing Plaintiff's hospitalization in March 2021, Dr. Neff explains that Plaintiff had been taking Zyprexa for "psychosis." (AR:5376) This means that when Dr. Moldawsky prescribed the medications, it was for psychosis, not for anxiety or depression. Plaintiff's neuropsychological evaluation also makes that distinction when analyzing Plaintiff's medical history. (AR:707-08, 987) Guardian's characterization of why Plaintiff was prescribed the medication, and his mental health problems, is inaccurate. There is a clear delineation between the pre-existing conditions and the severe psychotic and TA and TD conditions that Plaintiff started suffering from in January 2021.

Guardian also attempts to deflect the significance of Plaintiff's COVID-19. It emphasizes that Plaintiff's January 4, 2021 visit with Dr. Moldawsky was before he was diagnosed with COVID-19. However, January 7, 2021, was when Plaintiff **tested** positive for COVID-19. (AR:691, 3258, 3411)[5] He was symptomatic as of January 5. (AR:2040, 3258, 3411) Given that his January 4, 2021 visit with Dr. Moldawsky was a telephonic healthcare visit (AR:2238), Dr. Moldawsky could not have known that Plaintiff almost certainly had COVID-19 when his January 4, 2021,

_____

[5] Guardian inaccurately states that Plaintiff tested positive for COVID-19 on January 10, 2021. ECF 27 at 7. Different parts of the AR provide different dates. However, the majority of sources in the AR list him as testing positive on January 7.

symptoms started.  In fact, contrary to Guardian's assertions, Plaintiff's neurological
medical records from Dr. Neff's treatments specifically state that his COVID-19
likely caused his sudden deterioration in January 2021.  They state: "Note: onset of
psychosis and anxiety after covid in January, **medical literature support this is a
possible sequelae**." (emphasis added).  (AR:707-08)  Plaintiff's medical records
from March 25, 2021 also noted that these changes were a "possible post viral
event[.]"  (AR: 695)  Robbin Holley, BHCM, a Guardian employee, made a note
that explained:

> The case could be strongly made [that] the problems with COVID-19
> as well as his subsequent (& rather marked) problems with adverse
> psychiatric medication reactions strongly exacerbated his MH issues.
> One MD noted his problems as a possible sequela and noted recent
> research showing that 34% of COVID-19 survivors subsequently
> receive a neurological or psychiatric DC & 17% are specifically DX's
> with Anxiety.  (AR:562-63)

Many complications with COVID-19 are neurological in nature.  A
psychiatrist, such as Dr. Moldawsky, likely would not know about or understand
many of the related medical issues.  COVID-19 was still a new disease and its
effects were not well understood.  Even if Dr. Moldawsky understood certain basic
issues involving neurology, this was something much more advanced.  Dr. Neff, in
fact, had to cancel the medication that Dr. Moldawsky had erroneously prescribed,
the very medication that was disabling Plaintiff.  Of note and as explained above,
even Dr. Moldawsky acknowledged that COVID-19 could have caused Plaintiff's
symptoms.

Guardian's opening brief fails to address any of this.  Instead, it falsely argues
that Plaintiff's COVID-19 symptoms "were the same or similar symptoms of
depression and anxiety for which he had been treated previously."  ECF 27 at 19.  It
further falsely argues that the Zyprexa, an antipsychotic medication, was only for
anxiety and depression, and, therefore, the treatment of pre-existing conditions

caused Plaintiff's TA and TD.  The fact that Zyprexa caused the TA and TD is not disputed.  However, Guardian's analysis could not be more inaccurate.

By January 4, 2021, Plaintiff's condition had fundamentally changed.  An examination from the rest of Plaintiff's medical records reveals how misguided the narrative Guardian provided the Court is.  For example, Plaintiff's neuropsychological evaluation explained that:

> Mr. Kim and his wife reported that he contracted covid-19 in early January 2021.  After that time he began experiencing difficulties with attention, increased anxiety, restlessness, and **new onset of psychosis**.  They reported that he had 4 days of pressure in his head and he took ibuprofen.  He began pacing outside at night and could not sleep.  He began with odd cognition and panic.  He reported foggy recall about all of those incidents.  He began panicking about work related topics.  His wife reported that he became agitated and his affect changed.  He was up all night for 4 total days without any sleep.  He was very apathetic to things and did not have any enjoyment.  (AR:987)  (Emphasis added.)

Of note, all of these symptoms occurred before he was prescribed Zyprexa.  (AR:987)  They were related to his COVID-19 infection.

Guardian further argues that Plaintiff's position that COVID-19 caused his condition is allegedly based purely on the "say-so" of his family members.  ECF 27 at 21.  Guardian then provides extensive case law for the proposition that statements from family should be accorded "less" weight.  ECF 27 at 22.  Guardian further argues that "Indeed, courts have consistently held that a claimant's self-reported statements concerning his own disability are not entitled to weight where they are not supported by objective medical evidence."  ECF 27 at 22.

This argument has numerous flaws.  As noted above, Plaintiff's treating physicians explicitly support the fact that COVID-19 caused Plaintiff's symptoms.  (AR:695, 707-08)  As for Dr. Moldawsky, he did not deny that COVID-19 could have caused them either.  (AR:786)  Even Guardian's own employee acknowledged that COVID-19 may have caused Plaintiff's symptoms.  (AR:562-63)  And, the AR contains the summary of a study that explained that COVID-19 causes psychosis in



1.4% of people.  (AR:708)  As such, not only do medical professionals agree with Plaintiff, but there is even scientific evidence supporting their conclusions. Guardian's attempt to characterize Plaintiff's contentions as solely coming from his family's "say-so," is erroneous.  This argument can be completely rejected.

Furthermore, of note, Plaintiff's family members **are trained therapists**. (AR:2268, 3910)  The entire basis of the case law that Guardian relies on to undermine their opinions focuses on the untrained nature of a claimant's family. However, Plaintiff's wife and her parents are well-trained therapists.  In fact, Plaintiff's wife's opinion was vindicated.  Doctors, including Dr. Moldawsky, kept discounting Mrs. Kim's insistence that a neurologist become involved in Plaintiff's treatment because she believed that these new psychological problems were neurological in nature.  (AR:2334)  She had to desperately fight when the drugs that Dr. Moldawsky had prescribed were disabling her husband.  When she finally succeeded in getting a neurologist to treat her husband, she was vindicated.  The neurologist explained that all of Plaintiff's symptoms from January 2021 onward were likely tied to COVID-19 and that the drugs that Dr. Moldawsky had prescribed were doing incredible neurological harm to Plaintiff.  Mrs. Kim's professional judgment was proven correct.  She is a highly trained therapist who saved her husband by recognizing that he had a neurological problem.

Guardian's own case law, *Stratton v. Life Insurance Co. of North America*, 589 F.Supp.3d 1145, 1175 (S.D. Cal. 2022), supports this proposition.  In *Stratton*, the claimant was a senior executive partner who started suffering from severe back problems.  *See id*. at 1149.  He had LTD insurance with LINA.  *See id*. at 1147-48. LINA denied his claim for LTD benefits.  *See id*. at 1172.  When addressing the relevant legal standards, the *Stratton* court explained:

> Narratives provided by the claimant and any family and friends are
> properly accorded less weight than medical evidence in the record given
> their potential for bias and inability to "diagnose ... medical condition[s]
> or assess ... functional capacity in the way individuals trained in the



> medical field can." *Shaw*, 144 F. Supp. 3d at 1136, 1139. **Accordingly, "[r]eports from individuals with no medical background** cannot overcome medical evidence." *Id*. at 1136 (Emphasis added).

*Id*. at 1175. The Court then applied the standard to the medical opinions before it. It concluded that the claimant's treating physicians were persuasive because of the evidence they cited. The insurer's peer review doctors were not persuasive because they failed to provide an accurate evidentiary basis for their conclusions. *See id*. at 1175-79.

Here, not only did Plaintiff's treating physicians support that COVID-19 caused Plaintiff's disability, but Plaintiff's medical records even cite the relevant studies. Furthermore, Plaintiff's family has the medical background to provide insightful and medically meaningful assessments. They observed Plaintiff and could competently describe their observations. Under the case law, these opinions are entitled to deference.

In support of its position that Plaintiff's COVID-19 was not the cause of his disability, Guardian relies on the opinion of Arnold Lentnek, M.D. Dr. Lentnek's opinion was addressed at length in Plaintiff's opening trial brief. He concluded that COVID-19 did not cause Plaintiff's symptoms in January 2021. (AR:5409-10) However, of critical note, **Dr. Lentnek never saw Plaintiff's medical records**. Guardian ignores this highly salient fact. As explained in the AR:

> Panel review with Dr. Lentnek took place on 07/05/22. **Dr. Lentnek states he had access to only "abstracted" records**, but **based on what he was provided**, the claimant had a mild course of COVID-19 and that would not cause any restrictions. (AR:5417) (Emphasis added.)

This is particularly problematic. **Dr. Lentnek could not have developed an independent and objective opinion because he only saw what Guardian wanted him to see and then only "abstracts" of these records**.[6] Guardian argues at length

---

[6] There is no explanation of what "abstracted" records are or how they differ from the actual medical records. They are not contained in the AR so it left to one's

Footnote continues on next page…



that the Court should rely on objective and unbiased opinions over that of an
emotional untrained family member.  However, Guardian has not provided the
Court with a single independent, objective, and unbiased medical professional who
had before him complete medical records, supporting its position.

Furthermore, Dr. Lentnek never addressed how Plaintiff's treating physician
did support the fact that COVID-19 possibly caused Plaintiff's symptoms.  (AR:695,
707-08,)  He likely did not even know of this fact because of Guardian's failure to
provide him with the relevant actual records.  Those records, which were almost
certainly not "abstracted," documented the medical studies specifically supporting
Plaintiff's and his treating physicians' contentions that COVID-19 caused his
condition.  29 C.F.R. Section 2560.503-1 (j)(6)(i)(A) states that an insurer must
provide "an explanation of the basis for disagreeing with or not following . . . the
views presented by the claimant to the plan of health care professionals treating the
claimant and vocational professionals who evaluated the claimant . . . ."  Dr.
Lentnek's complete failure to address the evidence that COVID-19 caused his
condition left Guardian with insufficient information to rely upon his opinion when
addressing Plaintiff's claim.  *See also Miller v. PNC Financial Servs. Group, Inc*.,
278 F.Supp.3d 1333, 1344-45 (S.D. Fla. 2017).  Dr. Lentnek's opinion is
uninformed and should not persuade the Court of anything but Guardian's bad faith
in addressing Plaintiff's claim.

Guardian argues that:

The well-supported opinion of a peer reviewer is entitled to credit over
the unsupported opinion of a treating physician, let alone the conclu-
sory statements of a lay claimant or his family members. *Ibrahim v.
Bayer Corp. Disability Plan*, 584 Fed.Appx. 743, 745 (9th Cir. 2014);
*Biggar*, 274 F.Supp.3d at 968; *Sanchez-Levine v. Metro. Life Ins. Co.*,

imagination as to how the records were "abstracted."  It is disturbing that Dr.
Lentnek did not request the actual medical records so he could better understand
Plaintiff's medical issues and treatment.



2017 WL 4286139, *10 (C.D. Cal. 2017); *Johnson*, 2017 WL 6043086 at *6; *Shaw*, 144 F.Supp.3d at 1130.

ECF 27 at 23.

This choice of wording is interesting since Plaintiff's treating physicians explicitly provided studies supporting their conclusions that COVID-19 caused his condition, yet Guardian relied on the completely cursory, conclusory, and unsupported opinion of a peer-review doctor who never even read Plaintiff's medical records.

The case law that Guardian relies on is inapplicable or supports Plaintiff's position. It cites to several cases for the proposition that "[t]he well-supported opinion of a peer reviewer is entitled to credit over the unsupported opinion of a treating physician, ...." ECF 27 at 23. But, as discussed above, because the one paper reviewer Guardian relied on was not "well-supported," these cases are inapposite. For example, *Ibrahim v. Bayer Corp. Disability Plan*, 584 F.App'x 743 (9th Cir. 2014), was a two-page opinion involving a disability claim governed by the abuse of discretion standard under ERISA. The opinion merely states that a conclusory and belated opinion can be discounted under that standard of review if the peer-review doctor provides a reasoned opinion. Here, it was the *treating physicians* who provided the reasoned opinions as contrasted with a biased peer-review doctor who had not even reviewed Plaintiff's medical records. *Ibrahim* supports the likelihood that Plaintiff would be entitled to benefits under the abuse of discretion standard, as well as the current de novo standard of review.

Moreover, *Sanchez-Levine v. Metropolitan Life Insurance Co.*, 2017 WL 4286139, **10-11 (C.D. Cal. 2017), does not support Guardian's position either. There, even the claimant's own treating physicians did not support continuous disability and failed to provide a basis for their opinions that did not contradict the medical evidence. Here, the treating physicians were able to examine Plaintiff and

-13-

Case No.: 8:23-cv-01579-DOC-ADS



1    they cited the scientific studies supporting their conclusions – surely a sign that their

2    positions have a scientific and appropriate medical basis.

3       Ultimately, Guardian's trial brief omits numerous critical facts and

4    mischaracterizes others.  It is highly unpersuasive, and the Court should readily

5    reject the arguments therein.  For the reasons explained above, and in Plaintiff's

6    opening trial brief, judgment should be entered in Plaintiff's favor.

7      **B.**    <u>**A Pre-Existing Condition Did Not Substantially Contribute to**</u>

8          <u>**Plaintiff's Disability**</u>

9       Guardian argues that, at a minimum, a pre-existing condition substantially

10   contributed to Plaintiff's disability.  ECF 27 at 23.  Guardian argues that even if

11   depression and anxiety did not contribute to Plaintiff's development of TA and TD,

12   his depression and anxiety still substantially contributed to his disability.  This

13   argument is equally flawed.

14       As explained above, Guardian's entire argument is based on a number of

15   factual and analytical flaws.  One significant flaw is that it fails to differentiate

16   between (1) mild, barely present, long-term depression and anxiety, and (2) a

17   complete psychotic breakdown triggered by some outside cause that was likely

18   COVID-19.  It treats one condition as simply a continuation on a spectrum of

19   another.  In fact, there are differences.  These differences are significant.  Mental

20   health problems are very nuanced.  Guardian's own doctor, Dr. Richardson,

21   explicitly stated that Plaintiff's prior conditions and/or the treatment thereof **did not**

22   **cause or substantially contribute to his disability**.  (AR:5379)  **There is no**

23   **connection between the two**.  As such, Guardian's own doctor rejected this

24   argument.

25       A comparison of two matters addressed by the Ninth Circuit readily reveals

26   how, even if there were some negligible connection between the pre-existing

27   conditions and the disability (there is not), it would still not rise to the level of

28   substantial contribution.  The first case is *Dowdy v. Metropolitan Life Insurance*



*Co.*, 890 F.3d 802, 810 (9th Cir. 2018).  The second case is a case Guardian relies on, *Estate of Maurice v. Life Insurance Co. of North America*, 792 F.App'x 499 (9th Cir. 2020).

In *Dowdy*, the insured Tommy Dowdy had diabetes.  He was in a car accident that resulted in a severe fracture to his left ankle that nearly amputated his lower leg.  His ankle injury failed to improve.  He was transferred back to the hospital after three months because he suffered persistent leg infections related to his original injury that would not heal due to his diabetes.  His leg was amputated below the knee "due to his comorbidities" (wound issues complicated by his diabetes) and his original injury from the car accident.  He submitted a claim for the dismemberment of his leg.  MetLife denied his claim based on the policy's insuring clause – which required that an accident be the "direct and sole cause" of the amputation "independent of other causes" – and the exclusion for losses "contributed to by . . . illness."  MetLife asserted that Dowdy's diabetes contributed to the amputation and, therefore, it was not covered under the policy.  *Id*. at 805-07, 811.

Even though the Ninth Circuit found that diabetes was a "contributing factor" to the insured's dismemberment loss, it held the loss was covered because diabetes was not enough of a factor to meet the "substantial contribution" test, something the court said applied to the policy as a matter of law.  *Id*. at 808.  The court explained that "[i]n order to be considered a substantial contributing factor for the purpose of a provision restricting coverage to direct and sole causes of injury, a pre-existing condition must be more than merely *a* contributing factor."  *Id*. at 809 (emphasis original).  The court reasoned that "a 'predisposition' or 'susceptibility' to injury, whether it results from congenital weakness or from previous illness or injury, does not necessarily amount to a substantial contributing cause.  A mere 'relationship' of undetermined degree is not enough.'"  *Id*. at 808 (internal citations omitted).

The court explained that one respected source explained that the word "substantial" denotes that the conduct had an effect strong enough that it would lead

"reasonable [people] to regard it as a cause" in the more concrete sense and not just in some "philosophic sense." *Id*. at 809. Ultimately, the court held that there must be evidence showing that the preexisting ailment contributed a "significant magnitude of causation" and was a "substantial catalyst." *Id*. The preexisting condition cannot "merely [be] related to the injury." *Id*.

The second case, *Estate of Maurice*, also involved an accident, diabetes, and an amputation. *See Estate of Maurice*, 792 F.App'x at 500. First, it is important to note that this unpublished case appears to be at odds with the holding in *Dowdy* and thus it should not be deemed controlling law. Second, in any event, it easily distinguishable from this case. The exclusion in dispute there was also similar to that in *Dowdy*. However, as opposed to the serious car accident in *Dowdy*, the claimant in *Maurice*'s accident was that he simply stepped on some glass. *See id*. Like in *Dowdy*, the claimant's diabetes stopped the injury from healing properly and resulted in part of his leg being amputated. The *Maurice* court ruled that the injury was sufficiently minor that the diabetes was a much more significant catalyst of the cause of the amputation. *See id*.

Here, the pre-existing conditions Guardian asserts were excluded are depression and anxiety, conditions so minimal that they did not even register on the last tests before the lookback period in Plaintiff's medical records. (AR:881) By analogy, the "accident" here was the COVID-19 that triggered the psychotic breakdown, hyperkinetic movement disorder, and other psychological problems that directly led to Plaintiff's disability. Even if there was a connection between the pre-existing conditions and Plaintiff's January 2021 health problems, the impact from Plaintiff's minimal depression and anxiety from the pre-existing condition period is even less than that of the diabetes in *Dowdy*. Plaintiff would have become psychotic even without his prior barely symptomatic mile depression and anxiety. Ninth Circuit precedent supports that the depression and anxiety did not substantially contribute to Plaintiff's disability.



1     The other case law that Guardian relies on does not change the analysis. The

2  court in *Earle v. Unum Life Insurance Company of America*, 2021 WL 4871785, at

3  \*1 (9th Cir. 2021), held that, but for the pre-existing condition, the covered loss

4  would not have occurred. Here, the pre-existing condition is Plaintiff's long-term

5  and minor depression and anxiety. But those pre-existing conditions did not cause

6  or contribute to Plaintiff's disability. His disability occurred because of the onset of

7  psychosis (likely caused by COVID-19 or some other cause) and the then later

8  constellation of disabling conditions that Plaintiff suffered in January 2021. Drs.

9  Richardson and Neff determined that there was no connection between them and

10  Plaintiff's disability. As such, *Earle* clearly does not apply.

11     As for *Ekno v. Northwestern Mutual Life Insurance Co.*, 2008 WL 782728, at

12  \*7 (E.D. Cal. 2008), that matter addressed an LTD claim and a pre-existing

13  condition clause. During the lookback period, the plaintiff suffered from "severe

14  depression." *Id*. The matter was governed by the abuse of discretion standard. The

15  district court concluded that "Finally, while there is evidence in the record

16  indicating that Ekno also suffers from the non-preexisting condition of

17  *prolactinoma*, the record contains substantial evidence supporting NWML's

18  conclusion that Ekno's disability was caused or contributed to by depression." *Id*. at

19  \*7. Here, the standard of review is de novo, and multiple physicians, including

20  Guardian's own peer reviewer, concluded that there is no connection between

21  Plaintiff's **extremely mild** pre-existing conditions and his January 2021 symptoms

22  that led to his disability. As such, *Ekno* does not support Guardian's position.

23     Ultimately, Guardian has the burden of proving that its exclusion applies. It

24  cannot meet this burden.

25  **3.    CONCLUSION**

26     For the above-stated reasons, and those in Plaintiff's Opening Trial Brief, the

27  Court should enter judgment in Plaintiff's favor.

28

Case No.: 8:23-cv-01579-DOC-ADS

1    Dated:  March 25, 2024                    **McKENNON LAW GROUP PC**

2

3                                             By: _____

4                                             ROBERT J. McKENNON
                                              NICHOLAS A. WEST

5                                             ERIK C. FRITZ
                                              Attorneys for Plaintiff, Jason Kim

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.1**

    The undersigned, counsel of record for Plaintiff Jason Kim, certifies that this brief contains 5,359 words (excluding the caption, any table of contents, any table of authorities, the signature block, this certification, and any indices and exhibits), which complies with the word limit of Local Rule 11-6.1.

Dated:  March 25, 2024          **McKENNON LAW GROUP PC**

By: _____
          ROBERT J. McKENNON
          NICHOLAS A. WEST
          ERIK C. FRITZ
          Attorneys for Plaintiff, Jason Kim

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

<u>CERTIFICATE OF SERVICE</u>

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 20321 SW Birch St., #200, Newport Beach, California 92660; Fax 949-385-5165; E-mail address: dc@mckennonlawgroup.com.

I hereby certify that on March 25, 2024, I served the foregoing documents described as: PLAINTIFF JASON KIM'S REPLY TRIAL BRIEF on the interested parties as follows:

OPHIR JOHNA                                    Attorneys for Defendant, The Guardian
OJohna@maynardnexsen.com          Life Insurance Company of America
KAREN T. TSUI                                  ☒ ECF Participant
KTsui@maynardnexsen.com
MAYNARD NEXSEN LLP
10100 Santa Monica Boulevard
Los Angeles, CA 90067
Telephone:  310.596.4500

☒    **ECF/CM:** I caused a true and correct copy thereof to be electronically filed using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the

28

registered participants of the ECF System.  I served those parties who are not registered participants of the ECF System as indicated below.

☐    I placed the ☐ original ☐ a true copy thereof enclosed in sealed envelope(s) to the notification address(es) of record and caused such envelope(s) to be delivered by ☐ **FIRST-CLASS MAIL** ☐ **OVERNIGHT DELIVERY**.

☐    **BY E-MAIL:** I electronically transmitted a true and correct copy thereof to the notification electronic mail address(es) of record before close of business for the purpose of effecting service and the transmission was reported as complete and without error.

☐    **FACSIMILE:** Based on ☐ courtesy ☐ court order ☐ agreement of the parties, I caused a true copy thereof to be served by transmitting via facsimile machine to the notification facsimile number(s) of record before close of business. The transmission was reported as complete, without error.

☐    **PERSONAL DELIVERY:** I caused ☐ the original ☐ a true copy thereof to be delivered by hand to the notification address(es) of record by an employee or independent contractor of a registered process service.

I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America and the State of California that the above is true and correct.  Executed at Newport Beach, California on March 25, 2024.

NAME: _____ *Debi Cartee* _____
                                    (Signature)

