UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| JASON KIM,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA; and DOES 1 through 10, inclusive,<br><br>　　　　　Defendants. | Case No.: 8:23-cv-01579-DOC-ADS<br><br>Action Filed: August 23, 2023<br><br>Trial Date: April 15, 2024<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

# FINDINGS OF FACT

After consideration of the parties' trial briefs, oral argument at trial, and the evidence submitted, the Court determines that the following facts have been established in this case:

1. Any finding under this category that is a conclusion of law is also hereby adopted as a conclusion of law.

## Plaintiff's Employment with Dreamhaven, Inc. and Enrollment For Long-Term Disability Benefits

2. Plaintiff Jason Kim ("Plaintiff") was employed by Dreamhaven, Inc. ("Dreamhaven"). (Administrative Record ("AR") 1490).

3. Through his employment, Plaintiff became a participant in his employer's employee benefits plan (the "Plan"). (AR:5464).

4. Plaintiff enrolled for coverage under the group long-term disability ("LTD") policy (the "Policy"), issued by Defendant The Guardian Life Insurance Company of America ("Guardian"). (AR:1490).

5. As of May 1, 2020, and at all relevant times, he was a participant in, and eligible for benefits under, the Policy and Plan. (AR:5464).

## The Pertinent Policy Terms

6. The Policy states that an employee is "Disabled" under the following circumstances:

> **Total Disability or Totally Disabled** means that as a result of Sickness or Injury, during the Elimination Period and the Own Occupation period, You are not able to perform with reasonable continuity the substantial and material acts necessary to pursue Your Usual Occupation and You are not working in Your Usual Occupation. (AR:273)

7. The Policy excludes coverage for pre-existing conditions. It states:

> **Pre-Existing Conditions:** You are not covered for a Disability caused or substantially contributed to by a pre-existing condition or medical or surgical treatment of a pre-existing condition.
>
> You have a pre-existing condition if:

- You received medical treatment, care or services for a diagnosed condition or took prescribed medication for a diagnosed condition in the three months immediately prior to the effective date of Your insurance under this Certificate; or

  You suffered from a physical or mental condition, whether diagnosed or was misrepresented or not disclosed in Your application (i) for which You received a Doctor s advice or treatment within three months before the effective date of Your insurance under this Certificate, or (ii) which caused symptoms within three months before the effective date of Your insurance under this Certificate for which a prudent person would usually seek medical advice or treatment; and

- Disability caused or substantially contributed to by the condition begins in the first 12 months after the effective date of Your insurance under this Certificate. (AR:260-61).

8. Benefits are payable after the employee has been disabled for 90 days, *i.e.* the plan's "Elimination Period." (AR:286).

9. The effective date of coverage under the Policy was May 1, 2020, making the 3-month "lookback" period run from February 1, 2020 through April 30, 2020. (AR:2715).

### Plaintiff's Occupational Duties

10. Plaintiff worked for Dreamhaven as an art director. He was responsible for setting the artistic aspects of various computer projects' artistic look and feel. He worked with a variety of physical media and digital tools. He addressed recruiting, hiring, and managing an art team. This was a sedentary occupation that involved working with a wide variety of people. (AR:1490).

### Plaintiff's Medical History Prior to His Employment at Dreamhaven

11. When examining the Record, the Court notes discrepancies between the opinions of different physicians and sources of information about Plaintiff's condition. The Court places greater emphasis on doctors that examined Plaintiff in person and accords greater weight to medical assessments than Plaintiff's own accounts. Plaintiff repeatedly reported that he had never suffered from conditions

that the Record clearly documents that, in fact, he did suffer from. For example, he repeatedly reports that he never suffered from issues related to abnormal panicking even though his medical records clearly document that he had. (*Compare* AR:932, 1096, 1141 *with* 518, 730, 818, 4900). He also reported that he never suffered from psychosis even though his treating physician had diagnosed him with that condition. (*Compare* AR:932, 1096, 1141 *with* AR:987, 1604).

12. Before working at Dreamhaven, Plaintiff had a history of suffering from minor, low-grade and non-disabling depression, anxiety, and ADHD. Before January 2021, these conditions were very minor and never interfered with his ability to work. (AR: 931, 1019-23, 1490-91, 2239, 3256).

13. He was not seen by his therapist from 2019 to January 2021. (AR:2239).

14. The last relevant testing before January 4, 2021 listed Plaintiff as "Negative" for Depression and Anxiety. (AR:1019-23).

15. His medical records and Guardian's internal notes document that he had never been prescribed anti-psychotic medications or suffered from psychosis before January 2021. (AR:556, 707, 987, 3411).

**Plaintiff's Post Hiring Medical Problems and Disability**

16. In November 2020, Plaintiff contacted the office of his then-psychiatrist, Richard Moldawsky, M.D., about attempting Transcranial magnetic stimulation (TMS) therapy. (AR:5581). When contacting Dr. Moldawsky's office in December 2020, he explained that his condition was not severe, but he was inquiring because some relatives had used the treatment and he wanted to try it. (AR:5581).

17. On or about January 4-5, 2021, this changed. Plaintiff started to suffer from fever, chills, aches, hyperkinetic movement disorder, insomnia, cognitive deficits, "head pressure," restlessness, agitation, panic attacks, and "cognitive

clouding." He lost the ability to organize his thoughts. His affect, cognition, and behavior were significantly different. He became suicidal and paced all night. The pacing was sufficiently severe that over a couple of days he wore out a pair of shoes. For the first time, he developed symptoms of psychosis. (AR:562-63, 691, 695, 881, 931, 987, 2040, 2254, 3255-56, 3258, 3274, 3411, 5380)

18. On January 4, 2021, Plaintiff spoke with Dr. Moldawsky on the phone. This was Plaintiff's first contact with Dr. Moldawsky in two years and consisted of a thirty-minute phone call. Dr. Moldawsky stated that he would support a trial of TMS therapy. (AR:2239).

19. On January 5, 2021, Plaintiff became symptomatic for COVID-19. (AR:2040, 3258, 3411). On January 7, 2021, Plaintiff tested positive for COVID-19. (AR:691, 931, 3258, 3411). In light of Plaintiff's symptoms starting on January 5, the Record supports that Plaintiff likely had contracted COVID-19 earlier in January 2021 when his psychological symptoms started to quickly escalate.

20. The Record contains evidence that, while the likelihood is small, COVID-19 can cause psychosis and a variety of other mental health problems. (AR:708).

21. Plaintiff's medical records also contain statements from one of Plaintiff's neurologist, Carolyn Neff, M.D, that COVID-19 likely caused Plaintiff's psychosis and sudden onset of severe anxiety. Those records state: "Note: onset of psychosis and anxiety after covid in January, medical literature support this is a possible sequelae." (AR:707-08).

22. One of Guardian's employees agreed that this was likely true. She noted that:

> The case could be strongly made [that] the problems with COVID-19 as well as his subsequent (& rather marked) problems with adverse psychiatric medication reactions strongly exacerbated his MH issues. One MD noted his problems as a possible sequela and noted recent research showing that 34% of COVID-19 survivors subsequently

receive a neurological or psychiatric DC & 17% are specifically DX's with Anxiety. (AR:562-63).

23. The Record contains sufficient evidence to establish that Plaintiff's condition had subsequently changed from that of common anxiety and depression to something far more severe and unconnected to his documented prior conditions. (AR:691, 931-32, 987, 1263, 3255-56, 3411, 4900-01). He started showing signs of altered cognition, affect, and behavior, including pacing all night. (AR:2040). A statement from his wife notes that at this time he developed a "new onset of psychosis." (AR:556).

24. On January 19, 2021, Plaintiff again called Dr. Moldawsky on a four minute phone call.  Plaintiff explained that he was suffering from agitation, pacing, and feelings of doom. Dr. Moldawsky acknowledged that seeing Plaintiff in person was problematic given Plaintiff's COVID-19 diagnosis. Plaintiff was prescribed and started taking olanzapine (Zyprexa). (AR:987, 3411, 4900-01).

25. At about this time, Plaintiff developed a shuffled gait, made rocking movements, and suffered from "horrible" skin sensations.  He constantly shook his head, stared at the ceiling, and made unusual and grotesque positioning/movements. He grunted, jerked his hands, twitched, and made abnormal uncontrollable facial actions such as movements of the jaw and abnormal facial/eye movements.  His cognitive problems worsened. They continued to affect his memory, and he was constantly confused. (AR:690-91, 931-32, 2040, 3255-56, 3258, 3411).

26. In addition to Plaintiff's medical records, Plaintiff's condition is also recorded in various statements from his friends and family. (AR:3253-54, 3255-56, 3273, 3276, 3909-12). Of note, Plaintiff's wife and parents are therapists. (AR:2268, 3910).

27. Plaintiff sought treatment for his condition.  Initially, Plaintiff sought treatment from Dr. Moldawsky.  (AR:2239). Plaintiff's wife argued with Dr. Moldawsky that Plaintiff's cognitive problems were related to COVID-19.

(AR:786). Dr. Moldawsky acknowledged that it "could be true in part" but considered the psychiatry issues "more salient." (AR:786).

28. Plaintiff attempted to see a neurologist, but the referral was cancelled. (AR:2334). Plaintiff went to the hospital on March 25, 2021. (AR:1257). Plaintiff then managed to meet with a neurologist, Dr. Neff.  She diagnosed Plaintiff with tardive dyskinesia ("TD") and tardive akathisia ("TA"). (AR:695). TD and TA are movement disorders characterized by involuntary movements. These conditions also produce a myriad of mental health problems. The Zyprexa caused Plaintiff's TA and TD.  (AR:3274-75). Dr. Neff also noted an "onset of psychosis[.]" (AR:707).  Dr. Neff treated Plaintiff in person on multiple occasions. (AR:658-59, 680-81, 690, 696, 703).

29. Plaintiff's condition became sufficiently severe that he had to be hospitalized in March and April 2021 for attempted suicide. (AR:1326, 2715)

30. Plaintiff ceased treatment with Dr. Moldawski and transferred to the care of Robert Lee, D.O., M.S. (AR:928). Dr. Lee certified that Plaintiff was unable to work and noted that "patient with significant symptoms and far from baseline functioning, significant anxiety and depressive symptoms from movement problems...." (AR:1223, 1381-82). In a June 11, 2021 medical record, Dr. Lee addressed Plaintiff's prescription of Zyprexa. By this time, Dr. Lee had treated Plaintiff on an in-person basis on several occasions. Dr. Lee stated Zyprexa was started due in part to "agitation from physical symptoms of COVID."  (AR:1222).

31. These medical conditions, which at times were dormant, significantly impaired Plaintiff's ability to work. His symptoms continued to worsen until he could not work. (AR:988).

32. Dr. Neff certified Plaintiff's disability. (AR:659, 681).

33. To treat his condition, Plaintiff was prescribed a variety of medications and underwent psychotherapy. Some of the medications caused severe side effects with limited documented benefits. (AR:3262)

34. On May 10, 2021, Plaintiff underwent a neuropsychological evaluation that revealed that he suffered from "Mild Neurocognitive Disorder." (AR:987-90). He tested below average in a range of different aspects of "processing speed, timed verbal fluency, immediate and delayed verbal memory for a list learning task, and immediate visual memory." (AR:990). "He was impaired with immediate and delayed verbal memory for stories read to him." (AR:990).

35. Kenneth Martinez, M.D., a neurologist, started treating Plaintiff on May 11, 2021. (AR:3266). Dr. Martinez completed an "Attending Physician's Statement of Disability" ("APS") for Guardian stating that Plaintiff could not return to work until at least July 20, 2022. He explained that Plaintiff "has uncontrolled movements due to tardive dyskinesia and is unable to stay in one position due to tardive akathisia." (AR:2694). Plaintiff's TA and TD were "not consistent with a conversion disorder or anxiety." (AR:3260). Whereas his TA and TD had improved some, the symptoms were "still magnified with anxiety and stimulants." (AR:3260).

### The Claims Process and Denial

36. Plaintiff submitted a claim for LTD benefits asserting a date of disability of March 25, 2021. (AR:2714).

37. Guardian informed Mrs. Kim that the pre-existing condition clause may apply. (AR:2062).

38. Various people, including the insurance broker responsible for selling Dreamhaven the Policy, disagreed with Guardian's proposed position. (AR:2025-26). Guardian's case manager noted that "The records do not indicate prior treatment for some of the employee's current complaints." (AR:2060-61).

39. Guardian denied the claim by letter dated August 18, 2021, concluding that while Plaintiff was disabled, his disability was caused by pre-existing conditions that were excluded under the Policy. (AR:2714-17). The denial letter explained that Plaintiff was "prescribed Lexapro, an SSRI used to treat depression and anxiety. You were given 100 days of refills, at 1 pill a day, with 1 refill. This

1  would imply you were taking this medication for the period of November 18, 2019
2  through June 4, 2020, during our lookback period of February 1, 2020 through April
3  30, 2020." It further explained that "Because you received treatment for your Major
4  Depressive Disorder, Severe without Psychotic Symptoms, Generalized Anxiety
5  Disorder, and Mild Neurocognitive Disorder during the 'look-back period', these
6  conditions and all related conditions and/or complications are pre-existing conditions
7  as defined by the Plan." (AR:2715-16). Plaintiff was not diagnosed with "Mild
8  Neurocognitive Disorder" until May 10, 2021. (AR:987-90).

9        40. On February 7, 2022, Plaintiff appealed the denial of his claim.
10 (AR:3238). Plaintiff submitted updated medical records and statements from his
11 friends, his family, Dr. Lee, and Dr. Martinez. (AR:3240). Drs. Martinez and Lee
12 both expressed continued support for Plaintiff's disability claim.

13       41. In response to Plaintiff's appeal, Guardian submitted Plaintiff's medical
14 records to Leon Meytin, M.D., a neurologist. Dr. Meytin concluded that based on
15 his review of the medical records, it did not appear that Plaintiff was disabled due to
16 TA and TD. (AR5415-16).

17       42. On August 30, 2022, Dr. Martinez provided a response to Dr. Meytin's
18 report. In his response, Dr. Martinez reaffirmed his position that Plaintiff was
19 disabled due to his TA and TD. (AR:5447).

20       43. In response to Dr. Martinez's statement, Dr. Meytin noted a
21 "discrepancy" about Plaintiff's condition and recommended that Guardian have
22 Plaintiff examined. (AR:5455-56). Guardian did not do so.

23       44.  Guardian also submitted the claim to Arnold Lentnek, M.D. Guardian
24 failed to present Dr. Lentnek with Plaintiff's actual medical records. Instead, as
25 reported by Dr. Meytin, Dr. Lentnek stated that he only received "abstracted" copies
26 of the medical records. (AR:5417).

27       45. Dr. Lentnek determined that Plaintiff's COVID-19 did not cause his
28 disabling conditions in January 2021. (AR:5409-10). Dr. Lentnek did not address

1  that some of Plaintiff's treating physicians disagreed with this position. (AR:5409-
10).

46. Guardian submitted the medical records to Elbert Greer Richardson, M.D., a psychiatrist. (AR:5375). Dr. Richardson examined Plaintiff's medical records and spoke with one of Plaintiff's psychiatrists, Robert Lee, D.O., M.S. (AR:5378). He concluded that Plaintiff was unable to work as of January 2021. (AR:5379-81). He further concluded that "The conditions the claimant received advice, treatment, or medication caused by, contributed to by, or resulting from those conditions between 2/1/20-4/30/20; did not cause or contribute to the conditions that are impairing as of 3/25/21." (AR:5379).

47. On September 30, 2022, Guardian denied Plaintiff's appeal. (AR:5462). Guardian stated that "While Plaintiff did have Covid-19 in early January 2021, there was no mention in the records that these symptoms were related to Covid-19 but that he had a history of anxiety and depression, for which he had admitted had started to become worse prior to January 1, 2021." (AR:5466). Guardian concluded that Plaintiff was only disabled due to conditions falling under the pre-existing condition exclusion and denied the claim on that basis. (AR:5466).

## CONCLUSIONS OF LAW

After consideration of the parties' trial briefs and counsels' oral argument during the April 15, 2024 trial of this action, the Court makes the following conclusions of law:

1. Any conclusion under this category that is a finding of fact is also hereby adopted as a finding of fact.

2. This case is governed by the Employee Retirement Income Security Act, 29 U.S.C. Section 1001, et seq. ("ERISA") because it involves an employee welfare benefit plan within the meaning of that statute.

3. In making the above Findings of Fact and the foregoing Conclusions of Law, the Court employed a "de novo" standard of judicial review, per the parties'

agreement, and conducted an independent and thorough inspection of the Record without affording any deference to the plan administrator's findings. *Silver v. Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 728 (9th Cir. 2006).

## The Pre-existing Condition Exclusion Does Not Apply

4. Because Guardian relied on an exclusion to coverage under the Policy, it has the burden to establish that the exclusion applies. *See Dowdy v. Metropolitan Life Ins. Co.*, 890 F.3d 802, 810 (9th Cir. 2018). The court in *McClure v. Life Ins. Co. of N. Am.*, 84 F.3d 1129 (9th Cir. 1996), determined that the proper standard is whether a preexisting condition "substantially contributed" to the loss, "even though the claimed injury was the predominant or proximate cause of the disability." *Id.* at 1136.

5. The Court finds that Guardian has failed to meet its burden.

6. An examination of Plaintiff's medical records shows that Plaintiff had not seen a therapist in years before January 2021. Moreover, his test results show that the symptoms for his preexisting depression and anxiety were minimal. (AR:1019-23, 2239). In early 2021, however, he started suffering from a variety of severe symptoms, including: psychosis, brain fog, cognitive impairments, extreme pacing, fever, chills, insomnia, panic attacks, restlessness, agitation, "pressure in his head," loss of the ability to communicate, short-term memory damage, and damage to his ability to process information. (AR:691, 695, 881, 931, 987, 2040, 2254, 3255-56, 3258, 3274, 3411, 5380). His minimal prior anxiety and depression were categorically different than the symptoms he suffered beginning in early 2021, such that any preexisting condition did not substantially contribute to his disability.

7. Guardian's own peer review doctor, Dr. Richardson, informed Guardian that there was no connection between Plaintiff's disability and his pre-existing conditions. Dr. Richardson stated that "The conditions the claimant

1 received advice, treatment, or medication caused by, contributed to by, or resulting from those conditions between 2/1/20-4/30/20; did not cause or contribute to the conditions that are impairing as of 3/25/21." (AR:5379). An examination of Dr. Richardson's report shows that he was aware of Plaintiff's mental health history. He spoke with Dr. Lee and received medical records from the period in question. (AR:5375, 5378). He concluded that the pre-existing conditions and treatment therefore did not cause or contribute to the disability. No physician refuted this position.

8. Contrary to Guardian's assertion, multiple doctors considered that Plaintiff's treatment with Zyprexa was for psychosis. This included Drs. Neff, Richardson, and Priscilla Armstrong, Psy.D. (AR:707, 987, 5376).

9. Plaintiff's medical records demonstrate that COVID-19 has been shown to cause psychosis and could potentially have caused psychosis here. (AR:695, 707-08). Guardian's own employee acknowledged this. (AR:562-63). It is not necessary for Plaintiff's claim, however, to demonstrate that COVID-19 triggered his health problems in early 2021. Plaintiff must demonstrate that what rendered Plaintiff disabled was not caused or substantially contributed to by a pre-existing condition or its treatment. The prior identified mental health conditions/treatments did not "cause or substantially contribute to" the disability during the lookback period.

10. The Policy inquires whether a pre-existing condition, or treatment related thereto, "caused or substantially contributed" to the disability. As Dr. Richardson explained, Plaintiff's prior treatment for his depression, anxiety, and ADHD during the lookback period had no connection with his disability. Plaintiff was not disabled as a result of his preexisting common anxiety or depression. The record shows that COVID-19 likely caused Plaintiff's initially disabling symptoms in January 2021. This, in turn, prompted the administering of Zyprexa which caused Plaintiff's debilitating TA and TD.

11. The weight of the evidence does not support that Plaintiff's pre-existing conditions or treatment related thereto caused the disability. Guardian has failed to carry its burden.

### Plaintiff Was Disabled Under the Policy

12. Given that the pre-existing condition exclusion does not apply, the Court now examines whether Plaintiff was disabled due to his TA and TD. The evidence shows that he was.

13. The Court initially notes that Defendants have failed to argue that Plaintiff was not disabled during the time period in question. As such, Plaintiff's disability is undisputed.

14. The Court further notes that multiple physicians concluded that Plaintiff was disabled during the time period in question. Dr. Richardson determined that Plaintiff was totally disabled from January 2021 through July 4, 2021. (AR:5379-80). Dr. Richardson based this conclusion on Plaintiff's TA/TD and hyperkinetic movement disorder. (AR:5380). However, the evidence establishes that Plaintiff was still disabled well after that time period. (AR:2694, 3270-71, 3274-75). An examination of Dr. Richardson's report shows that he was not provided with this evidence and could not know that Plaintiff was disabled beyond that date. (AR:5375-77).

15. Plaintiff's own physicians also determined that Plaintiff was disabled. Dr. Lee, certified that Plaintiff could not work as of October 26, 2021. He explained, "The patient's current ability to function is impaired to the extent that he is not able to work." (AR:3270-71).

16. Dr. Martinez and Dr. Neff both concluded that Plaintiff could not work. (AR:659, 681, 3274-75). On July 22, 2021, Dr. Martinez explained that Plaintiff had an expected return to work date of July 20, 2022. (AR:2694). In a statement as late

1  as October 25, 2021, Dr. Martinez continued to certify that Plaintiff was disabled
2  due to his TA and TD. (AR:3274-75).

3      17.    In light of this evidence, and Guardian's lack of argument to the
4  contrary, the Court finds that Plaintiff has sufficiently established that he was
5  disabled under the Policy.

**Treatment of Plaintiff's pre-existing conditions did not cause his disability**

7      18.    Guardian argues that Plaintiff suffered from depression and anxiety
8  during the lookback period, that the same depression and anxiety became severe,
9  that he took Zyprexa for that specific depression and anxiety, and that the treatment
10 of the pre-existing conditions caused Plaintiff's TA and TD. Dkt. 27 at 17-18. The
11 Record does not support Guardian's position.

12     19.    An examination of the Record does not support Guardian's conclusion
13 that Plaintiff's mental health was quickly deteriorating before he developed COVID-
14 19.

15     20.    Notably, Guardian's own peer-review physician rejected this argument.
16 Having conversed with one of Plaintiff's treating physicians, and having reviewed
17 Plaintiff's medical records, Dr. Richardson addressed Guardian's specific questions.
18 He concluded that Plaintiff had pre-existing conditions that he received advice or
19 treatment for. (AR:5379). However, when addressing Plaintiff's disability, he
20 explained: The conditions the claimant received advice, treatment, or medication
21 caused by, contributed to by, or resulting from those conditions between 2/1/20-
22 4/30/20; did not cause or contribute to the conditions that are impairing as of
23 3/25/21. (AR:5379).

24     21.    Guardian's attempts to refute this statement are not persuasive.
25 Guardian insists that the context of the statement does not support the Court's
26 reading thereof. However, Dr. Richardson was well briefed on Plaintiff's mental
27 health issues and was asked specifically about them. He explicitly stated that pre-
28

existing conditions did not contribute to the disability. Guardian's arguments to the contrary are not persuasive.

22. No doctor in the evidence presented concluded that Plaintiff's prior depression and anxiety during the lookback period, or treatment related thereto, caused his disabling symptoms in 2021.

23. Guardian focuses on the fact that the records from Dr. Moldawsky reference pre-existing anxiety and depression. However, medical diagnoses often change over time as symptoms develop and emerge. That Dr. Moldawsky believed at the onset of Plaintiff's severe symptoms that pre-existing anxiety and depression may have been reasonable at the time, even though it later became clear that Plaintiff's condition was substantially different. Guardian's insistence that Plaintiff's psychosis was simply a more severe form of his prior anxiety and depression is not consistent with the facts or evidence.

24. Dr. Richardson cites Dr. Carolyn Neff's comments that clearly make that distinction. (AR:5376). When addressing Plaintiff's hospitalization in March 2021, Dr. Neff explains that Plaintiff had been taking Zyprexa for "psychosis." (AR:5376), indicating that when Dr. Moldawsky prescribed the medications, it was for psychosis, not for anxiety or depression. Plaintiff's neuropsychological evaluation also makes that distinction when analyzing Plaintiff's medical history. (AR:707-08, 987).

25. Guardian cites a single April 2021 medical record from Dr. Moldawski wherein Dr. Moldawski stated that Plaintiff was not psychotic during that visit. Dr. Moldawski did not state that Plaintiff was not psychotic in early January 2021. The Record demonstrates that multiple practitioners concluded the contrary, with different doctors reaching different conclusions from Dr. Moldawski based on more complete evaluations of Plaintiff's array of symptoms. Guardian's characterization of why Plaintiff was prescribed the medication, and his mental health problems, is inaccurate.

26. Contrary to Guardian's assertions regarding COVID-19, Plaintiff's neurological medical records from Dr. Neff's treatments state that his COVID-19 could have caused his sudden deterioration in January 2021. They state: "Note: onset of psychosis and anxiety after covid in January, **medical literature support this is a possible sequelae**." (emphasis added).  (AR:707-08). Plaintiff's medical records from March 25, 2021 also noted that these changes were a "possible post viral event[.]"  (AR: 695)  Robbin Holley, BHCM, a Guardian employee, noted that made a note that the "case could be strongly made" that COVID-19 caused Plaintiff's mental health problems. (AR:562-63).

27. Guardian argues that Plaintiff's COVID-19 symptoms "were the same or similar symptoms of depression and anxiety for which he had been treated previously."  Dkt. 27 at 19. By January 4, 2021, however, Plaintiff's condition had fundamentally changed from anything previously documented. For example, Plaintiff's neuropsychological evaluation explained that: Mr. Kim and his wife reported that he contracted COVID-19 in early January 2021.  After that time he began experiencing difficulties with attention, increased anxiety, restlessness, and new onset of psychosis.  They reported that he had 4 days of pressure in his head and he took ibuprofen.  He began pacing outside at night and could not sleep.  He began with odd cognition and panic.  He reported foggy recall about all of those incidents.  He began panicking about work related topics.  His wife reported that he became agitated and his affect changed.  He was up all night for 4 total days without any sleep.  He was very apathetic to things and did not have any enjoyment. (AR:987). All of these symptoms occurred before he was prescribed Zyprexa. (AR:987).

28. Guardian argues that even if depression and anxiety did not contribute to Plaintiff's development of TA and TD, his depression and anxiety still substantially contributed to his disability. Dkt. 27 at 23. This argument is flawed.

29. Guardian fails to differentiate between (1) mild, low-grade, non-disabling depression and anxiety, and (2) a psychotic breakdown triggered by some outside cause, possibly COVID-19. The differences between these conditions, however, are significant.

30. The parties dispute whether *Dowdy v. Metropolitan Life Insurance Co.*, 890 F.3d 802, 810 (9th Cir. 2018), or *Estate of Maurice v. Life Insurance Co. of North America*, 792 F.App'x 499 (9th Cir. 2020), control. Having examined the record, the Court finds that the current matter is governed by *Dowdy*.

31. In *Dowdy*, the insured, Tommy Dowdy, had diabetes. He was in a car accident that resulted in a severe fracture to his left ankle that nearly amputated his lower leg. His ankle injury failed to improve. He was transferred back to the hospital after three months because he suffered persistent leg infections related to his original injury that would not heal due to his diabetes. His leg was amputated below the knee "due to his comorbidities" (wound issues complicated by his diabetes) and his original injury from the car accident. He submitted a claim for the dismemberment of his leg. MetLife denied his claim based on the policy's insuring clause – which required that an accident be the "direct and sole cause" of the amputation "independent of other causes" – and the exclusion for losses "contributed to by . . . illness." MetLife asserted that Dowdy's diabetes contributed to the amputation and, therefore, it was not covered under the policy. *Id.* at 805-07, 811. Even though the Ninth Circuit found that diabetes was a "contributing factor" to the insured's dismemberment loss, it held the loss was covered because diabetes was not enough of a factor to meet the "substantial contribution" test, something the court said applied to the policy as a matter of law. *Id.* at 808. The court explained that "[i]n order to be considered a substantial contributing factor for the purpose of a provision restricting coverage to direct and sole causes of injury, a pre-existing condition must be more than merely *a* contributing factor." *Id.* at 809 (emphasis original). The court reasoned that "a 'predisposition' or 'susceptibility' to injury,

whether it results from congenital weakness or from previous illness or injury, does not necessarily amount to a substantial contributing cause. A mere 'relationship' of undetermined degree is not enough.'" *Id*. at 808 (internal citations omitted).

32. Ultimately, the court held that there must be evidence showing that the preexisting ailment contributed a "significant magnitude of causation" and was a "substantial catalyst." *Id*. The preexisting condition cannot "merely [be] related to the injury." *Id*.

33. The second case, *Estate of Maurice*, also involved an accident, diabetes, and an amputation. *See Estate of Maurice*, 792 F.App'x at 500. The exclusion in dispute there was similar to that in *Dowdy*. However, as opposed to the serious car accident in *Dowdy*, the claimant in *Maurice*'s accident was that he simply stepped on some glass. *See id*. Like in *Dowdy*, the claimant's diabetes stopped the injury from healing properly and resulted in part of his leg being amputated. The *Maurice* court ruled that the injury was sufficiently minor that the diabetes was a much more significant catalyst of the cause of the amputation. *See id*.

34. Here, the pre-existing conditions Guardian asserts were excluded are depression and anxiety, conditions so minimal that they did not even register on the last tests before the lookback period in Plaintiff's medical records. (AR:881). Based on the Record, the Court concludes that Plaintiff would have become psychotic even without his prior mild depression and anxiety.

## General Conclusions of Law

35. The medical evidence in the Record supports Plaintiff's claim that his diagnoses, accompanying symptoms, and functional restrictions prevented him from performing his own usual occupational duties in the usual and customary way.

36. Following a de novo review of the available evidence, the Court finds that Plaintiff was disabled from performing his usual occupation due to various conditions that were not connected to Plaintiff's pre-existing conditions. These

conditions include hyperkinetic movement disorder, TA, TD, and Psychosis. His disability is not excluded by the pre-existing condition exclusion.

37. For all these reasons, Plaintiff is disabled under the terms of Guardian's policy under a de novo determination of the available evidence. The Court concludes Guardian's denial decision was incorrect and is hereby overturned by this Court.

38. The Court awards Plaintiff his past-due LTD benefits from March 25, 2021 through March 2022, pre-judgment interest thereon, and attorneys' fees and costs.

39. Plaintiff has achieved "some degree of success on the merits" under *Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242 (2010) and is therefore entitled to reasonable attorneys' fees and costs in this action.

40. The parties are to meet and confer on a Proposed Judgment, consistent with the Findings of this Order and Plaintiff is to submit the same to the Court within ten (10) days of the date of these findings. Thereafter, the parties are to meet and confer regarding attorneys' fees. If the parties are unable to reach an agreement regarding the amount of fees, Plaintiff may submit his fee motion to the Court within thirty (30) days of Judgment.

Dated: May 9, 2024

*/s/ David O. Carter*

HON. DAVID O. CARTER
UNITED STATES DISTRICT COURT JUDGE

Case No.: 8:23-cv-01579-DOC-ADS